**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| ROY LEE WARD, | ) | |
| | ) | |
| *Petitioner,* | ) | Case No. _____ |
| | ) | |
| v. | ) | CAPITAL HABEAS |
| | ) | |
| RON NEAL, WARDEN | ) | **EXECUTION SCHEDULED** |
| | ) | **OCTOBER 10, 2025** |
| *Respondent.* | ) | **BEFORE THE HOUR OF SUNRISE** |


**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**
**UNDER 28 U.S.C. § 2254 RAISING NEWLY RIPENED EIGHTH AMENDMENT CLAIM**

Laurence E. Komp, MO Bar No. 40446
Michelle M. Law, MO Bar No. 45487
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
michelle_law@fd.org

*Attorneys for Roy Lee Ward*

1

The State of Indiana plans to execute Roy Lee Ward on October 10, 2025, before the hour of sunrise. Ward is currently incarcerated, as he has been for over two decades, at Indiana State Prison and in the custody of Respondent, Warden Ron Neal.

Recently, the Respondent Warden oversaw the execution of Benjamin Ritchie where something went wrong.

- During the execution, Amanda Johnson saw Ritchie "suddenly and strongly" raise his torso up from the gurney but was held back by the restraints. (Exhibit A at 3). Ritchie seemed to be trying to break out of "something." *Id.* This happened about two to three minutes after the blinds covering the viewing window first opened. Ritchie's sudden reaction lasted five to six seconds. It was upsetting to Johnson, and she remembers saying to Attorney Mark Koselke, "I don't think I can do this. I can't do this." *Id.*

- Attorney Steven Schutte remembers Ritchie "violently lurched forward and up as if to sit up, but he was restrained." (Exhibit B at 2). Schutte said it was almost like a spasm that lasted three to five seconds, after which Ritchie laid back down. *Id.*

- Attorney Mark Koselke describes similar events. (Exhibit C). He remembers that after Ritchie started to become motionless, he "seemed to shoot up" like "he was doing a crunch" because his head and shoulders lifted sharply from the gurney. (*Id.* at 2). He remembers Amanda Johnson being so startled by Ritchie's movements that she grabbed his arm. *Id.* Koselke remembers Ritchie lifting up for "about three to five seconds." *Id.* He then began focusing on Ritchie's chest and counted about six to seven breaths, each one becoming shallower until Ritchie stopped breathing. *Id.* at 2 -3. Koselke also remembers Ritchie's spiritual advisor looking "horrified" as he was escorted from the chamber. *Id.* at 3.

- Mitigation Specialist Hannah Hall reported when the blinds opened allowing her to see into the chamber, Ritchie's feet were moving. (Exhibit D at 2-3). She remembers Ritchie "settl[ing] down a little" and not moving as much as when the blinds were first opened. *Id.* at 3. Then Ritchie's "upper body jerked up" and although restrained, "his head and shoulders came up." *Id.* She remembers it being so "violent and so unexpected" that Amanda Johnson punched Mark Koselke's arm. *Id.* Ritchie lifted for about two to three seconds. *Id.* When this happened, she noticed Ritchie's spiritual advisor startle and "push back" in his chair. *Id.*

- Ritchie's spiritual advisor who was present in the chamber was interviewed by Kathleen Cleary, an attorney licensed in Indiana and a mitigation investigator with the Capital Habeas Unit of the Federal Defender for the Western District of Missouri. The spiritual advisor was reluctant to sign an affidavit about what he

witnessed during the execution because he signed a document promising not to reveal the identity of those involved in Ritchie's execution. He also fears that if he signs an affidavit, the Indiana Department of Correction (IDOC) will not allow him to continue his prison ministry. (Exhibit E at 2).[1] Cleary prepared an affidavit documenting her interview with the spiritual advisor, which she reviewed with him to ensure accuracy before signing it. The spiritual advisor told Cleary that after the execution began, Ritchie lifted several inches off the gurney and against the restraints. *Id.* at 1. Ritchie's struggle against the restraints startled the spiritual advisor so much that he pushed back against the chair he was sitting in. *Id.* He told Cleary this lasted about two seconds, and when Ritchie laid back down, it was about five seconds later when Ritchie was "gone." *Id.*

Most likely Ritchie's reaction was due to a problem with the drug being administered. *See* Exhibit F at ¶ 74-79. Dr. Michaela Almgren, a Doctor of Pharmacy, reviewed the witnesses' accounts and noted the reactions they observed and reported those reactions were not consistent with the usual operation of pentobarbital. Dr. Almgren also noted that Ritchie's reported reaction to the drug indicated that the drug may have been compromised in some way. *Id*. at ¶ 76-78. Specifically, Dr. Almgren stated, "Overall, the witnesses' accounts were highly consistent in describing Mr. Ritchie's intense and forceful movements, raising concerns about both the drug's effect and potential gaps in the execution protocol." *Id*. at ¶ 77. The doctor concluded, "The unexpected reaction raises questions about the quality and effectiveness of the pentobarbital used, as it did not produce the expected effect. Concerns include the drug's potency, purity, overall quality, pH and stability, as well as the possibility that it may have precipitated or undergone oxidation over time, potentially reducing its strength and effectiveness." *Id*. at ¶ 79.

---

[1]This is not an unreasonable belief. In the past, IDOC has punished pastoral and religious actors if they act contrary to the state's execution agenda. *Schornhorst ex. rel. Fleenor v. Anderson*, 77 F. Supp. 2d 944, 953-54 (S.D. Ind. 1999) (warden denied death row defendant access to his Catholic priest when he provided observations regarding individual's mental health). The Seventh Circuit has noted correctional doctors treating those persons on Indiana's death row have considered  the influence exerted by IDOC in making treating decisions. *Holmes v. Levenhagen*, 600 F.3d 756, 762 (7th Cir. 2010) (in *Holmes*, these were internal notes and an email from the DOC doctor – he didn't testify) .

In addition, Dr. Almgren points out there are concerns with the Indiana State Prison's execution protocols. *Id*. at ¶ 80–86.[2] Her review of the protocols revealed numerous gaps and deficiencies throughout the process that are troublesome. One area of concerns is "[t]he staff selected for the Execution Team are not licensed to perform medical procedures or to compound and prepare drugs." *Id*. at ¶ 81. Although proficiency in placing IVs requires extensive training and practice, the protocols do not specify whether the selected individuals on the execution team are so qualified. *Id*. at ¶ 82.

The concerns with the protocol do not stop with the training of the staff. Dr. Almgren points out that the protocols do not mention how the drug will be handled. Specifically, there appears to be no chain of custody requirements which leaves "significant risk that the drug could be manipulated, contaminated, or otherwise compromised at any point before use." *Id*. at ¶ 85. Additionally, storing pentobarbital properly is essential for potency and stability. *Id*. at ¶ 84. "Storage environments should be continuously monitored for temperature and humidity to ensure the drug remains uncompromised, with all measurements carefully recorded. However, the current execution procedure makes no mention of such monitoring or documentation, raising significant concerns about the integrity and quality of the drug used in lethal injections." *Id*.

---

[2] Outrageously, Indiana has spent $1.175 million on just four doses of a lethal injection drug, presumably pentobarbital, and two doses expired before being used. *See Casey Smith*, "*Braun clarifies Indiana acquisition of execution drugs; reveals more than $1M spent*," INDIANA CAPITAL CHRONICLE (June 24, 2025),https://indianacapitalchronicle.com/2025/06/24/braun-clarifies-indiana-acquisition-of-execution-drugs-reveals-more-than-1m-spent/ ("Indiana spent more than $1M in taxpayer funds to purchase four doses of execution drugs – some of which were used, and several others that expired."), and *Casey Smith*, "*Braun says Indiana is out of execution drugs, signals willingness to debate capital punishment*," INDIANA CAPITAL CHRONICLE (June 4, 2025),  https://indianacapitalchronicle.com/2025/06/04/braun-says-indiana-is-out-of-execution-drugs-signals-willingness-to-debate-capital-punishment ("Governor Braun also said the State of Indiana does not intend to buy more, 'at least not for now.'"). The waste, fraud, and abuse amounts to approximately a quarter million per execution dose.

Ward raised and attempted to present an Eighth Amendment claim to the Indiana Supreme Court once it became ripe. Exhibit G (Ward's Successor Request with Exhibits). Without argument or any evidentiary process, the Indiana Supreme Court denied Ward's attempt, without addressing the arguments, but indicating Ward should pursue remedies in federal court, overruling *sub silencio* two decades of Indiana precedent to the contrary. Exhibit H (*Ward v. State*, 264 N.E.3d 637 (Mem.)(Ind. 2025)). A dissenting justice noted that this Eighth Amendment claim only recently ripened, stating that the claim "ripened only when we set a tentative execution date." *Id.* at 641 (Goff, J., concurring and dissenting in part).

The majority unreasonably failed to comply with past Indiana practices and review the merits. The majority unreasonably failed to consider the uncontested affidavits demonstrating that something went wrong with the last execution. The majority unreasonably failed to consider the uncontested medical and scientific evidence supporting those affidavits demonstrating that the execution drugs did not work as designed.

The Eighth Amendment prohibits only a "method of execution" that is "deliberately designed to inflict pain." *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in judgment). To execute Ward via a method known not to work is deliberately designed to inflict pain. Indiana seemingly intends to use the same flawed procedure that caused Ritchie to violently spasm and writhe on the table as his horrified Spiritual Advisor and witnesses watched.

## PROCEDURAL HISTORY

On July 11, 2001, an unspeakable tragedy occurred. Ward murdered and raped Ms. Stacy Payne. Horrifically, Stacy was found in the kitchen, naked from the waist down; her throat had been cut, and she had a deep wound from her abdomen to her back. She valiantly fought and survived for four hours before succumbing to her injuries.

A jury convicted Ward. Following the jury's recommendation, the trial court sentenced Ward to death on the murder conviction. However, the Indiana Supreme Court reversed Ward's convictions and sentences on direct review, finding that Ward's constitutional right to a fair trial was violated when the trial court failed to grant Ward a change of venue. *Ward v. State* (*Ward I*), 810 N.E.2d 1042 (Ind. 2004).

On remand from the Indiana Supreme Court, Ward pleaded guilty to the murder and rape charges. Bypassing a guilt phase and proceeding directly to a penalty phase trial, the jury recommended a death sentence. On June 8, 2007, the trial court sentenced Ward to death. The Indiana Supreme Court affirmed Ward's death sentence on April 7, 2009. *Ward v. State* (*Ward II*), 903 N.E.2d 946 *aff'd on reh'g*, *Ward v. State*, 908 N.E.2d 595 (Ind. 2009). The United States Supreme Court denied Ward's request for review. *Ward v. Indiana*, 559 U.S. 1038 (2010).

On January 15, 2010, Ward filed a state petition for post-conviction relief, which was twice amended thereafter. After an evidentiary hearing, the trial court quickly denied the petition on November 10, 2010. The Indiana Supreme Court affirmed the denial of post-conviction relief. *Ward v. State* (*Ward III*), 969 N.E.2d 46 (Ind. 2012).

On March 4, 2013, Ward timely filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Indiana. The matter proceeded before the Southern District of Indiana in *Ward v. Wilson*, Case No. 3:12-cv-192-RLY-WGH. On September 22, 2015, the district court denied relief on all claims, but reserved ruling on a certificate of appealability. Case No. 3:12-cv-192 (Doc. 28). On December 3, 2015, the Court denied Ward's motion to alter and amend. Case No. 3:12-cv-192 (Doc. 33).

After a partial grant of a certificate of appealability, the Seventh Circuit Court of Appeals affirmed the denial of federal habeas relief. *Ward v. Neal*, 835 F.3d 698 (7th Cir. 2016).

6

Subsequently, the Supreme Court denied Ward's petition for writ of certiorari. *Ward v. Neal*, 581 U.S. 995 (2017).

On June 27, 2025, the State of Indiana moved the Supreme Court of Indiana to set an execution date for Ward. When the Indiana Supreme Court granted Ward's request for an extension to respond, the court tentatively set Ward's execution to occur on October 10, 2025, before sunrise. Exhibit I (July 7, 2025 Indiana Supreme Court Order (Case No. 25S-SD-167)).

On July 30, 2025, Ward filed his objection to setting an execution date and sought permission from the Indiana Supreme Court to file a successive petition for post-conviction relief based on newly-ripe claims challenging Indiana's Lethal Injection protocol. Exhibit G (Ward's Successor Request with Exhibits). The State responded. Exhibit J (State's Response). Ward received leave to file a reply. Exhibit K (Ward's Reply with Exhibits).

On August 27, 2025, the Indiana Supreme Court denied Ward's motion for permission to file a successive post-conviction petition and set Ward's execution date for October 10, 2025, before the hour of sunrise. Exhibit H (*Ward*, 264 N.E.3d 637 ). The majority premised its denial on the basis that Ward could not file his Eighth Amendment claim via a successor request. *Id.* at 638-39.

The dissent disagreed and noted that "Ward can make a subsequent civil-rights claim *or* request to file a successive PCR petition." *Id.* at 642-43(Goff, J., concurring and dissenting in part). As noted by the dissent, the majority departed from Indiana past practices and precedent, and a concession from the State:

> If Ward seeks to set aside his death sentence because the method is cruel and-unusual punishment, post-conviction proceedings provide the proper avenue for relief. The State itself acknowledges that "this Court has traditionally addressed the merits of method-of-execution claims under the Eighth Amendment in the post-conviction context."

*Id.*

On September 2, 2025, Ward filed for rehearing. Exhibit L. On September 8, 2025, the State filed a response. Exhibit M. On September 10, 2025, the Indiana Supreme Court denied rehearing by the identical 4-1 vote. Exhibit N (September 10, 2025 Indiana Supreme Court Order (Case No. 25S-SD-167)).

### RELEVANT FACTS RELATED TO THE EIGHT AMENDMENT CLAIM

As noted above, the pentobarbital simply did not work correctly during the last execution in Indiana. Instead, there was a dramatic and violent reaction during the execution. The State does not contest something went wrong. However, with knowledge that something is wrong comes intent. And thus, Ward can satisfy the "intent" factor of the Eighth Amendment analysis because the Eighth Amendment prohibits only a "method of execution" that is "deliberately designed to inflict pain." *Baze*, 553 U.S. 35. The State now seeks to deliberately execute Ward via a method that does not work when the State has alternatives, including easily administering an opiate prior to the pentobarbital, use of a firing squad or nitrogen gas.

### NEWLY RIPENED CLAIM A SECOND-IN-TIME NON-SUCCESSIVE CLAIM

Ward expects Respondent to suggest that this is an improper successive habeas petition. However, the facts leading to this allegation only occurred in May 2025. As noted by the only Indiana State Jurist to discuss the merits, Justice Goff, pointed out that this Eighth Amendment claim only recently available for review, stating that the claim "ripened only when we set a tentative execution date." Exhibit H *Ward,* 264 N.E.3d at 641(Goff, J., concurring and dissenting in part). Justice Goff cited *Isom v. State*, 170 N.E.3d 623, 653 (Ind. 2021), where the Indiana Supreme Court had previously affirmed the post-conviction court's denial of Isom's discovery

request for the state's lethal-injection protocol because the State had set "no execution date" and "did not know which substances or method would be used to execute him." *Id.*

A second in time claim is not a successor. *Magwood v. Patterson*, 561 U.S. 320, 330–31 (2010). A petition is not second or successive when it raises a claim that was unripe for review when the first habeas petition was filed. *Panetti v. Quarterman*, 551 U.S. 930, 945–47 (2007) (addressing a second habeas petition raising a *Ford*-based incompetency claim). A claim is unripe when the events giving rise to the claim have not yet occurred. The events giving rise to Ward's claims occurred this past May, when Indiana administered a flawed execution drug.

Ward stakes out a position consistent with the Indiana Supreme Court's acceptance of **the State's legal argument** in *Isom v. State*, 170 N.E.3d 623 (Ind. 2021). As noted in *Isom*, "The post-conviction court denied Isom's request based on the *State's objection* that it had no execution date set for Isom and did not know which substances or method would be used to execute him." *Id.* at 653 (emphasis added). The State argued this too in *Isom*, that methods litigation was premature, but below in state court they flip flopped.

## Prior Counsel

Barbara Coyle Williams and Scott A. Blazey, of Evansville and Jasper, Indiana, respectively, represented Ward at his first trial.

Steven E. Ripstra and Lorinda Meier Youngcourt, of Jasper and Huron, Indiana, respectively, represented Ward on direct review from his first trial, at his second trial, and on direct review of his second trial.

Thomas Hinesley and Laura Volk, of the Office of the State Public Defender, Indianapolis, Indiana, represented Ward during state post-conviction proceedings.

Marie Donnelly and Laurence Komp appointed Criminal Justice Act attorneys represented Ward in the first in time habeas proceedings before the Southern District of Indiana and the Seventh Circuit.

Joanna Green and Laura Volk, of the Office of the State Public Defender, Indianapolis, Indiana, represented Ward during his successor state post-conviction request.

## <u>GROUND FOR RELIEF</u>

I.    **Executing Ward would violate the Eighth Amendment because his execution with compromised drugs would be intentionally and deliberately designed to inflict pain.** *Baze v. Rees*, **553 U.S. 35, 94 (2008).**

The Eighth Amendment prohibits states from inflicting cruel and unusual punishment. Problems with Ritchie's execution present a substantial risk that Ward will be intentionally subjected to and suffer severe pain during his execution in violation of the Eighth Amendment. The State knows something with the pentobarbital went wrong as Ritchie died. Yet, they intend to use the same flawed drugs to proceed with Ward's execution without addressing the problems with the previous one.

The Eighth Amendment forbids "the infliction of unnecessary pain in the execution of the death sentence." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947). Cruel punishments are those that involve pleasure in hurting others or involve intentional hard-heartedness, inhumanity and a lack of compassion. *See Bucklew v. Precythe*, 587 U.S. 119, 130-31 (2019) (citing historical definitions of "cruel" to explain what cruel and unusual punishments are in the constitutional sense). Cruel punishments also involve mental pain and torment. *Id.*

Five witnesses to Ritchie's execution on May 20, 2025, report torment. After pentobarbital was administered, Ritchie experienced symptoms consistent with unnecessary pain

and suffering. All five witnesses report seeing Ritchie's upper torso suddenly lurch upward against the physical restraints holding him to the gurney.

The problem with the use of pentobarbital to execute people is not just an Indiana problem. The federal government subjected it to intense scrutiny because of the likelihood it inflicts needless pain and suffering in violation of the Eighth Amendment. On January 25, 2025, Attorney General Merrick Garland directed the Director of the Federal Bureau of Prisons to rescind the addendum to the federal execution protocol first put in place on July 25, 2019, which provided for lethal injection by pentobarbital because after careful study, "it cannot be said with reasonable confidence that the current execution protocol 'not only afford[s] the rights guaranteed by the Constitution and laws of the United States' but 'also treat[s] individuals [being executed] fairly and humanely.'" (Exhibit O at 2).  Garland wrote that the Department of Justice should "err on the side of treating individuals humanely and avoiding unnecessary pain and suffering." *Id.*[3]

This month, Tennessee carried out a lethal injection using pentobarbital which resulted in a scene like Ritchie's execution. The prisoner, Byron Black, lifted his head off the gurney several times and, because the witnesses can hear what is happening inside the execution chamber, said "oh, it's hurting so bad" as the drugs flowed. *See* Jonathan Mattise, "Attorney says heart device did not shock Tennessee man in execution who said he was 'hurting so bad'", AP (August 8, 2025), https://apnews.com/article/tennessee-execution-defibrillator-

---

[3] In Arizona, the Governor hired a retired federal magistrate to review execution procedures after several botched executions. The magistrate concluded lethal injection was not a "viable method of execution in actual practice." However, the Governor dismissed the magistrate prior to his report being finalized and released. *See* Emily Holshouser, "*Death penalty foes want Hobbs to publish the independent report she spiked,*" AZ MIRROR (December 12, 2024), https://azmirror.com/2024/12/12/death-penalty-foes-want-hobbs-to-publish-the-independent-report-she-spiked/.

beb6d03ec645080f4e26d67b0bd61a41?user_email=e26d88715de7c2cc4ded7dcbd3cde741ce674 ea5baf7aacc4b2bfeabba952e5b&utm_medium=Afternoon_Wire&utm_source=Sailthru_AP&ut m_campaign=AfternoonWire_Fri_Aug8_2025&utm_term=Afternoon%20Wire. Subsequent forensic pathology reveals the existence of pulmonary edema — a form of lung damage that can cause a drowning sensation. *See* Catherine Sweeney, "*Autopsy sheds light on Byron Black's painful execution,*" WPLN News (September 11, 2025), https://wpln.org/post/autopsy-sheds-light-on-byron-blacks-painful-execution/.

The evidence that something went wrong is stark and uncontradicted. Amanda Johnson saw Ritchie "suddenly and strongly" raise his torso up from the gurney but was held back by the restraints. (Exhibit A at 3). So much so, she said "I don't think I can do this.  I can't do this." *Id.* Attorney Schutte also describes that Ritchie "violently lurched forward and up as if to sit up, but he was restrained." (Exhibit B at 2). Attorney Koselke remembers that after Ritchie started to become motionless, he "seemed to shoot up" like "he was doing a crunch" because his head and shoulders lifted sharply from the gurney. (Exhibit C at 2). Koselke also remembers Ritchie's spiritual advisor looking "horrified" as he was escorted from the chamber. (*Id.* at 3). Hannah Hall remembers Ritchie's "upper body jerked up" and it being "so violent and so unexpected." (Exhibit D at 3).

Indiana is likely using compounded pentobarbital in executions. This can be ascertained from Governor Mike Braun's comments to the media about the drugs purchased expiring, *See* Tim Spears, "*Indiana allowed some lethal injection drugs to expire,*" WISHTV.COM (June 4, 2025), https://www.wishtv.com/news/i-team-8/indiana-allowed-some-lethal-injection-drugs-to-expire/, and his reluctance to purchase more drugs with a 90 day shelf life, *See* Casey Smith, "*Braun says Indiana is out of execution drugs, signals willingness to debate capital*

*punishment,"* INDIANA CAPTIAL CHRONICLE (June 4, 2025),

https://indianacapitalchronicle.com/2025/06/04/braun-says-indiana-is-out-of-execution-drugs-signals-willingness-to-debate-capital-punishment/. Manufactured drugs have a shelf life of two to three years. Exhibit F at ¶ 35. Compounded drugs have a much shorter shelf life. *Id.* at ¶ 36. The reasonable conclusion based on Gov. Braun's comments is that Indiana purchased compounded drugs. *Id.* at ¶ 37

 The difference between manufactured and compounded drugs is not just their longevity. Compounded drugs are less stable, and errors are common. *Id.* at ¶ 40, 67-69. Compounded pentobarbital must be dissolved in a liquid and precipitates and suspensions can form which can cause extreme pain and suffering from severe tissue injury, thromboembolism, suffocation or other respiratory distress. *Id.* at ¶ 50-57. These can all lead to an excruciatingly painful death. *Id.* at ¶ 57 ("leading to a slow and excruciatingly painful death . . . effects causing a prolonged death where the prisoner experiences suffocation, drowning or other severe respiratory distress."). Only pharmacies with extensive experience should prepare injectable pentobarbital and it should be done on special equipment. *Id.* at ¶ 58. Instead, Indiana allows execution drugs to be produced by unregulated entities that are not even considered pharmacies. *See* I.C. 35-38-6-1(e).

 Compounders are unregulated. They are not monitored by the FDA.  Exhibit F at ¶ 39-40. Indiana law specifically exempts entities making drugs for executions from regulation. I.C. 35-38-6-1(e) states compounding of lethal chemicals for execution (1) does not constitute the practice of pharmacy, and (2) is not subject to the jurisdiction of the Indiana board of pharmacy, the medical licensing board of Indiana, the Indiana department of health, or the Indiana professional licensing agency.

The instability of compounded pentobarbital and the resulting potential pain it can cause is the reason Ward needs access to the public records he requested months ago, not the non-responsive materials he recently received. Injectable pentobarbital must be:

- Made precisely. Exhibit F at ¶ 51-55;

- Transported correctly. *Id.* at ¶ 68 ("Transportation conditions can significantly impact the quality and stability of compounded drugs. Factors such as exposure to extreme temperatures, excessive humidity, and direct light can accelerate chemical degradation, reduce potency, or promote microbial growth. Timing is also critical, as prolonged transit or delays can allow these environmental factors to compromise the product."); and,

- Stored properly. *Id.* at ¶ 69 ("Storage conditions play a critical role in maintaining the quality of compounded drugs. Improper temperature, humidity, or light exposure can lead to chemical degradation, reduced potency, or microbial contamination.").

If the drug has precipitated out of the solution, the potency is lower and can lead to a slow, excruciating death. *Id.* at ¶ 56-57. Much can go wrong in the making, transporting, storing and administration of the lethal injection drugs. It seems that in Indiana's last execution, something did as evidenced by the physical response to what was likely excruciating pain.

The pentobarbital did not work as designed during Ritchie's execution, **a fact that the State does not contest**. There simply should be no movement that late in an execution if the pentobarbital was working as the State desired in an execution. Such sudden and violent movement demonstrates the obvious pain Ritchie felt as what must have been defective pentobarbital coursed through his veins. To permit Ward's execution to proceed under the same conditions would create "a substantial risk of serious harm" and an "objectively intolerable risk of harm" that would prevent prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Baze*, 553 U.S. at 50. Indeed, given what is

known regarding Ritchie's problematic execution, the State would be intentionally causing needless and excessive pain.

　　If pentobarbital is working as designed, there is movement voluntarily or involuntarily. As noted in news articles immediately after the execution, a professor emeritus from the Ohio State University College of Medicine said, "It should be really, really effective – really fast. No one should move . . . It's just lights out, go to sleep, no reaction, no coughing, no nothing. They just don't move." *See* Casey Smith, *"'Violent' moment during Indiana execution draws scrutiny; DOC official deny 'botched' process,"* INDIANA CAPITAL CHRONICLE (May 22, 2005), https://indianacapitalchronicle.com/2025/05/22/violent-moment-during-indiana-execution-draws-scrutiny-doc-officials-deny-botched-process/.

　　Dr. Almgren indicated such movement is impossible when pentobarbital is working: "Due to its rapid distribution and predictable pharmacologic profile, the drug should act quickly and evenly . . . ensuring the person simply falls asleep and remains unconscious without experiencing distress or abnormal reactions." Exhibit F at ¶ 78. Thus, the Ward execution conditions create "a substantial risk of serious harm" and an "objectively intolerable risk of harm" that would prevent prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Baze*, 553 U.S. at 50.

**A. This claim is properly before the Court.**

　　Ward properly exhausted his Eighth Amendment claim. Previously, in Indiana, a prisoner must request permission from the Indiana Supreme Court to file a petition containing a methods claim as a successive post-conviction petition. *Bieghler v. State*, 839 N.E.2d 691 (Ind. 2005); *Johnson v. State*, 827 N.E.2d 547 (Ind. 2005). Indeed, the State twice before the Indiana Supreme Court conceded this was the process: 1) in a footnote the State noted the Indiana Supreme

Court's long-standing precedent recognizing these claims as cognizable in Indiana successive post-conviction proceedings (Exhibit P at 14 n.1 (State's Opposition)); and, 2) citing *Bieghler* and *Johnson* in the opposition to rehearing. (Exhibit M p. 7). But the Indiana Supreme Court has now changed its position and the law regarding methods claims, refusing to examine whether Ward's impending execution will be (avoidably) excruciating and thus unconstitutional.

The change in law should not be given effect to deprive Ward of review here. It is a simple and long-standing principle that a procedural rule must be already on the books to bar review. The Seventh Circuit's application of *Ford v. Georgia*, 498 U.S. 411 (1991), underscores the importance of ensuring that state procedural rules are firmly established and consistently followed at the time of the alleged default. In *Ford*, the Court held that a procedural rule adopted after the defendant's trial could not serve as an adequate ground for procedural default because it was not in place or enforced at the time of the defendant's actions. *Liegakos v. Cooke*, 106 F.3d 1381 (7th Cir. 1997). The Seventh Circuit has adhered to this principle, emphasizing that retroactive application of procedural rules is impermissible for barring federal habeas review. *Timberlake v. Davis*, 409 F.3d 819 (7th Cir. 1997).

The Seventh Circuit has also emphasized that procedural rules applied inconsistently or in an unprincipled manner are inadequate to bar federal review. In *Smith v. McKee*, 598 F.3d 374 (7th Cir. 2010), the court noted that procedural rules must be clearly established and consistently followed to preclude federal habeas review. Rules applied in a "freakish" or inconsistent manner fail to meet this standard. *Johnson v. Thurmer*, 624 F.3d 786 (7th Cir. 2010). Finally, the Seventh Circuit has recognized that federal habeas review is not foreclosed if the state procedural rule was not firmly established at the time of the alleged default. This principle ensures that

defendants are not penalized for failing to anticipate future changes in procedural law.

*Timberlake*, 409 F.3d 819; *Liegakos v. Cooke*, 108 F.3d 144 (7th Cir. 1997).

This is a proper habeas claim. *Preiser v. Rodriguez*, 411 U.S. 475 (1973). The Supreme

Court noted in *Nelson v. Campbell*, 541 U.S. 637, 644 (2004), "In a State such as Alabama,

where the legislature has established lethal injection as the preferred method of execution, [] a

constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to

a challenge to the fact of the sentence itself."

**B. This Court should conduct a *de novo* review.**

Whether §2254(d) applies to a claim depends on how the state court addressed the claim.

Section 2254(d) provides: "an application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted with respect to any claim

that was adjudicated on the merits in State court proceedings. . . ." (emphasis added). If the state

court failed to resolve the merits of the claim entirely or failed to reach any component of the

standard prescribed for the claim by federal law, then §2254(d) is inapplicable and does not

prevent the federal court's analysis of a claim or component of a claim. *E.g.*, *Wiggins v. Smith*,

539 U.S. 510, 534 (2003) (addressing an ineffective assistance of counsel claim under *Strickland*,

reviewed prejudice *de novo* because the state courts never reached the issue of prejudice);

*Sussman v. Jenkins*, 642 F.3d 532, 533-534 (7th Cir. 2011). The Indiana Supreme Court has not

addressed the merits of Ward's claim, and so the Seventh Circuit applies *de novo* review. *Caffey*

*v. Butler*, 802 F.3d 884, 904 (7th Cir. 2015); *Ruhl v. Hardy*, 743 F.3d 1083, 1091 (7th Cir. 2014).

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should apply *de novo* review and find that the

evidence presented establishes a substantial threshold showing that the Eighth Amendment will

be violated if Indiana executes Ward with the same type of drugs and same process as the

botched May 2025 execution. This Court should issue a stay, grant the writ of habeas corpus,

vacate Ward's sentence of death, and grant any other relief this Court deems just.

Respectfully Submitted,

**/s/ Laurence E. Komp**
Laurence E. Komp, MO Bar No. 40446
Michelle M. Law, MO Bar No. 45487
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
michelle_law@fd.org

*Attorneys for Roy Lee Ward*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2025, I electronically filed the foregoing pleading
with the Clerk of the Court using the CM/ECF system and sent it via email to Tyler Banks, Office
of Indiana Attorney General, at Tyler.Banks@atg.in.gov.

/s/ Laurence E. Komp
Laurence E. Komp

18