# FORM FOR SUCCESSIVE POST-CONVICTION RELIEF RULE 1 PETITIONS

*(To Be Filed With Petition For Post-Conviction Relief)*

| | | |
|---|---|---|
| Roy Lee Ward, | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 25S-SD-00167 |
| | ) | |
| State of Indiana, | ) | |
| Appellee. | ) | |

## INSTRUCTIONS - READ CAREFULLY

If you have previously filed a Petition for Post-Conviction Relief directed to this conviction or these convictions and the earlier petition was decided on the merits, you must fill out this form and file it along with your Petition. It must be legibly handwritten or typewritten, signed by the petitioner, and affirmed under the penalties for perjury. Since this must be signed under oath, any false statement of a material fact herein may serve as the basis of prosecution and conviction for perjury. Exercise care to be sure all answers are true and correct.

You must mail the original and two copies of this form along with your petition to the Clerk of the Supreme Court and Court of Appeals, 200 West Washington Street, Room 216, Indianapolis, IN 46204-2732. The Clerk will refer your petition to the Supreme Court in death penalty cases and the Indiana Court of Appeals in all other cases. The court will then decide whether your petition may be filed in the trial court where your first Post-Conviction Remedy Rule 1 petition was adjudicated.

NOTE:  The court will allow a second or successive petition for post-conviction relief to be filed if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief.  However, a petitioner does not establish a reasonable possibility that the petitioner is entitled to post-conviction relief, for example, (1) if the petitioner only alleges grounds for relief that are not different from those which have already been decided on the merits, or (2) if the only grounds alleged, even if different, should have been alleged in an earlier proceeding.

In addition to this form, you may submit no more than fifteen (15) pages, double-spaced, to provide supporting facts. You may also submit exhibits. Any citation of authorities should be avoided and is only appropriate if there has been a change in the law since the judgment you were attacking was entered. Your answer(s) should be confined to relevant facts and must not include legal arguments.


1. Were you represented by an attorney on your prior Petition for Post-Conviction Relief?

        Yes __X_ No ___

If yes, name(s) and address(es) of attorney(s).
        Laura Volk
        Office of the Public Defender of Indiana
        One North Capitol, Suite 800
        Indianapolis, IN 46204

        Thomas Hinesley
        Formerly of the Office of Public Defender, now deceased

Proceedings at which each attorney represented you:

        Drafting Petition for Post-Conviction Relief _____X_____

        Hearing of Petition for Post-Conviction Relief _____X_____

        Appeal of denial of Petition for Post-Conviction Relief _____X_____


2. Was there a hearing on your prior Petition?

        Yes _X__ No ___

3. If the Petition was denied, did you appeal?

        Yes _X__ No ___

If yes, please state result on appeal, date of decision and citation of case if known:

The Indiana Supreme Court affirmed the denial of post-conviction relief on June 21,

2012, *Ward v. State,* 969 N.E.2d 46 (Ind. 2012), *rehearing denied* September 7, 2012.

4. If you are alleging ground(s) for relief which were raised in your previous Petition,
explain why you feel consideration is merited:

Ward seeks permission to raise claims not available to him at the time he filed his

first petition. More specifically, his proposed claims concern Indiana's lethal injection

protocol Method 2, a one-drug (pentobarbital) lethal injection protocol was not in effect

at the time Ward filed his post-conviction petition.

5. If your Petition raises new grounds which were not included in your prior Petition,
explain why you are raising these grounds now. Your explanation should rely on FACTS,
not your opinions or conclusions:

Ward does not claim the newer one-drug protocol is *per se* a cruel and unusual

punishment under the Eighth Amendment of the U.S. Constitution and Article One,

Section 16 of the Indiana Constitution. Instead, he claims his execution in particular

carries the substantial risk of needless pain and suffering Benjamin Ritchie appeared to

experience during his execution on May 20, 2025. Five witnesses remember that after the

pentobarbital was injected, Ritchie lurched upward against his restraints as if he was

doing a crunch in a sudden motion lasting for seconds. Given Ritchie's experience and

the likelihood the State will carry out Ward's execution in the same way, there is a

substantial risk Ward's execution will involve needless pain and suffering in violation of

the Eighth Amendment to the U.S. Constitution and Article One, Section 16 of the
Indiana Constitution.

Ward also seeks to raise claims related to the State's refusal to answer repeated
public records requests for non-protected information related to its lethal injection
protocol. To this day, the only information disclosed is the number of doses the State has
purchased in the last year, the total cost of those doses (so far) and that some doses
expired presumably before being used. This information was not disclosed in response to
a public records request, however, the Governor told the news media in his public call to
have the legislature examine the death penalty in Indiana in light of the exorbitant cost of
the lethal injection drug. None of Ward's public records requests are for information
"reasonably calculated to lead to the identity" of the lethal-injection drug supplier,
including employees and contractors, the only information protected from disclosure. *See*
IC § 35-38-6-1(f). The State's failure to disclose public information related to its
protocol unduly interferes with Ward's First Amendment right to petition the state for
redress of grievances, which includes access to courts. *See Snyder v. Nolen*, 380 F.3d
279, 291 (7th Cir. 2004)("The right of access to the courts is the right of an individual,
whether free or incarcerated, to obtain access to the courts without undue interference.").
Ward's proposed claims have a reasonable basis in law and fact, and his right to pursue
them is not only protected by the First Amendment right to petition for redress of
grievances, but also the Fourteenth Amendment right to substantive due process. *Id.*

Ward also seeks to raise claims related to the execution chamber itself, claims
which he could not have raised at the time of the first petition because it was unknown if

at the time of his execution the chamber itself would be new, part of a different building
or configured differently, if sounds from the chamber could be heard by witnesses during
the execution, or if the condemned inmate could see his witnesses immediately before
and during his execution.  Witnesses from Indiana's two most recent executions report
they could hear no sound emanating from the execution chamber.  It is now also known
that Ward will not be able to see his witnesses because the window between the chamber
and his witnesses is one-way glass. The lack of sound from the chamber violates the First
Amendment right of access to governmental proceedings (*See First Amendment Coalition
of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019)(" . . . First Amendment right
of access to governmental proceedings encompasses a right to hear the sounds of
executions in their entirety.")). Depriving Ward of his ability to see his witnesses violates
his due process rights under the Fourteenth Amendment and Article One, Section 12 of
the Indiana Constitution because Ward will have no way of knowing whether the State
has complied with his request to have witnesses present at his execution.  Additionally,
depriving him of the opportunity to see his witnesses is cruel and unusual punishment
under the Eighth Amendment and Article One, Section 16 of the Indiana Constitution
because it deprives him of having the comfort of his witnesses in the final moments of his
life.

     Consideration of these claims is now warranted because at the time of his first
petition, his proposed claims were not ripe since no execution date had been set and the
substances and method of execution, and current characteristics of the execution chamber
were not known. *See Isom v. State*, 170 N.E.3d 623, 653 - 54 (Ind. 2021)(recognizing the

State's objection to providing discovery concerning the lethal injection protocol based on its argument the claim was not ripe since no execution date was set and it "did not know which substance or method would be used to execute him," and upholding the post-conviction court's dismissal of Isom's lethal injection challenge on the alternate ground Isom failed to articulate a cogent legal theory in support of his lethal-injection claim). Although the State has not publicly announced it intends to use Method 2 to execute Ward, in the two most recent executions, that of Joseph Corcoran and Benjamin Ritchie, post-mortem blood toxicology results revealed the presence of high levels of pentobarbital. This indicates that the State used Method 2, the one-drug protocol, to execute Corcoran and Ritchie. Thus, given the State's request to set an execution date comes on the heels of the Corcoran and Ritchie executions, there is reason to believe the State will also use Method 2 to execute Ward. The constitutional issues surrounding how Indiana carries out the death penalty are too important to not be addressed in a court of law.



Signature of Petitioner

I affirm, under the penalties for perjury, that the foregoing representation(s) is (are) true.

Signature of Petitioner

Respectfully submitted,

AMY E. KAROZOS
Public Defender of Indiana
Attorney No. 14429-49

By: /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

## Certificate of Service

I certify that on July 30, 2025, the foregoing **Form for Successive Post-Conviction Relief Rule 1 Petitions** was served upon the Tyler Banks, Supervising Deputy Attorney General, via the e-filing system with the Clerk of the Indiana Supreme Court, Court of Appeals, and Tax Court.

/s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender

Public Defender of Indiana
One North Capitol, Suite 800
Indianapolis, Indiana  46204-2026
Telephone:  (317) 232-2475

Received: 7/30/2025 2:26 PM
25S-SD-00167

| | | |
|---|---|---|
| State of Indiana | ) | In the Spencer Circuit Court |
| | ) | |
| County of Spencer | ) | Cause No. _____ |

| | | |
|---|---|---|
| Roy Lee Ward, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| State of Indiana, | ) | |
| | ) | |
| Respondent. | ) | |

## SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF

Roy Ward, by counsel, Laura Volk and Joanna Green, Deputies Public Defender,

under Ind. Post-Conviction Rule 1(12), having been granted permission to file a successive

petition by the Indiana Supreme Court, files this Successive Petition[1] for Post-Conviction

Relief.

### I.    Introduction

Roy Ward has been convicted of capital murder and sentenced to death.

The Indiana Supreme Court tentatively set his execution to occur on October 10, 2025,

between midnight and sunrise. (Cause No.  25S-SD-167, Order dated July 7, 2025).  What is

surprising is the Attorney General requested an execution date even though Governor Mike

Braun publicly called for the legislature to examine how Indiana carries out the death

penalty after revealing that since resuming executions in 2024, Indiana has spent $1.175

million on doses of a lethal injection drug, presumably pentobarbital, and multiple doses

---

[1] Ward refers to this petition as a "successive" petition, even though the claims raised herein
are new claims just now ripe for the Court's consideration. The statutory framework and
forms refer to petitions such as this as "successive" petitions.

1

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

expired before being used.  *See* Casey Smith, "*Braun clarifies Indiana acquisition of execution drugs; reveals more than $1M spent*," INDIANA CAPITAL CHRONICAL, June 24, 2025, available at https://indianacapitalchronicle.com/2025/06/24/braun-clarifies-indiana-acquisition-of-execution-drugs-reveals-more-than-1m-spent/ ("Indiana spent more than $1M in taxpayer funds to purchase four doses of execution drugs – some of which were used, and several others that expired.") *and* Casey Smith, "*Braun says Indiana is out of execution drugs, signals willingness to debate capital punishment*," INDIANA CAPITAL CHRONICLE, June 4, 2025, available at https://indianacapitalchronicle.com/2025/06/04/braun-says-indiana-is-out-of-execution-drugs-signals-willingness-to-debate-capital-punishment ("Governor Braun also said the State of Indiana does not intend to buy more, 'at least not for now.'").

Indiana's lethal injection protocol is shrouded in secrecy not because the legislature intends it to be, but because the Indiana Department of Correction ("IDOC") refuses to answer public records requests about the lethal injection drug it spends so much taxpayer money to purchase. This is counter to the purpose of the Access to Public Records Act which instituted a presumption in favor of disclosure to promote government transparency. Ind. Code § 5-14-3-1 and *Tax Analysts v. Indiana Econ. Dev. Corp.*, 162 N.E.3d 1111, 1118 (Ind. Ct. App. 2020). Ward's multiple public records requests for documents concerning how the lethal injection drug is transported and stored, and tested for quality and contamination, are unanswered. Although Indiana law shields from disclosure only information "reasonably calculated to lead to the identity" of the lethal injection drug supplier, including contractors and employees, Ward has requested no such information. And, even if the requested documents contain identifying information, the State could redact the identifying information and still comply with the request.  Indiana's failure to

2

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

disclose public information obstructs Ward's efforts to ensure his execution is carried out in

a manner consistent with his rights under the United States and Indiana Constitutions and

violates his First Amendment right to petition the government for redress of grievances and

his Fourteenth Amendment right to due process.

This shroud of secrecy is troubling in its own right given the strong presumption

favoring public disclosure of how state authorities spend taxpayer dollars.  It is especially

troubling given how Indiana's most recent execution, that of Benjamin Ritchie on May 20,

2025, was carried out.  Five witnesses to Ritchie's execution recount how Ritchie lurched

upward against restraints during his execution, in a sudden reaction so startling, it caused

his spiritual advisor, who was at Ritchie's side, to shift backward in his chair.  Ritchie's

reaction is inconsistent with the normal effects of unadulterated pentobarbital, a powerful

sedating barbiturate which in high doses acts as an anticonvulsant.  Given the likelihood

Indiana will carry out Ward's execution in the same way, there is a substantial risk Ward's

execution will also involve needless pain and suffering in violation of the Eighth

Amendment to the United States Constitution and Article One, Section Sixteen of the

Indiana Constitution.

Indiana's execution chamber itself raises constitutional concerns.  Witnesses to the

execution cannot hear sound from the chamber which violates the First Amendment right of

access to governmental proceedings.  The glass separating the witness viewing room from

the execution chamber is glazed so that witnesses can see into the chamber, but the

condemned inmate cannot see the witnesses he has designated to witness his execution.

Depriving Ward of his ability to see his witnesses violates his due process rights under the

Fourteenth Amendment to the United States Constitution and Article One, Section 12 of

3

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

the Indiana Constitution because he will not know if the State has complied with his

statutory right to have witnesses present.  Additionally, not being able to see his witnesses

during his last moments is especially cruel, implicating Eighth Amendment concerns.

## II.    Claims for Relief

**The State's failure to answer Ward's public records requests about its lethal injection
protocol and the drugs it intends to use to carry out his execution actively conceals public
information and obstructs his ability to challenge the constitutionality of his execution in
court in violation of his First Amendment right to petition the government for redress of
grievances.**

8(A) The First Amendment's Petition Clause creates a right to "petition the

Government for redress of grievances.  The Fourteenth Amendment due process clause

includes the right to petition state and local governments for redress of grievances.  *See*

*Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016).  The First Amendment right to petition

the government for redress of grievances includes the right of *meaningful* access to the courts.

*Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004)(emphasis added).  The right of access to

the courts is the right of an individual, whether free or incarcerated, to obtain access to the

courts without undue interference.  *Id.* The IDOC's refusal to answer Ward's public records

requests about its lethal injection protocol actively conceals his access to public information

not shielded from disclosure by statute and actively obstructs his ability to challenge the

constitutionality of his execution in court.  *See Snyder*, 380 F.3d at 291 (access to the courts

must be free from "undue interference."); *and John L. v. Adams*, 969 F.2d 228, 235 (6th Cir.

1992)(the state may not erect barriers that "impede" the right). Ward must be allowed to

litigate Indiana's method of execution to ensure his execution will not be needlessly painful

under constitutional standards. IDOC's refusal to comply with its obligation to disclose

public information actively obstructs Ward's right to seek redress for grievances.

4

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

9(A) Indiana's method of execution is "inflicted by intravenous injection of a lethal substance into the convicted person" in a "quantity sufficient to cause the death of the convicted person" and "until the convicted person is dead." Ind. Code § 35-38-6-1. The IDOC may adopt rules under Indiana's Administrative Rules and Procedures Act (ARPA), Ind. Code § 4-22-2, necessary to implement the method of execution. Ind. Code § 35-38-6-1(d). IDOC's lethal injection rules are not "rules" under the ARPA and are therefore exempt from ARPA's rulemaking strictures including public notice and comment. *Ward v. Carter,* 90 N.E.3d 660, 666 (Ind. 2018). Thus, there is no public input into IDOC's execution protocol.

Indiana's lethal injection protocol establishes two alternative methods of carrying out executions. "Method 1" is a three-drug lethal injection protocol requiring the successive injections of 1) Sodium Pentothal, Pentobarbital or Brevital; 2) Pancuronium Bromide or Vecuronium Bromide; and 3) Potassium Chloride. (Exhibit A at 13 -14). "Method 2" is a one-drug lethal injection protocol requiring the injection of a lethal dose of pentobarbital. (Exhibit A at 14 – 15). Although the IDOC has not publicly announced which protocol it intends to use to execute Ward, toxicology results from Indiana's two most recent executions indicate the IDOC is using Method 2 to carry out executions because high levels of pentobarbital were found in post-mortem toxicology results. (Exhibits B and C).

Lethal injection drugs, including pentobarbital, are manufactured or compounded. IDOC has not publicly disclosed whether it uses manufactured or compounded pentobarbital to carry out executions.

Manufactured drugs are produced in large quantities by pharmaceutical companies in a standardized form and dosage and are formulated with a fixed set of ingredients and

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

dosages to meet the needs of a broad patient population.  Manufactured drugs undergo

rigorous testing and evaluation by the Food and Drug Administration (FDA) to ensure

safety, effectiveness and quality.  Drug manufacturers object to the use of their drugs in

executions and require those who purchase their drugs not to resell the drug for use in

executions. *See e.g.* David Jolly, "Danish Company Blocks Sale of Drug for U.S.

Executions," THE NEW YORK TIMES, July 1, 2011, available at

https://www.nytimes.com/2011/07/02/world/europe/02execute.html (Lundbeck); *See*

*also,* e.g.,  Exhibit D (Akorn) *and* Exhibit E (Sagent).

        Drug compounding is a practice used by pharmacists to combine, mix or alter

ingredients to create drugs.  Compounding pharmacies typically follow informal recipes to

approximate the patented process used in manufactured drugs approved by the FDA.

Compounded drugs are not subject to the same FDA approval process as manufactured

drugs and are not evaluated for safety, efficacy or quality by the FDA before they are

marketed.  Compounded drugs are not FDA-approved and compounding pharmacies are

not subject to the FDA's good manufacturing practice regulation.  The FDA does not verify

the safety or effectiveness of drugs prepared by compounding pharmacies.

        The process for compounding pentobarbital is complex.  A pharmacy preparing

compounded pentobarbital should have extensive parental[2] compounding experience to

prepare compounded pentobarbital correctly.  Compounded pentobarbital is generally

prepared in one of two ways: 1) As a mixture containing pentobarbital sodium, propylene

glycol and alcohol ("Mixture 1"); or 2) As a mixture of bulk powder dissolved in alcohol

---

[2] "Parenteral" refers to the administration of medication or nutrition via a route other than
the digestive tract, typically through injection or infusion.

6

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

with polypropylene glycol and water ("Mixture 2").  Each preparation involves a delicate

balance of the ingredients to maintain the correct pH so the solution does not form a

precipitate.

Deviations from the appropriate compounding procedure can negatively impact the

efficacy and safety of the pentobarbital injection.  A shift in concentration of one of the

ingredients can lead to the formation of precipitants and oxidation which will impact the

potency of the drug and its pharmacological effects.  A change in the pH can lead to

extreme pain as the compounded pentobarbital is injected.  Many factors influence the

degradation of compounded pentobarbital including formulation errors and improper

storage of the compounded drug and its constituents.

Compounded drugs are especially vulnerable to contamination because they are

comprised of Active Pharmaceutical Ingredients ("APIs") which may themselves be

contaminated.  Many APIs come from overseas manufactures in China and India which are

not regulated by the FDA.  It is difficult to trace the APIs back to the original manufacturer

for information about their quality and integrity.  It is also difficult to ascertain information

about quality and expiration.  Compounded drugs degrade if the required environmental

conditions are not met.  Use of contaminated or degraded pentobarbital will result in severe

pain and burning upon injection.

To procure lethal injection drugs, whether from a manufactured source or by

compounding, the IDOC "may make and enter into a contract with an outsourcing facility,

a wholesale drug distributor, a pharmacy or a pharmacist."  Ind. Code § 35-38-6-1.  The

issuance or compounding of a lethal substance does not constitute the practice of pharmacy,

and the supplier of lethal injection drugs "is not subject to the jurisdiction of the Indiana

7

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

board of pharmacy, the medical licensing board of Indiana, the Indiana department of

health, or the Indiana professional licensing agency" Ind. Code. § 35-38-6-1(e).   Nor is the

supplier subject to Indiana law covering the regulation and licensing of professionals and

occupations.  Thus, Indiana exempts lethal injection drug suppliers from its own

professional oversight and licensing standards raising further concerns about the quality of

the drug.

     The Controlled Substances Act (CSA) regulates the manufacture, importation,

possession, use and distribution of scheduled controlled substances.  Under the CSA, drugs,

substances and chemicals used to make drugs are classified into five categories depending

upon the drug's acceptable medical use and the drug's abuse or dependency potential.

These categories are called "schedules."  Schedule II drugs are considered dangerous.

Pentobarbital is a Schedule II drug under the CSA.

     Drugs classified as a controlled substance under the CSA are also regulated by the

Drug Enforcement Agency (DEA).  Because pentobarbital is a Schedule II substance, it is

regulated by the DEA.  If a drug is a controlled substance, as pentobarbital is, individuals

who handle it must have a registration number from the DEA.  Completion of DEA Form

222 is required to sell or transfer Schedule I or II controlled substances.  Completion of

DEA Form 41 is required if a DEA registrant destroys a controlled substance.  Thus, IDOC

procurement of pentobarbital must be documented by DEA Form 222 and its destruction of

pentobarbital, which includes its disposal of expired doses, must be documented by DEA

Form 41.

     Ward has made multiple public records requests for information about Indiana's

lethal injection protocol, none of which are designed to seek information "reasonably

8

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

calculated to lead to the identity" of its supplier of pentobarbital. *See* Ind. Code. § 35-38-6-

1(f)(4). Ward has made three separate requests for public information -- on May 8, June 9

and July 14, 2025.

On May 8, 2025, before the state sought an execution warrant and before Ritchie

was executed on May 20, 2025, Ward requested the IDOC provide public records

concerning any and all drugs in its possession intended for use in executions including the

number of vials it possessed, the size of each vial and the concentration of lethal drug in

each vial. He also requested lethal injection drug inventory logs or chain of custody

documents for such drugs, including documents relating to the date of purchase. Ward

further requested the amount of money the IDOC paid for lethal injection drugs. The

request was for documents for lethal injection drugs acquired from January 1, 2023, to the

date of his request. (Exhibit F).

On June 9, 2025, before the state sought an execution warrant for Ward and after the

Ritchie execution, Ward renewed his request made on May 8 and requested additional

public information. This request was made after the Governor of Indiana, Mike Braun,

publicly announced that Indiana was out of lethal injection drugs and did not intend to

purchase more. *See* Casey Smith, "*Braun says Indiana is out of execution drugs, signals*

*willingness to debate capital punishment*," INDIANA CAPITAL CHRONICLE, June 4, 2025,

available at https://indianacapitalchronicle.com/2025/06/04/braun-says-indiana-is-out-of-

execution-drugs-signals-willingness-to-debate-capital-punishment/ ("Governor Braun also

said the State of Indiana does not intend to buy more, 'at least not for now.'"). Given

Governor Braun's statements, Ward requested financial documents related to IDOC's

purchases, retention and storage of lethal injection drugs and documents concerning its

9

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

obligation to comply with Indiana's competitive bidding law.  Ward broadly requested all

logs related to the purchase of lethal injection drugs including the date of purchase and

expiration dates, all certificates of analysis, all DEA Form 222s from June 2024 to present,

documentation of the expiration dates of lethal injection drugs used in executions and

financial documents related to IDOC's acquisition, purchase, retrieval, storage and

maintenance of use of lethal injection drugs. (Exhibit G).

On July 14, 2025, after this Court set a tentative execution date of October 10, 2025,

Ward supplemented his public records requests made on May 8 and June 9 and made

additional public records requests.  His request was lengthy and included requests for all

documents related to the quality and testing of the lethal injection drug intended for use in

his execution, including certificates of analysis.  He also requested DEA Form 41 for lethal

injection drugs it has destroyed since May of 2024. (Exhibit H).

Even if the IDOC refused to answer Ward's requests because it has concerns about

disclosure of identifying information, such concerns are easily alleviated through document

redaction. (*See e.g.* Exhibit I).[3]  Nevertheless, the IDOC has not answered Ward's lawful

public records requests even though Indiana's public records law is liberally construed and

recognizes that disclosure of public "information is an essential function of a representative

government and an integral part of the routine duties of public officials and employees,

whose duty it is to provide the information."  Ind. Code § 5-14-3-1.  Further, the IDOC has

---

[3]The documents contained in Exhibit I are the only documents IDOC provided to Joseph
Corcoran's attorneys in response to their public records requests.  In using this example,
Ward does not concede the disclosure of this redacted document was responsive or
complied with Indiana's public records law. It is offered as an example only to show the
IDOC has the technology and can redact documents.

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

failed to offer any explanation for its failure to comply even though "the burden of proof for

the nondisclosure of a public record [is] on the public agency that would deny access to the

record and not on the person seeking to inspect and copy the record." *Id.*

**The State's failure to respond to Ward's public records requests violates his procedural
and substantive due process rights under the Fourteenth Amendment to the United States
Constitution and Article One, Section Twelve of the Indiana Constitution.**

8(B) The Due Process Clause of the Fourteenth Amendment provides that no state

shall deprive any person of life, liberty or property, without due process of law. A violation

of procedural due process involves the deprivation of a protected liberty or property interest

occurring without due process. *GEFT Outdoors, LLC v. City of Westerfield*, 922 F.3d 357, 365

(7th Cir. 2019). To assess whether a liberty or a property interest is protected by due

process, courts look to independent sources like state law rather than the Constitution itself.

*GEFT Outdoors*, 922 F.3d at 365. Ward's "liberty interest" is his right to use state law, in

this case Indiana's public records statute, to request and receive public information about

the protocol to be used to execute him to ensure compliance with the Eighth Amendment's

and Indiana Constitution, Art. One, Section 16's ban on cruel and unusual punishment. *See*

*Gutierrez v. Saenz*, 145 S.Ct. 2258, 2266 (June 26, 2025)(a state-created right to

postconviction procedures can create rights to other procedures essential to realizing the

state-created right). The IDOC's refusal to answer public records requests in a lawful

manner as is required by Indiana law, violates Ward's procedural due process rights because

it prevents him from being able to fully avail himself of state-created procedures to litigate

whether his execution will comply with the Indiana and US Constitutions.

The substantive component of the Due Process Clause bars arbitrary and wrongful

actions regardless of the fairness of the procedures used to implement them. *GEFT Outdoors*,

11

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

922 F.3d at 368; *Melton v. Indiana Athletic Trainers Board*, 156 N.E.3d 633, 659 (Ind. Ct. App.

2020).  Substantive due process protects against government action that is arbitrary,

conscience-shocking, or oppressive in a constitutional sense, but not against government

action that is incorrect or ill-advised.  *Melton*, 156 N.E.3d at 660.  Conduct intended to

injure, in some way unjustifiable by any government interest, is the sort of official action

most likely to rise to conscience shocking level.  *County of Sacramento v. Lewis*, 523 U.S. 833,

849 (1998).  Ward's injury is created by the state's refusal to answer public records requests,

an arbitrary decision not justified by any legitimate governmental interest.  The fact IDOC

intentionally ignores its obligation as a state agency to comply with Indiana's public records

law is shocking to the conscience because it seeks to avoid compliance in the face of Ward's

impending execution which when carried out will obviate its obligation to comply with his

public records requests.

"Because of its irreversibility, apart from whatever one thinks of its morality, we

should err on the side of caution in carrying out an execution." *Baird v. State,* 833 N.E.2d 28,

33 (Ind. 2005), J. Boehm, dissenting. Ward's execution should not be carried out unless and

until he has been given access to information surrounding the storage, maintenance and

efficacy of the lethal injection drugs especially in light of what occurred during Benjamin

Ritchie's execution.

9(B) Ward incorporates by reference all facts alleged in section 8(B).

12

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

**Problems occurring during Benjamin Ritchie's execution present a substantial risk that Ward will suffer severe pain during his execution in violation of the Eighth Amendment and Article One, Section Sixteen of the Indiana Constitution**.[4]

8(C) Ward's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article One, Section Sixteen of the Indiana Constitution is violated because IDOC's refusal to meaningfully inform Ward about his execution prevents his legal counsel from taking steps to ensure his execution will be carried out humanely. The Eighth Amendment forbids "the infliction of unnecessary pain in the execution of the death sentence." *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463 (1947). Article One, Section 16 of the Indiana Constitution prohibits punishment that "constitutes only purposeless and needless imposition of pain and suffering." *Ratliff v. Cohn,* 693 N.E.2d 530, 542-43 (Ind. 1998).

9(C) Ward incorporates by reference all facts alleged in section 8(B).

The use of pentobarbital to execute people has fallen under intense scrutiny because of the likelihood it inflicts needless pain and suffering in violation of the Eighth Amendment. On January 25, 2025, Attorney General Merrick Garland directed the Director of the Federal Bureau of Prisons to rescind the addendum to the federal execution protocol first put in place on July 25, 2019 which provided for lethal injection by pentobarbital because after careful study "it cannot be said with reasonable confidence that the current execution protocol 'not only afford[s] the rights guaranteed by the Constitution and laws of the United States' but 'also treat[s] individuals [being executed] fairly and

---

[4] Ward reserves the right to supplement this claim should the IDOC finally comply with its obligation to disclose public information about the pentobarbital it used in Ritchie's execution and plans to use in his execution.

13

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

humanely.'" (Exhibit J at 2).  Garland wrote the Department of Justice should "err on the

side of treating individuals humanely and avoiding unnecessary pain and suffering." *Id.*

Five witnesses to Benjamin Ritchie's execution on May 20, 2025, report that after

pentobarbital was administered, he experienced symptoms consistent with unnecessary pain

and suffering.  All five witnesses report seeing Ritchies upper torso suddenly lurch upward

against the physical restraints holding him to the gurney.

One witness, Amanda Johnson, has known Ritchie since the sixth grade.  (Exhibit K

at 1).  During the execution, she saw Ritchie "suddenly and strongly" raise his torso up

from the gurney but was held back by the restraints. (Exhibit K at 3).  Ritchie seemed to be

trying to break out of the "something*." Id.*   This happened about two to three minutes after

the blinds covering the viewing window first opened.  Ritchie's sudden reaction lasted five

to six seconds. It was upsetting to Johnson, and she remembers saying to Mark Koselke, "I

don't think I can do this.  I can't do this." *Id.*

Steven Schutte, one of Ritchie's attorneys, also remembers Ritchie violently lurching

forward during the execution. (Exhibit L at 2).  He remembers that seconds after Ritchie

stopped moving "he violently lurched forward and up as if to sit up, but he was restrained."

Schutte said it was almost like a spasm that lasted three to five seconds, after which Ritchie

laid back down. *Id.*

Attorney Mark Koselke describes similar events. (Exhibit M).  He remembers that

after Ritchie started to become motionless, he "seemed to shoot up" like "he was doing a

crunch" because his head and shoulders lifted sharply from the gurney.  (Exhibit M at 2).

He remembers Amanda Johnson being so startled by Ritchie's movements that she grabbed

his arm.  Koselke remembers Ritchie lifting up for "about three to five seconds."  He then

14

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

began focusing on Ritchie's chest and counted about six to seven breaths, each one

becoming more shallow until Ritchie stopped breathing.  (Exhibit M at 2 -3).  Koselke also

remembers Ritchie's spiritual advisor looking "horrified" as he was escorted from the

chamber. (Exhibit M at 3).

    Hannah Hall reported when the blinds opened allowing her to see into the chamber,

Ritchie's feet were moving, and it looked like he was talking or singing. (Exhibit N at 2 - 3).

She remembers Ritchie "settl[ing] down a little" and not moving as much as when the

blinds were first opened. (Exhibit N at 3).   Then Ritchie's "upper body jerked up" and

although restrained, "his head and shoulders came up." *Id.*   She remembers it being so

"violent and so unexpected" that Amanda Johnson punched Mark Koselke's arm. *Id.*

Ritchie lifted for about two to three seconds. When this happened, she noticed Ritchie's

spiritual advisor startle and "push back" in his chair. *Id.*

    Ritchie's spiritual advisor present in the chamber, was interviewed by Kathleen

Cleary, an attorney licensed in Indiana and a mitigation investigator with the Capital

Habeas Unit of the Federal Defender for the Western District of Missouri.  The spiritual

advisor was reluctant to sign an affidavit about what he witnessed during the execution

because he signed a document promising not to reveal the identity of those involved in

Ritchie's execution.  He also fears that if he signs an affidavit, the IDOC will not allow him

to continue his prison ministry.  (Exhibit O at 2).  Cleary prepared an affidavit documenting

her interview with the spiritual advisor, which she reviewed with him to ensure accuracy

before signing it.

    The spiritual advisor told Cleary that after the execution began, Ritchie lifted several

inches off the gurney and against the restraints. (Exhibit O at 1). Ritchie's struggle against

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

the restraints startled the spiritual advisor so much that he pushed back against the chair he

was sitting in.  *Id.* He told Cleary this lasted about two seconds, and when Ritchie laid back

down, it was about five seconds later when Ritchie was "gone." *Id.*

Ward reserves the right to supplement facts upon disclosure of public information by

the IDOC.

**The execution chamber's one-way glass will block Ward's view of his witnesses
preventing him from knowing whether the IDOC has complied with his statutory right
to have his own witnesses present during his execution in violation of his due process
rights under the Fourteenth Amendment and Article One, Section 12 of the Indiana
Constitution and his right to be free from cruel and unusual punishment under the
Eighth Amendment and Article One, Section 16 of the Indiana Constitution.**

8(D) The Due Process Clause of the Fourteenth Amendment provides that no state

shall deprive any person of life, liberty or property, without due process of law. A violation

of procedural due process involves the deprivation of a protected liberty or property interest

occurring without due process.  *GEFT Outdoors* 922 F.3d at 365.  Indiana law allows Ward

to invite "not more than five (5) friends or relatives" to witness his execution.  Ind. Code. §

35 -38-6-6(a)(7).  Ward has a due process right to know whether Indiana is carrying out his

execution in compliance with state law which includes the right to know for himself

whether the people he selected as witnesses are in fact present as witnesses to his execution.

It is not sufficient for prison staff to tell Ward his witnesses are present behind the glass

because assurances from those obligated to follow rules that they *are* following rules will

have little value to Ward who will be completely in the dark about whether the assurances

are true.  Due process also protects against government action that is arbitrary.  *Melton* 156

N.E.3d at 660.  IDOC's use of one-way glass to block Ward's view of his witnesses is not

done to comply with a state law prohibiting Ward from seeing his witnesses because no

16

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

such law exists; it is an arbitrary decision which effectively deprives Ward of knowing if

Indiana is carrying out his execution in compliance with its own laws.

Blocking Ward's view of his witnesses is also cruel in violation of the Eighth

Amendment's punishment clause and Article One, Section 12 of the Indiana Constitution.

Cruel punishments are those that involve pleasure in hurting others or involve intentional

hard-heartedness, inhumanity and a lack of compassion. *See Bucklew v. Precythe*, 587 U.S.

119, 130 -131 (2019)(citing historical definitions of "cruel" to explain what cruel and

unusual punishments are in the constitutional sense). Cruel punishments also involve

mental pain and torment. *Id.* Blocking Ward's view of his witnesses is intentionally hard-

hearted and involves inflicting unnecessary and cumulative mental pain and torment

because it deprives Ward of the comfort of seeing and connecting with those closest to him

as he is executed without serving any legitimate state interest. "By protecting even those

convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government

to respect the dignity of all persons." *Hall v. Florida*, 572 U.S. 701, 707-08 (2014), quoting

*Roper v. Simons,* 543 U.S. at 572. Ensuring Ward can see his witnesses during the execution

is included in the governmental duty to respect the dignity of a person in his final minutes of

life.

9(D) On information and belief, IDOC's current execution chamber blocks the

condemned inmates view of the witness room[5] by separating the chamber and the witness

room with one-way glass. Thus, Ward will not be able to see that the IDOC complied with

his request to have certain people present as witnesses to his execution.

---

[5] Ward's complaint concerns his view into the witness room where his witnesses are present
to view the execution, and not the witness room containing victim witnesses.

17

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

**The State's action in preventing sound from emanating from the execution chamber violates Ward's right to access governmental proceedings under the First Amendment and Article One, Sections One and Nine of the Indiana Constitution.**

8(E) Ward's right to access to governmental proceedings under the First Amendment to the United States Constitution and Article One, Sections One and Nine of the Indiana Constitution will be violated if the witnesses to the execution are not able to see and hear the execution in its entirety. Ward's last words, or any sound he makes during the execution simply will not be heard by witnesses. Ward has a right to be heard, and the public has a right to hear what he says or any sounds he may make as the execution proceeds. "[P]ublic viewing of executions in their entirety is rooted in historical tradition and that public observation plays a significant role in the functioning of capital punishment." *First Amendment Coalition of Arizona, Inc. v. Ryan,* 938 F.3d 1069, 1075 (9th Cir. 2019). This right includes hearing the sounds of the execution so witnesses to the execution can "observe and report on the entire process so that the public can determine whether lethal injections are fairly and humanely administered." *First Amendment Coalition of Arizona,* 938 F.3d at 1075.

9(E)Witnesses to Benjamin Ritchie's execution describe being unable to hear what was going on in the execution chamber. The witnesses could see Ritchie's mouth moving but could not hear what he was saying. The witnesses also could not see the execution in its entirety. The intravenous lines were already inserted when the blinds were opened, and the witness could see Ritchie strapped to the gurney in the execution chamber. Due to the size and angle of the witness room to execution chamber, the view of the witnesses was partially obstructed. No press witnesses were allowed to view Ritchie's execution because Indiana Code § 35-38-6-6(a) does not list members of the press as a separate category of witnesses

18

Successive Petition for Post-
Conviction Relief –
Roy Lee Ward

authorized to witness executions.  The Associated Press and other news organizations have

filed a civil rights lawsuit arguing Indiana Code § 35-38-6-6(a) violates their rights under the

First Amendment.  *See generally* Southern District of Indiana Case No. 1:25-cv-00872-MPB-

MJD, Dkt.9 (May 7, 2025)

Ward submits this second Petition for Post-Conviction Relief raising claims

unavailable and not ripe at the time of his first post-conviction proceedings. To show the

Court the necessity of granting permission to file a successor, Ward has attached as exhibit

P, requests he will serve on the State of Indiana if allowed to litigate his claims.  These

claims must be litigated and resolved to ensure that if his execution is to occur, it complies

with the state and federal constitutions.

> Respectfully submitted,
>
> AMY E. KAROZOS
> Public Defender of Indiana
> Attorney No. 14429-49
>
> By:  /s/ Joanna Green
> Joanna Green
> Deputy Public Defender
> Attorney No. 16724-53
>
> By:  /s/ Laura L. Volk
> Laura L. Volk
> Deputy Public Defender
> Attorney No. 18934-49

19

# INDIANA DEPARTMENT OF CORRECTION
## *INDIANA STATE PRISON*
## *FACILITY DIRECTIVE*

## ISP 06-26:  EXECUTION OF DEATH SENTENCE

**A.**    **PURPOSE**:

The purpose of this Facility Directive is to establish appropriate guidelines to enable the Indiana State Prison to comply with state statutes governing the administration of the death penalty.

**B.**    **LEGAL BASIS**:

**1.**    **EXECUTION OF DEATH SENTENCE; SPECIFIED TIME AND DATE; EXECUTIONER:**

    **a.**    The punishment of death shall be inflicted by intravenous injection of a lethal substance or substances into the convicted person in a quantity sufficient to cause the death of the convicted person and until the convicted person is dead.

    IC 35-38-6-1(a).

    **b.**    The Warden of the State Prison, or persons designated by the Warden, shall designate the person who is to serve as the executioner (referred to herein as the "Execution Director").

    IC 35-38-6-1(c).

**2.**    **PLACE OF EXECUTION OF DEATH SENTENCE:**

The execution must take place inside the walls of the state prison in a room designed for that purpose.  The department of correction shall provide the necessary room (referred to herein as the "Execution Chamber") and appliances to carry out the execution as provided in this chapter.

IC 35-38-6-5.

**3.**    **PERSONS PERMITTED TO BE PRESENT AT THE EXECUTION OF DEATH SENTENCE:**

    **a.**    Only the following persons may be present at the execution:

        i.    The Warden and any assistants who are necessary to assist in the execution;

1

Revised June 17, 2024

Exhibit A  Page 1

    ii.     Up to two (2) physicians;

    iii.    The spiritual advisor of the convicted person;

    iv.    The State Prison Chaplain;

    v.     The convicted person may invite up to, but no more than, five (5) relatives or friends to attend;

    vi.    Up to eight (8) of the following members of the victim's immediate family who are at least eighteen (18) years of age;

        a.    The victim's spouse.

        b.    One or more of the victim's children.

        c.    One or more of the victim's parents.

        d.    One or more of the victim's grandparents.

        e.    One or more of the victim's siblings.

The offender shall submit a list of witness names and their relationships: (family, friends, and spiritual advisor) to the Warden for approval at least twenty (20) days prior to the execution date.

If there was more than one (1) victim, no more than (8) eight persons who are members of the victims' immediate families may be present at the execution.

If an agreement between the victims' immediate family members cannot be reached, the Warden shall conduct a lottery to determine which members are selected to be present at the execution.

The Warden shall provide a support room for the use of an immediate family member of the victim who is not selected to be present at the execution and persons invited by the immediate family for support. One or more members of the designated Critical Incident Stress Management (CISM) Team shall accompany the individual(s).

The Warden may exclude a person from viewing the execution if it is determined that the presence of the person would threaten the safety and security of the Indiana State Prison. The determination will be provided in writing.

IC 35-38-6-6(a)-(d).

**b.**    The Department of Correction shall keep confidential the identities of persons who assist the Warden of the State Prison in an execution and may classify as confidential and withhold from the public any part of a document relating to an execution that would reveal the identity of a person who assists the Warden in the execution.

IC 35-38-6-6(e).

2

C.    **NEWS MEDIA**:

1.    The Commissioner or their designee shall designate a Central Office staff person to assist the State Prison in the coordination of media communications.  The designated Central Office staff person shall be present at the State Prison to assist with the media during the period preceding the execution.  Additionally, the Warden shall designate a staff person to assist with coordinating media activities.

2.    Authorized and properly identified representatives of the news media shall be permitted access to a designated area.  Media personnel must remain in the designated area until the execution has been completed.  The Warden or designee shall assign a staff person to remain with the media personnel at all times.

3.    Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber.  The only exception to this rule is if the offender requests, in writing, that a member or members of the media be present.  The name of the individual(s) must then be included on the list of five (5) persons who are invited by the offender to witness the execution.

4.    Under no circumstances will cameras or recorders not under the control of the Department of Correction be permitted in the execution area.

D.    **COMMUNICATION SYSTEMS**:

1.    Prior to an execution date, the Warden or designee shall ensure appropriate communications systems are established in close proximity to the Execution Chamber.  At a minimum, these communication systems shall consist of the following:

   a.    A dedicated line to the Governor's office and residence;

   b.    A dedicated line to the Supreme Court Administrator;

   c.    A dedicated line to the Indiana Department of Correction Central Office Command Center;

   d.    An open line between the Execution Chamber and the Indiana State Prison Command Center;

   e.    An open line between the Lethal Injection Chemical Room and the Physician's Room;

   f.    Two-way communication radio open to outside areas, on a frequency separate for the frequency used for general in-house communications.

2.    The Warden or designee shall ensure that adequate staff persons are assigned to continually monitor the communication system during the time preceding the execution.

3

E.    <u>**SELECTION OF EXECUTION TEAM AND SUPPORT PERSONNEL**</u>:

1.    When an Execution Team vacancy occurs, the Warden or designee shall appoint a Screening Committee to assist with the Execution Team selection process. ████████████████████████████████████████ The Screening Committee shall interview appropriate personnel and assess their emotional stability and their willingness/ability to handle the stress of assisting with the execution. The following issues are discussed:

<u>Personal History and Background</u>

    a.    Obtain information about the individual in order to ascertain whether or not they have life experiences which might make their participation more difficult.

    b.    Determine values regarding death penalty.

    c.    Determine religious values and talk about potential conflicts in regard to taking another person's life.

    d.    Obtain information about the individual's personal support system (e.g., family, friends, etc.) that is available to help cope with stress.

<u>Medical/Psychological Background</u>

    a.    Determine this person's belief about their medical/physical ability to cope with stressful situations.

    b.    Solicit examples of how this person copes with other stressful situations in their life.

    c.    Establish current coping mechanisms used by this person and evaluate their ability to learn new skills if necessary.

    d.    Evaluate levels of trust this person has in their own ability to carry out difficult tasks, and their perceived beliefs regarding how others view that ability.

    e.    Define the individual's interpretation of confidentiality.

    f.    Identify issues that would prevent them from carrying out this type of duty.

    g.    Determine if they have ever been involved with a counseling experience and what their reaction was to it.

<u>Professional Experience</u>

    a.    Identify professional experiences (e.g., departmental, custody, educational, administrative, medical, etc.) that would aid them in performing this task.

4

b.   Identify the professional characteristics of this individual and what role they played in making them a candidate to become a member of the team.

2.   Following the individual screening process, the Committee shall provide a list of candidates to the Warden. The Warden shall approve the personnel who will assist in the execution.

3.   ████████████████████████████ shall select, subject to the approval of the Warden, personnel who will perform support roles in the execution process, including, but not limited to: security, communications, and other appropriate support activities.

4.   During the preparation for an execution, should a staff person desire to be relieved of these responsibilities or should observations of a staff person's behavior dictate that they may be unsuitable for the task, they will be relieved of these duties. In either case, the Warden or designee shall contact ████████████████████ to arrange a debriefing session with the staff person(s).

5.   The Warden or designee shall locate and select a physician to be present at the State Prison at the time of the execution. The physician's duties shall include monitoring or performing any medical procedures conducted in accordance with this Facility Directive and pronouncing death.

## F.   TEAM TRAINING:

Staff selected for the Execution Team are trained at least quarterly. The training includes intensive cell extraction/restraint training, protocols in starting IV's including practical training with regional EMS oversight. Lighting is evaluated during training sessions by the team. The IV team also uses an intravenous light and equipment such as a Venoscope, which assists in identification and finding of veins to start the IV. Practical training is conducted in the Execution Chamber so that staff are well prepared and accustomed to the environment prior to the actual execution.

Staff will consult with a licensed physician in the preparation and administration of the lethal chemicals used to carry out the duty described in IC 35-38-6-1. This consultation shall include an examination of how the lethal chemicals are transferred to syringes and delivered.

## G.   PRELIMINARY PROCEDURES:

1.   Thirty (30) days prior to a scheduled execution or one (1) week after receiving a warrant for execution or equivalent order for the execution of a death sentence ("Execution Order"), ████████████████████████████████████████████████████ who will be the offender's contact person, will attend a meeting with the condemned offender. They will discuss the lethal injection procedures,

5

establish a visiting list for approval, and determine if the offender wishes to prepare a will and write a last statement. The offender shall receive translated instructions and materials if English is not his primary language. If a literacy problem exists, a staff member will assist the offender in understanding the material. If the offender refuses to leave his cell for the notification meeting, the Warden may meet with the offender in front of his cell and provide him a packet of the applicable information, including appropriate timelines.

2.   The offender will receive a full medical evaluation, including venous access, approximately thirty (30) days prior to a scheduled execution. A weekly assessment of the offender's veins will be conducted up to the day of execution. Fluids will be provided orally to maintain hydration.

3.   The facility shall be constantly monitored during the days immediately before the scheduled date of execution. Activities of the facility may be adjusted in order to maintain a proper level of security.

4.   Visitors of the condemned will visit in conjunction with regular visiting hours, 8:00 a.m. through 4:30 p.m. Extended visiting hours (visitation) may be requested and approved only by the Warden or designee. Legal counsel shall be subject to the same hours listed above.

     Approved spiritual advisors may visit longer if extra time is requested and approved in advance by the Warden or designee. All visits will conclude by 10:00 p.m.

5.   Prior to the scheduled date of the execution, the Warden or designee shall arrange for the Execution Chamber to be equipped, and for the necessary supplies to be ordered.

6.   An inspection of the building and immediate area housing the Execution Chamber will be made weekly, beginning thirty (30) days prior to the scheduled date of execution, and beginning five (5) days prior to the scheduled execution, inspections will be conducted daily. The inspection will be conducted by the Deputy Warden of Operations, the Physical Plant Supervisor, and a custody supervisor. This inspection will concentrate on the level of security and sanitation of the building in general, and more specifically, the immediate area where the execution will occur.

7.   At the discretion of the Warden, the condemned offender may be moved to ████████████████████████████ within thirty (30) days of the scheduled date of the execution. The custody staff person assigned to this post shall maintain constant supervision of the condemned offender and will maintain a log, recording the offender's activities and visitors. In the event the condemned offender is not moved to ██████████ ████████████████████████████████ Custody staff are to maintain observation of the offender and maintain a log, recording the offender's activities and listing all persons entering and exiting the housing unit.

6

8.    Prior to the scheduled date of the execution, the Warden shall determine the appropriate time to move the condemned offender to a holding cell in the Execution Chamber.  When moved, appropriate staff shall be assigned to maintain security and continue constant observation of the offender.  Staff are to maintain a log, recording the offender's activities and listing all persons entering and exiting the Execution Chamber.  The offender may have in his possession the following items:  Bible or equivalent religious book and other religious materials, up to 20 photographs, address book, eyeglasses, appropriate writing materials and any other items, as approved by the Warden or designee. A television and telephone will be provided for the offender's use.

9.    If the condemned offender wishes to receive a special meal, he will be permitted to order his choice of food (within reason, based on availability and legality) seven (7) days prior to execution.  This meal will be eaten thirty-six (36) to forty-eight (48) hours before the execution and is to be consumed in one sitting, not exceeding four (4) hours.  Any leftovers will be removed from the cell and discarded. The condemned offender is to have nothing to eat or drink past 12:00 p.m. on the day of the execution.  A limited amount of water will be permitted in order to take oral medication.

10.    If requested, an approved spiritual advisor or prison chaplain may be present with the offender on the day preceding the execution to provide pastoral care and sacramental functions.  The name of the spiritual advisor must be submitted to the Warden or designee for approval a minimum of twenty (20) hours prior to the execution.  The spiritual advisor may visit in the Execution Chamber until 10:00 p.m. the night preceding the execution.

11.    The offender may be provided with a sedative upon request.  The strength should be sufficient to calm him, however, not enough to render him unconscious.

12.    One team member will be available to translate if English is not the offender's primary language.

**H.    RECORD KEEPING**:

Upon receipt of an Execution Order, all associated correspondence will be forwarded to the Warden's Office.  This includes, but is not limited to: petition for clemency, clemency schedule, request for modification of visitation, personal autopsy preference, last will and testament, request for spiritual advisor, request for execution witness, request for last meal, media statements or interview requests, news releases, funeral arrangements, confirmation of coroner and funeral home, E-Squad Security Procedures, victim witnesses, master visiting list, staff authorized in the Execution Chamber and Command Center, facility memoranda, all chamber inspection reports, team practices, rehearsal schedule, all observation logs and CISM debriefing schedule.  Upon confirmation of a stay of execution or

7

the completion of an execution, all documents will be maintained in accordance
with record retention requirements or department policy.

**I.    EXECUTION PROCEDURES:**

1.    The execution of an offender shall generally occur between midnight and
      no later than an hour before sunrise on a date fixed by the sentencing court.
      The execution must not occur until, at least, one hundred (100) days after
      the conviction. An example of an execution schedule is located in 06-26
      Appendix B.

2.    

3.    

4.    

5.    The Warden or designee shall designate staff to monitor the
      communications systems put in place for the execution.

6.    Persons authorized to be in the facility command center are as follows:
       A list of approved persons
      will be maintained by the Warden.

7.    The _____ will record the steps taken during the
      execution process and log the times. In carrying out the execution process,
      the followings steps shall be taken:

      a.    Injection Team prepares the syringes to be used during the
            execution, according to the designated injection method. ____ IV Team
            sets up IV trays.

      b.    

      c.    

      d.    The Warden or designee and _____ report to the
            Execution Chamber.

      e.    Security staff escorts offender witnesses to the holding location. A
            chaplain is available if needed.

8

The Warden calls the command center to ensure the execution is to proceed.

f.      The Extraction Team is notified by radio.

    i.      At the command of the Warden or designee, the Extraction Team will approach the holding cell and ask the condemned offender to approach the cell door and be handcuffed.

    ii.     The ████████████████ will then ask the offender to step back and place his hands above his head, on the wall in front of him.   (If the condemned offender refuses to cooperate, Departmental Extraction Policy will be used.)

    iii.    The ███████████████ will unlock the cell door to allow the Extraction Team to enter.  The offender will then be escorted from the cell and walked into the Execution Chamber.  He will be assisted onto a stationary gurney.  His legs will be secured to the gurney with soft leather restraints on his ankles, as well as a soft leather strap that will go across his chest and upper arms. His wrists will be secured to the gurney with soft restraints.  The team leader will ensure good circulation of the extremities. The Extraction Team will return to the holding cell staging area, out of view of any witnesses.

g.      The IV Team is notified by radio to move in.  The IV Team will insert a venous catheter in each arm, attach the necessary tubing, and start an IV flow by slow infusion consisting of a saline solution. Continued surveillance of the IV site will be conducted to monitor for infiltration. The catheter must be properly secured using tape. The IV process will be observed by the physician, Warden, Execution Director and Injection Team.

If a suitable vein cannot be discovered in an arm, the IV Team shall substitute a suitable vein in another part of the body under the supervision of the physician.

Upon completion, the IV Team announces "IV process completed," then proceeds to the holding cell staging area.

h.      If access cannot be established through peripheral intravenous cannulation, the physician will provide access by central venous cannulation or alternative means in accordance with reasonable medical standards.

Upon completion, the Execution Director announces "IV process completed." ████████████████████████

i.      The Warden or designee will then read the Execution Order to the condemned offender.

9

i.      After the Execution Order has been read, the Warden or
        designee will then ask the condemned offender if he has any
        last words. If he does, they will be recorded by the Warden,
        ████████████████  and/or designee.

        NOTE: The condemned offender will be given ample
        opportunity to prepare a written statement prior to the
        execution.

ii.     The ████████████████  secures the recorder, checks IV lines
        and notifies the ████████  to
        transport the witnesses into the viewing area by radio.

iii.    Victim witnesses will be escorted from the Deputy Warden's
        office or designated area to the Execution Chamber and
        seated left of the partition. ████████  and law enforcement
        will provide security.

        NOTE: The victim witnesses who do not wish to view the
        execution or cannot view the execution will remain in the
        Deputy Warden's office or designated area.

iv.     Offender witnesses will be escorted from the holding
        location and seated to the right of the partition. ████████
        and law enforcement will provide security.

j.  The ████████████████  provides notice that
    the witnesses are in place.

k.  The Warden checks with the Command Center to proceed.

l.  The Warden orders the lights to be dimmed and the viewing window
    blinds and louvered doors opened.

m.  The Warden instructs the Injection Team to proceed.

n.  The Injection Team proceeds, advising the Warden by radio after
    each syringe. Extreme care will be exercised during the selection of
    syringes. The Injection Team members will verify the syringe by
    number, color code, and description prior to use. Once the
    "Proceed" command is given, the injection procedure will begin
    with slow, even syringe pressure. IV lines will be constantly
    monitored for leaks or stoppage. The injection procedure will
    continue until all the chemicals in the syringe set have been injected
    into the condemned offender and the offender is pronounced dead.

o.  The Injection Team provides notice that the injection process is
    complete.

p.  Following the completion of the injection process, the Warden will
    then order the blinds and louvered doors to be closed and the lights
    turned up. The physician comes out and pronounces time of death,
    and then returns to the holding area.

10

q.   If the offender's heart has not stopped, the physician will return to the holding area, the lights will be dimmed, the blinds and louvered doors will be reopened, and the Warden or designee shall order the injection procedure to be repeated. After this procedure is completed, the blinds and louvered doors will be closed, and the lights turned up.

The physician reenters and pronounces time of death, and then returns to the holding area.

r.   The Warden advises the Command Center of the time of death and of the last statement if there is one.

s.   The ███████████████████████████████████████ that the witnesses may leave.



Designated State Prison staff will be available to address questions from witnesses.

t.   The ███████████████████████████████████ when the visiting areas are clear.

u.   IV Team, Injection Team, Extraction Team are authorized to leave by the Warden.

v.   ████████████████████████

w.   The Warden returns to the facility Command Center.

x.   ██████████████████████████████████████ to assist the ID & Release Officer in the preparing, photographing and fingerprinting of the body. The Warden or designee may request that color photographs are taken and maintained by ██████████ staff.

y.   The Coroner is escorted to the Execution Chamber to photograph, claim, and prepare the body for transportation. The body will be released to the Coroner utilizing established departmental procedures.

11

z.    The hearse enters the institution through ███████████ ███████████ The deceased is loaded into the hearse for transport to the funeral home.

**J.    CODES FOR COMMUNICATION:**



(2 members will have headsets)
(2 members will have headsets)
(2 members will have headsets)

**K.    POST EXECUTION PROCEDURES:**

1.    After the body has been removed from the facility, a representative of the facility or Department of Correction shall make a statement to the news media.

2.    Following the execution, any staff who request it shall meet with CISM staff for debriefing.

3.    The Warden or designee shall return the Execution Warrant to the Clerk of the sentencing court as soon as possible following the execution of the offender.

4.    The Warden shall conduct a debriefing, separate from the debriefing by CISM, to identify concerns with personnel involved with the execution process. This debriefing shall be conducted as soon as practical following the execution.

**L.    REVIEW:**

The contents of this document will be reviewed and/or revised as needed on an annual basis, in accordance with Policy 00-04-101, "THE DEVELOPMENT, and APPROVAL AND IMPLEMENTATION OF POLICY."

APPROVED:    _____Signature on file_____    DATE: _____
                 **Warden, Indiana State Prison**

12

# CONFIDENTIAL

## ISP 06-26
## Appendix A

**PREPARATION AND ADMINISTRATION OF CHEMICALS**

A.    **Procurement and Maintenance of Inventories**

1.    Procurement of pharmaceuticals is in accordance with applicable state and federal law. The Warden and the ███████████ will manage all pharmaceuticals, once delivered to the Administration Building, for secured storage and inventory.

2.    Inventories must be adequate to cover expected usage. Sharps and controlled substances must be maintained under careful control at all times. A perpetual inventory of pharmaceuticals and supplies (e.g., needles, syringes, medications, trays, etc.) will be maintained.

3.    Expired and/or damaged pharmaceuticals may be used by the Execution Team for training purposes. These items will be clearly marked as expired and/or damaged and will be destroyed in accordance with established protocols.

B.    **Preparation of Chemicals**

1.    **Method 1**

The Injection Team prepares two sets equaling eight (8) injection syringes. One set is used as a backup in the event the first attempt fails. Safety precautions will be exercised when preparing the syringes, including the use of gloves and safety glasses. Spills will be promptly diluted with saline and absorbed with towels. Expiration dates of the drugs are verified prior to use. As each syringe is prepared, it is clearly numbered, color coded and described with the chemical name and amount.

- Syringe 1: Sodium Pentothal, Pentobarbital (1.0 grams per vial) or Brevital (2.5 grams per vial) is carefully mixed with 50 mL of sterile saline. Two (2) vials are used. This process is under the direct observation of the physician. This syringe is color coded yellow.

- Syringe 2: Sodium Pentothal, Pentobarbital (1.0 grams per vial) or Brevital (2.5 grams per vial) is carefully mixed with 50 mL of sterile saline. Two (2) vials are used. This process is under the direct observation of the physician. This syringe is color coded yellow.

- Syringe 3: 60cc syringe is 50 mL of sterile saline and is color coded black.

- Syringe 4: 60cc syringe is 50 mg of Pancuronium Bromide or Vecuronium Bromide and is color coded blue.

- Syringe 5: 60cc syringe is 50 mg of Pancuronium Bromide or Vecuronium Bromide and is color coded blue.

- Syringe 6: 60cc syringe is 50 mL of sterile saline and is color coded black.

- Syringe 7: 60cc syringe is 50 mEq of Potassium Chloride and is color coded red.

- Syringe 8: 60cc syringe is 50 mEq of Potassium Chloride and is color coded red.

2.   **Method 2**

The Injection Team prepares three identical sets equaling nine (9) injection syringes. Two (2) of the sets will be used as backups. Safety precautions will be exercised when preparing the syringes, including the use of gloves and safety glasses. Spills will be promptly diluted with saline and absorbed with towels. Expiration dates of the drugs are verified prior to use. As each syringe is prepared, it is clearly numbered, color coded and described with the chemical name and chemical amount.

**Primary Set A**:

- Syringe 1A: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1A and color coded yellow.

- Syringe 2A: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2A and color coded yellow.

- Syringe 3A: 60 mL of a sterile saline solution, labeled 3A and color coded black.

**Backup Set B**:

- Syringe 1B: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1B and color coded yellow.

- Syringe 2B: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2B and color coded yellow.

- Syringe 3B: 60 mL of a sterile saline solution, labeled 3B and color coded black.

Exhibt A  Page 14

**Backup Set C**:

- <u>Syringe 1C</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1C and color coded yellow.

- <u>Syringe 2C</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2C and color coded yellow.

- <u>Syringe 3C</u>: 60 mL of a sterile saline solution, labeled 3C and color coded black.

3.     After the Injection Team prepares all syringes with the proper chemicals and labels as provided above for the method selected, the IV Team must ensure that the IV setup is completed.

**C.     Administration of Chemicals**

1.     **Method 1**

a.     Syringes 1 (yellow), 2 (yellow), 3 (black), containing Sodium Pentothal, Pentobarbital, or Brevital and the saline solution, are injected in order. The offender will be closely and vigilantly monitored to ensure the surgical depth or surgical plane is deep enough so that the offender is unconscious. The depth may be tested through the use of ammonia inhalant, pin prick, or other accepted stimuli.

b.     Syringes 4 (blue), 5 (blue), and 6 (black), containing Pancuronium Bromide or Vecuronium Bromide and the saline solution, are injected in order.

c.     The Warden signals approval to proceed. Syringes 7 (red) and 8 (red), containing Potassium Chloride, are injected in order.

d.     At the completion of the process and after a sufficient amount of time for death to have occurred, the injection process will be completed.

2.     **Method 2**

a.     The lethal chemicals from Syringes 1A and 2A shall be injected in order.

b.     The saline solution from Syringe 3A shall be injected.

c.     Following a sufficient amount of time for death to occur after the injection of Syringe 3A, the Physician shall examine the offender to determine if death has occurred.

3

If the offender is still exhibiting visible signs of life, Syringes 1B and 2B shall be injected, followed by Syringe 3B.

If the offender is still exhibiting visible signs of life, Syringes 1C and 2C shall be injected, followed by Syringe 3C.

d.    At the completion of the process and after a sufficient amount of time for death to have occurred, the injection process will be completed.

3.    Each chemical must be administered in the predetermined order in which the syringes are prepared and labeled. The full dose contained in each syringe must be administered to the offender. If all electrical activity of the heart ceases prior to administering all of the chemicals prepared, the Injection Team must continue to follow the protocol and administer all remaining chemicals in the set in the order and amounts set forth above.

4.    The IV lines will be constantly monitored for leaks or stoppage. If this situation should occur, the Injection Team shall immediately transfer to the alternate line to restart the injection procedure. The Injection Team will not proceed until approval is obtained from the Warden.

5.    The actual time of death will be when the physician pronounces death.

6.    All of the prepared chemicals must be used or properly disposed of no later than twenty-four (24) hours after the time designated for the execution to occur. Should a stay delay the execution beyond twenty-four (24) hours of the scheduled executions, another complete set of syringes must be prepared in accordance with this procedure when the execution is rescheduled.

**D.    Disposal**

All supplies and equipment used during an execution will be discarded or sanitized in accordance with established protocols.

Successive Petition for Post-Conviction Relief -

1

Exhibt A  Page 19

4

Exhibt A  Page 21

6

Exhibt A  Page 23

**NMS**
LABS

Successive Petition for Post-Conviction Relief -

**NMS Labs**
200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

# Toxicology Report

**Report Issued**   06/05/2025 09:02

| | |
|---|---|
| **Patient Name** | RITCHIE, BENJAMIN |
| **Patient ID** | 30318644 |
| **Chain** | 30318644 |
| **DOB** | ▮▮▮▮ |
| **Sex** | Male |
| **Workorder** | 25222776 |

To:  **147473**
LaPorte County Coroner
Attn: Lynn Swanson, MDI
809 State St. Suite 304
LaPorte, IN   46350

**Page 1 of 5**

## Positive Findings:

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Pentobarbital | 43 | mcg/mL | 001 - Subclavian Blood |
| Ethanol | 13 | mg/dL | 001 - Subclavian Blood |
| Blood Alcohol Concentration (BAC) | 0.013 | g/100 mL | 001 - Subclavian Blood |
| Caffeine | Presump Pos | mcg/mL | 001 - Subclavian Blood |
| Lorazepam | 9.1 | ng/mL | 001 - Subclavian Blood |
| Amphetamine | 100 | ng/mL | 001 - Subclavian Blood |
| Methamphetamine | 1200 | ng/mL | 001 - Subclavian Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Test | Test Name |
|---|---|
| 3410B | Pentobarbital, Blood |
| 8084B | Postmortem, Expanded w/Vitreous Alcohol and 6-MAM Confirmation, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Gray Stopper Glass Tube | 8.75 mL | 05/20/2025 08:55 | Subclavian Blood | 30318644 |
| 002 | Gray Stopper Glass Tube | 7.75 mL | 05/20/2025 08:55 | Subclavian Blood | 30318644 |
| 003 | Red Stopper Glass Tube | 4 mL | 05/20/2025 08:55 | Vitreous Fluid | 30318644 |
| 004 | White Cap Plastic Container | 20 mL | 05/20/2025 08:55 | Urine | 30318644 |

All sample volumes/weights are approximations.

Specimens received on 05/21/2025.

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 25222776 |
| **Chain** | 30318644 |
| **Patient ID** | 30318644 |

**Page 2 of 5**

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Pentobarbital | 43 | mcg/mL | 1.0 | 001 - Subclavian Blood | GC/MS |
| Ethanol | 13 | mg/dL | 10 | 001 - Subclavian Blood | Headspace GC |
| Blood Alcohol Concentration (BAC) | 0.013 | g/100 mL | 0.010 | 001 - Subclavian Blood | Headspace GC |
| Caffeine | Presump Pos | mcg/mL | 0.20 | 001 - Subclavian Blood | LC/TOF-MS |
| This test is an unconfirmed screen. Confirmation by a more definitive technique is recommended. | | | | | |
| Ethanol | Confirmed | mg/dL | 10 | 001 - Subclavian Blood | Headspace GC |
| Lorazepam | 9.1 | ng/mL | 5.0 | 001 - Subclavian Blood | LC-MS/MS |
| Amphetamine | 100 | ng/mL | 5.0 | 001 - Subclavian Blood | LC-MS/MS |
| Methamphetamine | 1200 | ng/mL | 5.0 | 001 - Subclavian Blood | LC-MS/MS |

**Examination of the specimen(s) submitted did not reveal any reportable findings by procedure(s) outlined in the accompanying Analysis Summary, other than those listed above. Interpretation of reported findings should be based on the totality of available case information. Reference information is not case-specific but is provided as a general guide.**

## Reference Comments:

1.  Amphetamine - Subclavian Blood:

    Amphetamine (Adderall, Dexedrine) is a central nervous system stimulant. Amphetamine is also a metabolite of methamphetamine, benzphetamine and selegiline. It is used therapeutically in the treatment of narcolepsy and obesity and also in the treatment of attention-deficit hyperactivity disorder (ADHD). Amphetamine has a high potential for abuse. At low doses, amphetamine causes mild stimulation, offset of fatigue, and increase in alertness. It also causes changes in attitude, judgment and impulsivity. At higher doses, amphetamine causes euphoria, excitation, agitation, hypervigilance, rapid speech, dilated pupils which react slowly to light and increased motor restlessness. Pulse and blood pressure may be elevated. Withdrawal from amphetamine following abuse can result in extreme fatigue and uncontrollable sleepiness, agitation, and depression. In the treatment of narcolepsy, amphetamine is administered in daily divided doses of 5 to 60 mg. In abuse doses of several grams may be used on a daily basis in 'runs' lasting a week or more.

    Following a single oral dose of 10 mg amphetamine sulfate, a reported peak blood concentration of 40 ng/mL was reached at 2 hr. Following a single 30 mg dose to adults, an average peak plasma level of 100 ng/mL was reported at 2.5 hr. A steady-state blood level of 2000-3000 ng/mL was reported in an addict who consumed approximately 1000 mg daily.

    Overdose with amphetamine can produce restlessness, hyperthermia, convulsions, hallucinations, respiratory and/or cardiac failure. Reported blood concentrations in amphetamine-related fatalities ranged from 500-41000 ng/mL (mean 9000 ng/mL).

2.  Ethanol (Ethyl Alcohol) - Subclavian Blood:

    Ethyl alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination. Ethanol can also be a product of decomposition or degradation of biological samples.

3.  Lorazepam (Ativan®) - Subclavian Blood:

    Lorazepam is a benzodiazepine used for sedation and for short-term relief of anxiety associated with depressive symptoms. It shares the actions and adverse reactions of other CNS-depressants. Lorazepam can be administered by oral, IV and IM routes. Daily divided oral doses of up to 10 mg are generally prescribed for anxiety. Its adverse effects can include sedation, dizziness, weakness, unsteadiness and disorientation.

    Fatalities with lorazepam are relatively rare and generally have postmortem blood concentrations exceeding 300 ng/mL; however, such concentrations are not necessarily fatal.

**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 25222776 |
| Chain | 30318644 |
| Patient ID | 30318644 |

Page 3 of 5

## Reference Comments:

4.  Methamphetamine - Subclavian Blood:

    d-Methamphetamine is a DEA schedule II stimulant drug capable of causing hallucinations, aggressive behavior and irrational reactions. Chemically, there are two forms (isomers) of methamphetamine: l- and d-methamphetamine. The l-isomer is used in non-prescription inhalers as a decongestant and has weak CNS-stimulatory activity. The d-isomer has been used therapeutically as an anorexigenic agent in the treatment of obesity and has potent CNS-, cardiac- and circulatory-stimulatory activity. Amphetamine and norephedrine (phenylpropanolamine) are metabolites of methamphetamine. d-Methamphetamine is an abused substance because of its stimulatory effects and is also addictive.

    A peak blood concentration of methamphetamine of 20 ng/mL was reported at 2.5 hr after an oral dosage of 12.5 mg. Blood levels of 200-600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior. High doses of methamphetamine can also elicit restlessness, confusion, hallucinations, circulatory collapse and convulsions.

    *In this case, the level of methamphetamine determined has not been differentiated according to its isomeric forms. Differentiation of the isomers of methamphetamine is available upon request.

5.  Pentobarbital - Subclavian Blood:

    Pentobarbital is a barbiturate sedative hypnotic agent with a short duration of action. It has been used to treat insomnia, for pre-surgical anxiety, and in the control of seizures.  It is subject to abuse. Reported plasma concentrations ranging from 1-5 mcg/mL are reported for the sedation-producing effects of pentobarbital whereas concentrations of 5-15 mcg/mL generally produce sleep.  Plasma concentrations greater than 10 mcg/mL may produce deep coma. Major adverse effects associated with pentobarbital derive from its CNS-depressant properties including sedation, drowsiness, lethargy, respiratory depression, and coma.

    Reported postmortem concentrations of pentobarbital in fatalities from the substance range from 5-112 mcg/mL.

## Sample Comments:

001    Glass tube placed in NMS provided container

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 25222776 was electronically signed on 06/05/2025 08:01 by:

Emily M. Fenton, MBA, MSFS, D-ABFT-FT
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

The following test(s) were performed for this case; the scope of each test includes the analyte(s) listed along with the associated reporting limit(s). The reporting limit is the lowest concentration of the analyte that will be reported as positive. Only results that meet reporting criteria at or above the reporting limit appear in the Positive Findings section of the report.

Test 3410B - Pentobarbital, Blood: 001 - Subclavian Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Pentobarbital | 1.0 mcg/mL | | |

Test 50011B - Barbiturates Confirmation, Blood: 001 - Subclavian Blood

CONFIDENTIAL

**NMS** LABS

| | | |
|---|---|---|
| Workorder | 25222776 | |
| Chain | 30318644 | |
| Patient ID | 30318644 | |

**Page 4 of 5**

## Analysis Summary and Reporting Limits:

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Butalbital | 0.20 mcg/mL | Phenobarbital | 0.50 mcg/mL |
| Pentobarbital | 1.0 mcg/mL | Secobarbital | 0.20 mcg/mL |

**Test 52248B - Alcohols and Acetone Confirmation, Blood: 001 - Subclavian Blood**

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

**Test 53154B - Benzodiazepines Confirmation, Blood (Forensic): 001 - Subclavian Blood**

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| 7-Amino Clonazepam | 5.0 ng/mL | Diazepam | 20 ng/mL |
| Alpha-Hydroxyalprazolam | 5.0 ng/mL | Lorazepam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Midazolam | 5.0 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Nordiazepam | 20 ng/mL |
| Clobazam | 20 ng/mL | Oxazepam | 20 ng/mL |
| Clonazepam | 2.0 ng/mL | Temazepam | 20 ng/mL |

**Test 53165B - Amphetamines Confirmation, Blood (Forensic): 001 - Subclavian Blood**

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Amphetamine | 5.0 ng/mL | Norpseudoephedrine | 5.0 ng/mL |
| Ephedrine | 5.0 ng/mL | Phentermine | 5.0 ng/mL |
| MDA | 5.0 ng/mL | Phenylpropanolamine | 20 ng/mL |
| MDMA | 5.0 ng/mL | Pseudoephedrine | 5.0 ng/mL |
| Methamphetamine | 5.0 ng/mL | | |

**Test 53249FL - Alcohols and Acetone Confirmation, Vitreous Fluid (Forensic): 003 - Vitreous Fluid**

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

**Test 8084B - Postmortem, Expanded w/Vitreous Alcohol and 6-MAM Confirmation, Blood (Forensic): 001 - Subclavian Blood**

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Gabapentin | 5.0 mcg/mL |
| Cannabinoids | 10 ng/mL | Salicylates | 120 mcg/mL |

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 25222776 |
| **Chain** | 30318644 |
| **Patient ID** | 30318644 |

**Page 5 of 5**

## Analysis Summary and Reporting Limits:

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of analyte classes included in this screen.  The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified analyte class are included. Some specific analytes outside of these classes are also included.  For a detailed list of all analytes and reporting limits, please contact NMS Labs. Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotics, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

**NMS** Labs
200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**  12/31/2024 10:19

To:  **147473**
LaPorte County Coroner
Attn: Lynn Swanson, MDI
809 State St. Suite 304
LaPorte, IN  46350

| | |
|---|---|
| **Patient Name** | CORCORAN, JOSEPH |
| **Patient ID** | 30314272 |
| **Chain** | 30314272 |
| **DOB** | |
| **Sex** | Male |
| **Workorder** | 24521919 |

Page 1 of 4

### Positive Findings:

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Pentobarbital | 48 | mcg/mL | 001 - Femoral Blood |
| Ethanol | 14 | mg/dL | 001 - Femoral Blood |
| Blood Alcohol Concentration (BAC) | 0.014 | g/100 mL | 001 - Femoral Blood |
| Caffeine | Presump Pos | mcg/mL | 001 - Femoral Blood |
| Sertraline | 120 | ng/mL | 001 - Femoral Blood |
| Desmethylsertraline | 280 | ng/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Test | Test Name |
|---|---|
| 3410B | Pentobarbital, Blood |
| 8084B | Postmortem, Expanded w/Vitreous Alcohol and 6-MAM Confirmation, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Gray Stopper Glass Tube | 10 mL | 12/18/2024 07:10 | Femoral Blood | 30314272 |
| 002 | Gray Stopper Glass Tube | 7.75 mL | 12/18/2024 07:10 | Femoral Blood | 30314272 |
| 003 | Red Stopper Glass Tube | 5.75 mL | 12/18/2024 07:10 | Vitreous Fluid | 30314272 |

All sample volumes/weights are approximations.
Specimens received on 12/19/2024.

Exhibit C Page 1

NMS

| | |
|---|---|
| CONFIDENTIAL | |
| Workorder | 24521919 |
| Chain | 30314272 |
| Patient ID | 30314272 |

**Page 2 of 4**

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Pentobarbital | 48 | mcg/mL | 4.0 | 001 - Femoral Blood | GC/MS |
| Ethanol | 14 | mg/dL | 10 | 001 - Femoral Blood | Headspace GC |
| Blood Alcohol Concentration (BAC) | 0.014 | g/100 mL | 0.010 | 001 - Femoral Blood | Headspace GC |
| Caffeine | Presump Pos | mcg/mL | 0.20 | 001 - Femoral Blood | LC/TOF-MS |
| This test is an unconfirmed screen. Confirmation by a more definitive technique is recommended. | | | | | |
| Sertraline | 120 | ng/mL | 10 | 001 - Femoral Blood | LC-MS/MS |
| Desmethylsertraline | 280 | ng/mL | 20 | 001 - Femoral Blood | LC-MS/MS |
| Ethanol | Confirmed | mg/dL | 10 | 001 - Femoral Blood | Headspace GC |

**Examination of the specimen(s) submitted did not reveal any reportable findings by procedure(s) outlined in the accompanying Analysis Summary, other than those listed above. Interpretation of reported findings should be based on the totality of available case information. Reference information is not case-specific but is provided as a general guide.**

## Reference Comments:

1. Desmethylsertraline (Norsertraline; Sertraline Metabolite) - Femoral Blood:

   Desmethylsertraline is the principal metabolite of sertraline and has about 10 to 20% of the pharmacologic activity of the parent analyte. Fifteen adults taking 200 mg daily sertraline had mean trough serum concentrations of 87 ng/mL desmethylsertraline (range 40-189 ng/mL).

   In a report of seven postmortem cases in which sertraline was not related to the cause of death, desmethylsertraline concentrations were 80-990 ng/mL in heart blood. A patient survived an acute overdose with a serum concentration of 1700 ng/mL desmethylsertraline. Her symptoms included confusion, agitation, fever and seizures.

   The blood to serum or plasma ratio is unknown.

2. Ethanol (Ethyl Alcohol) - Femoral Blood:

   Ethyl alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination. Ethanol can also be a product of decomposition or degradation of biological samples.

3. Pentobarbital - Femoral Blood:

   Pentobarbital is a barbiturate sedative hypnotic agent with a short duration of action. It has been used to treat insomnia, for pre-surgical anxiety, and in the control of seizures. It is subject to abuse. Reported plasma concentrations ranging from 1-5 mcg/mL are reported for the sedation-producing effects of pentobarbital whereas concentrations of 5-15 mcg/mL generally produce sleep. Plasma concentrations greater than 10 mcg/mL may produce deep coma. Major adverse effects associated with pentobarbital derive from its CNS-depressant properties including sedation, drowsiness, lethargy, respiratory depression, and coma.

   Reported postmortem concentrations of pentobarbital in fatalities from the substance range from 5-112 mcg/mL.

Exhibit C Page 2

Successive Petition for Post-Conviction Relief -
CONFIDENTIAL
NMS
USDC Case 3:25-cv-00798-CCB   document 1-7   filed 09/18/25   page 57 of 134

Workorder     24521919
Chain         30314272
Patient ID    30314272

Page 3 of 4

## Reference Comments:

4.   Sertraline (Zoloft®) - Femoral Blood:

Sertraline is a selective serotonin reuptake inhibitor used in the treatment of depression. The initial adult dosage is 50 mg daily and can be increased to a maximum of 200 mg daily. Sertraline is subject to significant first pass metabolism with desmethylsertraline as the principal metabolite. Overdose with sertraline may cause sleepiness, nausea, tachycardia, and mydriasis. Fifteen adults taking 200 mg daily sertraline had mean trough serum concentrations of 29 ng/mL (range 9-82 ng/mL) sertraline. The blood to serum or plasma ratio is approximately 1.2.

In a report of seven postmortem cases in which sertraline was not related to the cause of death, sertraline concentrations were 230-460 ng/mL in heart blood. Postmortem blood sertraline concentrations greater than 1,500 ng/mL were considered to be contributory to death in a review of 75 cases. A patient survived an acute overdose with a serum concentration of 2,900 ng/mL sertraline. Her symptoms included confusion, agitation, fever and seizures.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 24521919 was electronically
signed on 12/31/2024 09:17 by:

*Nicholas Laraia*

Nicholas P. Laraia, MSFS, D-ABFT-FT
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

The following test(s) were performed for this case; the scope of each test includes the analyte(s) listed along with the associated reporting limit(s). The reporting limit is the lowest concentration of the analyte that will be reported as positive. Only results that meet reporting criteria at or above the reporting limit appear in the Positive Findings section of the report.

Test 3410B - Pentobarbital, Blood: 001 - Femoral Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Pentobarbital | 4.0 mcg/mL | | |

Test 50011B - Barbiturates Confirmation, Blood: 001 - Femoral Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Butalbital | 0.20 mcg/mL | Phenobarbital | 0.50 mcg/mL |
| Pentobarbital | 0.20 mcg/mL | Secobarbital | 0.20 mcg/mL |

Test 52116B - Sertraline and Desmethylsertraline Confirmation, Blood: 001 - Femoral Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Desmethylsertraline | 20 ng/mL | Sertraline | 10 ng/mL |

Test 52248B - Alcohols and Acetone Confirmation, Blood: 001 - Femoral Blood

Exhibit C Page 3

Successive Petition for Post-Conviction Relief -

NMS

USPC Case 3:25-cv-00798-CCB    document 1-7    filed 09/18/25    page 58 of 134

CONFIDENTIAL

Workorder    24521919
Chain        30314272
Patient ID   30314272

Page 4 of 4

**Analysis Summary and Reporting Limits:**

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

Test 53249FL - Alcohols and Acetone Confirmation, Vitreous Fluid (Forensic): 003 - Vitreous Fluid

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

Test 8084B - Postmortem, Expanded w/Vitreous Alcohol and 6-MAM Confirmation, Blood (Forensic): 001 - Femoral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Barbiturates | 0.040 mcg/mL | Gabapentin | 5.0 mcg/mL |
| Cannabinoids | 10 ng/mL | Salicylates | 120 mcg/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---------|-----------|---------|-----------|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of analyte classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified analyte class are included. Some specific analytes outside of these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs. Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotics, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

Digital data review may have taken place remotely by qualified NMS staff utilizing a secure VPN connection for some or all of the reported results. This is in accordance with and follows CLIA regulations.

Exhibit C Page 4

USDC IN/ND case 3:25-cv-00798-CCB     document 1-7     filed 09/18/25     page 59 of 134

Press Release
View printer-friendly version

<< Back

# Akorn Adopts Comprehensive Policy to Support the Use of Its Products to Promote Human Health

*- Akorn Will Not Ship Directly to Prisons -*

*- Programs to Be Put In Place to Limit Potential Product Diversion for Executions -*

LAKE FOREST, Ill., March 4, 2015 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq:AKRX), today announced the company has adopted a comprehensive policy that endorses the use of its products to promote human health and wellness and condemns the use of its products - particularly midazolam and hydromorphone hydrochloride - in execution protocols.

Akorn's policy statement regarding the appropriate use of its products is as follows:

> *The employees of Akorn are committed to furthering human health and wellness through our vast portfolio of products. In the interest of promoting these values, Akorn strongly objects to the use of its products to conduct or support capital punishment through lethal injection or other means. To prevent the use of our products in capital punishment, Akorn will not sell any product directly to any prison or other correctional institution and we will restrict the sale of known components of lethal injection protocols to a select group of wholesalers who agree to use their best efforts to keep these products out of correctional institutions.*

**Direct Sales to Prisons Prohibited**

Earlier this year, Akorn adopted a policy not to accept direct orders from prison systems. Departments of Correction in the United States who wish to purchase Akorn products for a legitimate medical need may purchase from our approved list of wholesalers. However, prison purchases of hydromorphone hydrochloride injection, USP, and midazolam injection, USP, through these wholesalers will not be allowed.

**Wholesalers Engaged to Help Control Distribution of Midazolam and Hydromorphone**

Building upon Akorn's prohibition of direct sales into prisons, the company is working to ensure that its distributors and wholesalers agree to not resell midazolam and hydromorphone to departments of correction and secondary wholesalers. In addition, Akorn plans to work with wholesalers and distributors to ensure that best efforts are used in other sales channels to prevent the sale of both products to prison systems.

**Akorn Seeking the Return of Midazolam and Hydromorphone from Prison Systems**

Akorn has dispatched a letter to the attorneys general and heads of departments of correction of the states that currently execute inmates or have prisoners on death row along with the United States Attorney General, the United States Secretary of Defense, the Director of the Federal Bureau of Prisons and the Chairman of the Department of Defense Corrections Council reiterating the company's policy on the appropriate use of its products. In addition, Akorn is seeking the return of any the company's products that may have been inappropriately purchased to aid in the execution process.

**About Akorn**

Akorn, Inc. is a specialty pharmaceutical company engaged in the development, manufacture and marketing of multisource and branded pharmaceuticals. Akorn has manufacturing facilities located in Decatur, Illinois; Somerset, New Jersey; Amityville, New York; Hettlingen, Switzerland and Paonta Sahib, India where the company manufactures ophthalmic, injectable and specialty non-sterile pharmaceuticals. Additional information is available on the company's website at www.akorn.com.

**Forward Looking Statements**

This press release includes statements that may constitute "forward-looking statements", including projections of certain measures of Akorn's results of operations, projections of sales, projections of certain charges and expenses, projections related to the number and potential market size of ANDAs, projections with respect to timing and impact of pending acquisitions, and other statements regarding Akorn's goals, regulatory approvals and strategy. Akorn cautions that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated in the forward-looking statements. These statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Because such statements inherently involve risks and uncertainties, actual future results may differ materially from those expressed or implied by such forward-looking statements. You can identify these statements by the fact that they do not relate strictly to historical or current facts. They use words such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with a discussion of future operating or financial performance. Factors that could cause or contribute to such differences include, but are not limited to: statements relating to future steps we may take, prospective products, prospective acquisitions, future performance or results of current and anticipated products and acquired assets, sales efforts, expenses, the outcome of contingencies such as legal proceedings, and financial results. These cautionary statements should be considered in connection with any subsequent written or oral forward-looking statements that may be made by the Company or by persons acting on its behalf and in conjunction with its periodic SEC filings. You are advised, however, to consult any further disclosures we make on related subjects in our reports filed with the SEC. In particular, you should read the

*Exhibit D*

discussion under the caption "Forward-Looking Statements" regarding forward-looking statements in our Annual Report on Form 10-K, as it may be updated in subsequent reports filed with the SEC. That discussion covers certain risks, uncertainties and possibly inaccurate assumptions that could cause our actual results to differ materially from expected and historical results. Other factors besides those listed there could also adversely affect our results.

CONTACT: Investors/Media:
         Dewey Steadman
         Executive Director, Investor Relations
         (847) 582-6923
         investor.relations@akorn.com



Akorn, Inc.

Exhibit D



# sagent.



## Resources

News, product information, policies and more. We can help
you get the information you need.

## News & Updates

Browse all press releases, product updates
announcements and more.

Exhibit E

**Sagent and Qilu Announce Strategic Collaboration to Expand Access to Critical Injectables in U.S.**

July 7, 2025                                    Press Releases

**MICAFUNGIN for Injection 100mg Reconstitution Carton Error Letter**

September 6, 2024                               Product Updates

**DOCETAXEL Injection, USP Recall Information**

May 28, 2024                                    Product Recalls

**MethylPREDNISolone Acetate Injectable Suspension, USP Recall Information**

May 13, 2024                                    Product Recalls

# Product Information Downloads



Product Catalogs
▼

Wholesaler Numbers & Safety Data Sheets

# Policies

## Anti-Capital Punishment Statement

Sagent is dedicated to improving the outcomes of patients treated by doctors, nurses, pharmacists and other healthcare professionals throughout the United States by supplying an extensive portfolio of injectable pharmaceutical products. In order to help ensure that patients have access to our products for use in accordance with the products' labels but to ensure our products are not used in capital punishment, Sagent is implementing appropriate distribution controls and other measures. In particular, Sagent will not accept orders from correctional facilities and prison systems for products believed to be part of certain states' lethal injection protocols. Also, each of Sagent's distributors and wholesalers will be asked to make

Exhibit E

Successive Petition for Post-Conviction Relief -
Roy Lee Ward

commitments not to sell or distribute any such products to these facilities.

Privacy Policy   +

Return Goods Policy   +

Sales Terms and Conditions   +

Terms of Use for Site(s)   +

sagent.

Enter your email to stay up to date
about Sagent news and products

Exhibit E

including more information about
**PreventIV Measures®** Packaging
and Labeling and how to Discover
Injectables Excellence® with Sagent.

Enter your email

**Ordering Portal**

Exhibit E

# Request for Public Records

5/8/2025 8:02:48 AM

## Introduction

Your request will be reviewed to determine if we have the information you are seeking and if the information is releasable. This process can take some time depending on the scope of your request. You can track the progress of your request through the portal.

Please note that your APRA filing is a matter of public record and will be displayed in the log of all requests that have been filed with the agency, <u>which you can find here</u>.

## REQUEST FOR PUBLIC RECORDS

### Requestor Information

**Full Name:** Laura L Volk

**Phone Number:** (317) 443-4057

**Email Address:** lvolk@pdo.in.gov

**Company / Organization Name:** PDO - Public Defender of Indiana

### Address

**Address Line 1:** 1 North Capitol Ave., Suite 800

**Address Line 2:**

**City:** Indianapolis

**State:** Indiana

**Zip:** 46204

   I am making this request on behalf of another person.

### Request for Public Records

Pursuant to Indiana's Access to Public Records Law (IC 5-14-3 et. seq.), I would like to inspect these public records.

**Detailed request for public records:** Public Defender of Indiana One North Capitol, Suite 800 Indianapolis, IN 46204-2026 Telephone: (317) 232-2475 May *, 2025 Lloyd Arnold Indiana Department of Correction Indiana Government Center South 302 West Washington Street Indianapolis, IN 46204 Re: Public Records Request Dear Commissioner Arnold, We are writing to request records from the Indiana Department of Correction pursuant to I.C. 5-14-3-3(a). We seek copies of all records in the agency's possession, regardless of who wrote them, regarding the

Successive Petition for Post-Conviction Relief -

following: 1. The quantity, including the number, size and concentration of vials, of any and all drug(s) intended or considered for use in executions currently in possession of IDOC. 2. Any and all drug inventory logs and or drug chain of custody documents related to any drug intended or considered for use in executions from January 1, 2023, to present. 3. Information verifying the amount of money paid by the State of Indiana for the drugs acquired that are intended or considered for use in an execution or executions. 4. Any and all drug logs and/or documents related to the date the drug(s) was acquired from January 1, 2023, to present. If your agency does not maintain these public records, please let us know who does and include the proper custodian's name and address. We agree to pay any reasonable copying and postage fees. As provided by the Indiana Access to Public Records Act, we expect a response without unreasonable delay. If you deny this request, you are required to respond in writing and to state the statutory exception authorizing the withholding of all or part of the public record and the name and title of the person responsible for the denial. The information requested does not violate or conflict with I.C. 35-38-6-1(f). Sincerely, /s/Joanna Green Joanna Green Deputy Public Defender /s/Laura L. Volk Laura L. Volk Deputy Public Defender

**Requestor's Signature Attestation:**

X   I attest that by checking this box it qualifies as a digital signature.

**Date:** 5/8/2025

Exhibit F

# Request for Public Records

6/9/2025 9:03:43 AM

## Introduction

Your request will be reviewed to determine if we have the information you are seeking and if the information is releasable. This process can take some time depending on the scope of your request. You can track the progress of your request through the portal.

Please note that your APRA filing is a matter of public record and will be displayed in the log of all requests that have been filed with the agency, underline which you can find here.

## REQUEST FOR PUBLIC RECORDS

### Requestor Information

**Full Name:** Laura L. Volk

**Phone Number:** (317) 233-5494

**Email Address:** lvolk@pdo.in.gov

**Company / Organization Name:** Public Defender of Indiana

### Address

**Address Line 1:** 1 North Capitol Ave., Suite 800

**Address Line 2:**

**City:** Indianapolis

**State:** Indiana

**Zip:** 46204

I am making this request on behalf of another person.

### Request for Public Records

Pursuant to Indiana's Access to Public Records Law (IC 5-14-3 et. seq.), I would like to inspect these public records.

**Detailed request for public records:** Dear Commissioner Arnold, We are writing to renew and supplement our request records submitted on May 8, 2025, from the Indiana Department of Correction pursuant to I.C. 5-14-3-3(a). We seek copies of all records in the agency's possession, regardless of who wrote them, regarding the following: 1. According to Gov. Mike Braun it is now public knowledge that $1,200,000 was paid for execution drugs, "at $300,000 a pop" and because competitive bidding is required for purchases above $150,000, pursuant to I.C. 5-22 Exhibit G Bidding

materials, protocols or other documents prepared and utilized by the Indiana Department of Correction to ensure full compliance with the law in the legally required bidding process. 2. It is now public knowledge that drugs on two occasions expired, in September 2024 and in April 2025. A previous log provided pursuant to a public records request, which was ultimately delivered in December 2024, only contained a single entry. We request the entirety of the logs given it seems apparent matters were withheld which should have been turned over. 3. All certificates of analysis of the execution drugs in the possession of the Indiana Department of Correction from June 2024 until current day. 4. All DEA Form-222s of the execution drugs in the possession of the Indiana Department of Correction from June 2024 until current day. 5. Documentation of the expiration dates of the drugs actually used in the executions. 6. It is not immediately transparent in available public records where the $1,200,000 expenditure was accounted for in the Indiana Department of Correction's FY 2023 – FY 2025 budget. We request all documentation related to the preparation of the Indiana Department of Correction's budget for FY 2023 – FY 2025 which pertains to proposed and/or predicted costs of the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs, including the budget line-item breakdown. 7. All documentation related to the preparation and/or submittal of off-year budget action requests made from January 2024 to current day by the Indiana Department of Corrections regarding the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs. 8. All documentation submitted to the Indiana Auditor of State by the Indiana Department of Corrections regarding the $1,200,000 expenditure, and any other expenditures, made in the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs. 9. All documentation submitted to the Indiana Office of State Comptroller by the Indiana Department of Corrections regarding the $1,200,000 expenditure, and any other expenditures, made in the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs. If your agency does not maintain these public records, please let us know who does and include the proper custodian's name and address. We agree to pay any reasonable copying and postage fees. As provided by the Indiana Access to Public Records Act, we expect a response without unreasonable delay. If you deny this request, you are required to respond in writing and to state the statutory exception authorizing the withholding of all or part of the public record and the name and title of the person responsible for the denial. The information requested does not violate or conflict with I.C. 35-38-6-1(f). Sincerely, /s/Joanna Green Joanna Green Deputy Indiana Public Defender /s/Laura L. Volk Laura L. Volk Deputy Indiana Public Defender /s/ Laurence E. Komp Capital Habeas Unit, Chief Federal Public Defender, Western District of Missouri /s/ Michelle Law Assistant Federal Public Defender, Western District of Missouri

**Requestor's Signature Attestation:**

X   I attest that by checking this box it qualifies as a digital signature.

**Date:** 6/9/2025

Exhibit G

# Request for Public Records

7/14/2025 2:06:38 PM

## Introduction

Your request will be reviewed to determine if we have the information you are seeking and if the information is releasable. This process can take some time depending on the scope of your request. You can track the progress of your request through the portal.

Please note that your APRA filing is a matter of public record and will be displayed in the log of all requests that have been filed with the agency, which you can find here.

## REQUEST FOR PUBLIC RECORDS

### Requestor Information

**Full Name:** Laura L. Volk

**Phone Number:** (317) 232-2475

**Email Address:** lvolk@pdo.in.gov

**Company / Organization Name:** Indiana State Public Defender Office

### Address

**Address Line 1:** 1 North Capitol Ave., Suite 800

**Address Line 2:**

**City:** Indianapolis

**State:** Indiana

**Zip:** 46204

☐   I am making this request on behalf of another person.

### Request for Public Records

Pursuant to Indiana's Access to Public Records Law (IC 5-14-3 et. seq.), I would like to inspect these public records.

**Detailed request for public records:** Commissioner Arnold, We are writing to supplement our records requests submitted on May 8, 2025, and June 9, 2025, to the Indiana Department of Correction pursuit to Ind. Code 5-14-3-3, et seq. In addition to the requests we submitted on the two above dates, we are also seeking copies of all records in the agency's possession, regardless of who wrote them, regarding the following: 1. All DEA Form 41 documents that reference any execution drug that is in possession of the Indiana Department of Correction for the period of May

Exhibit H

2024 to present. Based on the governor's statements, at least two doses of the drugs were destroyed which would necessitate filling out a DEA Form 41. 2. All Flammable Toxic and Caustic Inventory/Issue Logs from May 2024 to present. 3. All Purchase Orders for any drug, ingredient, chemical, or medicine intended to be use in lethal injection executions. 4. All copies of prescriptions for any drugs, chemicals, or medicines acquired for the purpose of anything related to lethal injections. 5. All documents related to the quality or testing of the ingredients, or related to the final testing, of any chemical or substance intended or considered for the use in lethal injection executions, including but not limited to certificates of analysis, extended stability testing, testing lab sheets, chemical logs, purity analysis, or any other correspondence related to the quality of the constitution of any ingredient or chemical considered or intended for the use in lethal injections. 6. All documentation and corresponded, including emails, letters, and faxes, whether internal or external, bearing on the ability to carry out an execution, the ability to acquire any drugs, chemical, or medicines intended for use in lethal injections executions, or discussing any topic related to the execution of prisoners, whether in Indiana or another jurisdiction. This includes all correspondence with any other state department of corrections or any federal agency regarding anything related to executions. 7. Any and all documentation regarding the qualifications of the person or people who set the intravenous lines that deliver the lethal substance to the inmate being executed. 8. ISP 06-26 lists Method 1 and Method 2 under Preparation and Administration of Chemicals. We are requesting any and all documentation of which method was used in executions since December 2024 and which method the Department of Correction intends to use in any upcoming execution this year. If any of the items listed in # 1-8 are not available in document form, please provide a photograph of the requested information. If your agency does not maintain these public records, please let us know who does and include the proper custodian's name and address. We agree to pay any reasonable copying and postage fees. As provided by the Indiana Access to Public Records Act, we expect a response without unreasonable delay. If you deny this request, you are required to respond in writing and to state the statutory exception authorizing the withholding of all or part of the public record and the name and title of the person responsible for the denial. The information requested does not violate or conflict with I.C. 35-38-6-1(f). Sincerely, /s/Joanna Green Joanna Green, Deputy Indiana Public Defender /s/Laura L. Volk Laura L. Volk, Deputy Indiana Public Defender /s/ Laurence E. Komp Capital Habeas Unit, Chief Federal Public Defender, Western District of Missouri /s/ Michelle Law Assistant Federal Public Defender, Western District of Missouri

**Requestor's Signature Attestation:**

X   I attest that by checking this box it qualifies as a digital signature.

**Date:** 7/14/2025

Exhibit H



**STATE OF INDIANA**
**Department of Correction**
Indiana Government Center—South

Eric J. Holcomb                302 W. Washington Street • Indianapolis, Indiana 46204-2738                Christina Reagle
Governor                Phone: (317) 232-5711 • Fax: (317) 232-6798 • Website: www.in.gov/idoc/                Commissioner

October 8, 2024

Joanna Green
Office of the Public Defender of Indiana
One North Capital, Suite 800
Indianapolis, IN 46220

Re: Public Records Request received August 13, 2024

Dear Ms. Green,

You submitted the following request for records to the Indiana Department of Correction (IDOC) on August 13, 2024, seeking:

> *We seek copies of all records in the agency's possession, regardless of who wrote them, regarding the following:*
> *1. The quantity, including the number, size and concentration of vials, of any and all drug intended or considered for use in executions currently in possession of IDOC.*
> *2. The expiration date of any and all drugs intended or considered for use in executions currently in possession of IDOC.*
> *3. The lot numbers of any and all drugs intended or consider for use in executions currently in possession of IDOC.*
> *4. Any and all drug inventory logs and or drug chain of custody documents related to any drug intended or considered for use in executions from January 1, 2023 to present.*
> *5. Information verifying the amount of money paid by the State of Indiana for the drugs acquired that are intended or consider for use in an execution or executions.*
> *6. A redacted copy of the prescription needed to secure a controlled substance.*
> *7. Any and all drug logs and or documents related to the sterility and potency of related to any drug intended or considered for use in executions from January 1, 2023 to present.*
> *8. Copies or photographs of any and labels documenting the name of the lethal substance, its dosage, a projected expiration date, and a statement that the lethal substance shall be used only by the department of correction for the purpose of carrying out an execution by lethal injection related to any drug intended or considered for use in executions from January 1, 2023 to present.*
> *9. Any and all policies related to the manner of storage and current logs related to the storage of any drug intended or considered for use in executions from January 1, 2023 to present.*
> *10. The current execution protocol.*

Exhibit I

Enclosed are records responsive to your request.  As a courtesy, we are providing these records to you free of charge.

Certain records and/or portions of records have been withheld from disclosure and are not being produced in this response in accordance with and as permitted by the laws of the State of Indiana, as follows:

- Ind. Code § 5-14-3-4(a)(1), which is summarized as follows, records that are declared confidential by state statute—specifically:
  - Ind. Code § 35-38-6-1(f), which is summarized as follows: declaring confidential, not subject to discovery, and inadmissible the identity of a person who enters into a contract with the department of correction for the issuance or compounding of lethal substances necessary to carry out an execution by lethal injection; the identity of an officer, an employee, or a contractor of such a person; the identity of a person contracted by such a person to obtain equipment or a substance to facilitate the compounding of a lethal substance; and information reasonably calculated to lead to the identity of such a person.
  - Ind. Code § 35-38-6-6(e), which is summarized as follows: requiring the department of correction to keep confidential the identities of persons who assist the warden of the state prison in an execution, and allowing the department of correction to classify as confidential and withhold from the public any part of a document relating to an execution that would reveal the identity of a person who assists the warden in the execution.
- Ind. Code § 5-14-3-4(a)(1) & (8), which are summarized as follows, records that are declared confidential by state statute, or by or under rules adopted by the Supreme Court of Indiana—specifically:
  - Ind. Code § 33-43-1-3(5), which is summarized as follows: requiring an attorney to maintain the confidence, and preserve the secrets, of the attorney's client; and
  - Ind. Code § 34-46-3-1(1), which is summarized as follows: exempting attorneys from requirements to testify regarding confidential communications made to them in the course of their professional business, and as to advice given in such cases; and
  - Ind. Rule of Trial Procedure 26(B)(1), which is summarized as follows: exempting privileged communications from discovery.
- Ind. Code § 5-14-3-4(b)(2), which is summarized as follows: records that are work product of an attorney representing, pursuant to state employment or an appointment by a public agency, a public agency or the state.
- Ind. Code § 5-14-3-4(b)(6), which is summarized as follows: records that are advisory or deliberative material.
- Ind. Code § 5-14-3-4(b)(7), which is summarized as follows: diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal.
- Ind. Code § 5-14-3-4(b)(10), which is summarized as follows: records containing administrative or technical information that would jeopardize a security system.
- Ind. Code § 5-14-3-4(b)(19), which is summarized as follows: records for which public disclosure would have a reasonable likelihood of threatening public safety by exposing a vulnerability to terrorist attack.

The person responsible for withholding the records is Anna Quick, Chief Legal Officer.

Exhibit I

Accordingly, we have completed our response to your public records request and are closing our file at this time. If you have any questions regarding this request, please contact DOCPublicrecords@idoc.in.gov.

Respectfully,

Anna Quick
Chief Legal Officer
Indiana Department of Correction

Exhibit I

# CONFIDENTIAL

## INDIANA DEPARTMENT OF CORRECTION
### *INDIANA STATE PRISON*
### *FACILITY DIRECTIVE*

### ISP 06-26:  EXECUTION OF DEATH SENTENCE

A.  **PURPOSE**:

The purpose of this Facility Directive is to establish appropriate guidelines to enable the Indiana State Prison to comply with state statutes governing the administration of the death penalty.

B.  **LEGAL BASIS**:

1.  **EXECUTION OF DEATH SENTENCE; SPECIFIED TIME AND DATE; EXECUTIONER:**

   a.  The punishment of death shall be inflicted by intravenous injection of a lethal substance or substances into the convicted person in a quantity sufficient to cause the death of the convicted person and until the convicted person is dead.

   IC 35-38-6-1(a).

   b.  The Warden of the State Prison, or persons designated by the Warden, shall designate the person who is to serve as the executioner (referred to herein as the "Execution Director").

   IC 35-38-6-1(c).

2.  **PLACE OF EXECUTION OF DEATH SENTENCE:**

   The execution must take place inside the walls of the state prison in a room designed for that purpose.  The department of correction shall provide the necessary room (referred to herein as the "Execution Chamber") and appliances to carry out the execution as provided in this chapter.

   IC 35-38-6-5.

3.  **PERSONS PERMITTED TO BE PRESENT AT THE EXECUTION OF DEATH SENTENCE:**

   a.  Only the following persons may be present at the execution:

      i.  The Warden and any assistants who are necessary to assist in the execution;

1

Revised June 17, 2024

Exhibit I

    ii.      Up to two (2) physicians;

    iii.     The spiritual advisor of the convicted person;

    iv.     The State Prison Chaplain;

    v.      The convicted person may invite up to, but no more than, five (5) relatives or friends to attend;

    vi.     Up to eight (8) of the following members of the victim's immediate family who are at least eighteen (18) years of age;

        a.      The victim's spouse.

        b.      One or more of the victim's children.

        c.      One or more of the victim's parents.

        d.      One or more of the victim's grandparents.

        e.      One or more of the victim's siblings.

The offender shall submit a list of witness names and their relationships: (family, friends, and spiritual advisor) to the Warden for approval at least twenty (20) days prior to the execution date.

If there was more than one (1) victim, no more than (8) eight persons who are members of the victims' immediate families may be present at the execution.

If an agreement between the victims' immediate family members cannot be reached, the Warden shall conduct a lottery to determine which members are selected to be present at the execution.

The Warden shall provide a support room for the use of an immediate family member of the victim who is not selected to be present at the execution and persons invited by the immediate family for support. One or more members of the designated Critical Incident Stress Management (CISM) Team shall accompany the individual(s).

The Warden may exclude a person from viewing the execution if it is determined that the presence of the person would threaten the safety and security of the Indiana State Prison. The determination will be provided in writing.

IC 35-38-6-6(a)-(d).

**b.**    The Department of Correction shall keep confidential the identities of persons who assist the Warden of the State Prison in an execution and may classify as confidential and withhold from the public any part of a document relating to an execution that would reveal the identity of a person who assists the Warden in the execution.

IC 35-38-6-6(e).

2

Exhibit I

C.   **NEWS MEDIA**:

   1.   The Commissioner or their designee shall designate a Central Office staff person to assist the State Prison in the coordination of media communications.  The designated Central Office staff person shall be present at the State Prison to assist with the media during the period preceding the execution.  Additionally, the Warden shall designate a staff person to assist with coordinating media activities.

   2.   Authorized and properly identified representatives of the news media shall be permitted access to a designated area.  Media personnel must remain in the designated area until the execution has been completed.  The Warden or designee shall assign a staff person to remain with the media personnel at all times.

   3.   Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber.  The only exception to this rule is if the offender requests, in writing, that a member or members of the media be present.  The name of the individual(s) must then be included on the list of five (5) persons who are invited by the offender to witness the execution.

   4.   Under no circumstances will cameras or recorders not under the control of the Department of Correction be permitted in the execution area.

D.   **COMMUNICATION SYSTEMS**:

   1.   Prior to an execution date, the Warden or designee shall ensure appropriate communications systems are established in close proximity to the Execution Chamber.  At a minimum, these communication systems shall consist of the following:

      a.   A dedicated line to the Governor's office and residence;

      b.   A dedicated line to the Supreme Court Administrator;

      c.   A dedicated line to the Indiana Department of Correction Central Office Command Center;

      d.   An open line between the Execution Chamber and the Indiana State Prison Command Center;

      e.   An open line between the Lethal Injection Chemical Room and the Physician's Room;

      f.   Two-way communication radio open to outside areas, on a frequency separate for the frequency used for general in-house communications.

   2.   The Warden or designee shall ensure that adequate staff persons are assigned to continually monitor the communication system during the time preceding the execution.

3

Exhibit I

E.    **SELECTION OF EXECUTION TEAM AND SUPPORT PERSONNEL**:

1.    When an Execution Team vacancy occurs, the Warden or designee shall appoint a Screening Committee to assist with the Execution Team selection process. ██████████████████████████████████████████████ The Screening Committee shall interview appropriate personnel and assess their emotional stability and their willingness/ability to handle the stress of assisting with the execution. The following issues are discussed:

Personal History and Background

a.    Obtain information about the individual in order to ascertain whether or not they have life experiences which might make their participation more difficult.

b.    Determine values regarding death penalty.

c.    Determine religious values and talk about potential conflicts in regard to taking another person's life.

d.    Obtain information about the individual's personal support system (e.g., family, friends, etc.) that is available to help cope with stress.

Medical/Psychological Background

a.    Determine this person's belief about their medical/physical ability to cope with stressful situations.

b.    Solicit examples of how this person copes with other stressful situations in their life.

c.    Establish current coping mechanisms used by this person and evaluate their ability to learn new skills if necessary.

d.    Evaluate levels of trust this person has in their own ability to carry out difficult tasks, and their perceived beliefs regarding how others view that ability.

e.    Define the individual's interpretation of confidentiality.

f.    Identify issues that would prevent them from carrying out this type of duty.

g.    Determine if they have ever been involved with a counseling experience and what their reaction was to it.

Professional Experience

a.    Identify professional experiences (e.g., departmental, custody, educational, administrative, medical, etc.) that would aid them in performing this task.

4

Exhibit I

        b.   Identify the professional characteristics of this individual and what role they played in making them a candidate to become a member of the team.

    2.   Following the individual screening process, the Committee shall provide a list of candidates to the Warden. The Warden shall approve the personnel who will assist in the execution.

    3.   ███████████████████████████ shall select, subject to the approval of the Warden, personnel who will perform support roles in the execution process, including, but not limited to: security, communications, and other appropriate support activities.

    4.   During the preparation for an execution, should a staff person desire to be relieved of these responsibilities or should observations of a staff person's behavior dictate that they may be unsuitable for the task, they will be relieved of these duties. In either case, the Warden or designee shall contact ████████████████████ to arrange a debriefing session with the staff person(s).

    5.   The Warden or designee shall locate and select a physician to be present at the State Prison at the time of the execution. The physician's duties shall include monitoring or performing any medical procedures conducted in accordance with this Facility Directive and pronouncing death.

**F.**    **TEAM TRAINING**:

Staff selected for the Execution Team are trained at least quarterly. The training includes intensive cell extraction/restraint training, protocols in starting IV's including practical training with regional EMS oversight. Lighting is evaluated during training sessions by the team. The IV team also uses an intravenous light and equipment such as a Venoscope, which assists in identification and finding of veins to start the IV. Practical training is conducted in the Execution Chamber so that staff are well prepared and accustomed to the environment prior to the actual execution.

Staff will consult with a licensed physician in the preparation and administration of the lethal chemicals used to carry out the duty described in IC 35-38-6-1. This consultation shall include an examination of how the lethal chemicals are transferred to syringes and delivered.

**G.**    **PRELIMINARY PROCEDURES**:

    1.   Thirty (30) days prior to a scheduled execution or one (1) week after receiving a warrant for execution or equivalent order for the execution of a death sentence ("Execution Order"), ████████████████████████████████████████████████████ who will be the offender's contact person, will attend a meeting with the condemned offender. They will discuss the lethal injection procedures,

Exhibit I

establish a visiting list for approval, and determine if the offender wishes to prepare a will and write a last statement. The offender shall receive translated instructions and materials if English is not his primary language. If a literacy problem exists, a staff member will assist the offender in understanding the material. If the offender refuses to leave his cell for the notification meeting, the Warden may meet with the offender in front of his cell and provide him a packet of the applicable information, including appropriate timelines.

2. The offender will receive a full medical evaluation, including venous access, approximately thirty (30) days prior to a scheduled execution. A weekly assessment of the offender's veins will be conducted up to the day of execution. Fluids will be provided orally to maintain hydration.

3. The facility shall be constantly monitored during the days immediately before the scheduled date of execution. Activities of the facility may be adjusted in order to maintain a proper level of security.

4. Visitors of the condemned will visit in conjunction with regular visiting hours, 8:00 a.m. through 4:30 p.m. Extended visiting hours (visitation) may be requested and approved only by the Warden or designee. Legal counsel shall be subject to the same hours listed above.

   Approved spiritual advisors may visit longer if extra time is requested and approved in advance by the Warden or designee. All visits will conclude by 10:00 p.m.

5. Prior to the scheduled date of the execution, the Warden or designee shall arrange for the Execution Chamber to be equipped, and for the necessary supplies to be ordered.

6. An inspection of the building and immediate area housing the Execution Chamber will be made weekly, beginning thirty (30) days prior to the scheduled date of execution, and beginning five (5) days prior to the scheduled execution, inspections will be conducted daily. The inspection will be conducted by the Deputy Warden of Operations, the Physical Plant Supervisor, and a custody supervisor. This inspection will concentrate on the level of security and sanitation of the building in general, and more specifically, the immediate area where the execution will occur.

7. At the discretion of the Warden, the condemned offender may be moved to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ within thirty (30) days of the scheduled date of the execution. The custody staff person assigned to this post shall maintain constant supervision of the condemned offender and will maintain a log, recording the offender's activities and visitors. In the event the condemned offender is not moved to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Custody staff are to maintain observation of the offender and maintain a log, recording the offender's activities and listing all persons entering and exiting the housing unit.

Exhibit I

8.  Prior to the scheduled date of the execution, the Warden shall determine the appropriate time to move the condemned offender to a holding cell in the Execution Chamber. When moved, appropriate staff shall be assigned to maintain security and continue constant observation of the offender. Staff are to maintain a log, recording the offender's activities and listing all persons entering and exiting the Execution Chamber. The offender may have in his possession the following items: Bible or equivalent religious book and other religious materials, up to 20 photographs, address book, eyeglasses, appropriate writing materials and any other items, as approved by the Warden or designee. A television and telephone will be provided for the offender's use.

9.  If the condemned offender wishes to receive a special meal, he will be permitted to order his choice of food (within reason, based on availability and legality) seven (7) days prior to execution. This meal will be eaten thirty-six (36) to forty-eight (48) hours before the execution and is to be consumed in one sitting, not exceeding four (4) hours. Any leftovers will be removed from the cell and discarded. The condemned offender is to have nothing to eat or drink past 12:00 p.m. on the day of the execution. A limited amount of water will be permitted in order to take oral medication.

10. If requested, an approved spiritual advisor or prison chaplain may be present with the offender on the day preceding the execution to provide pastoral care and sacramental functions. The name of the spiritual advisor must be submitted to the Warden or designee for approval a minimum of twenty (20) hours prior to the execution. The spiritual advisor may visit in the Execution Chamber until 10:00 p.m. the night preceding the execution.

11. The offender may be provided with a sedative upon request. The strength should be sufficient to calm him, however, not enough to render him unconscious.

12. One team member will be available to translate if English is not the offender's primary language.

**H.    RECORD KEEPING:**

Upon receipt of an Execution Order, all associated correspondence will be forwarded to the Warden's Office. This includes, but is not limited to: petition for clemency, clemency schedule, request for modification of visitation, personal autopsy preference, last will and testament, request for spiritual advisor, request for execution witness, request for last meal, media statements or interview requests, news releases, funeral arrangements, confirmation of coroner and funeral home, E-Squad Security Procedures, victim witnesses, master visiting list, staff authorized in the Execution Chamber and Command Center, facility memoranda, all chamber inspection reports, team practices, rehearsal schedule, all observation logs and CISM debriefing schedule. Upon confirmation of a stay of execution or

7

Exhibit I

the completion of an execution, all documents will be maintained in accordance with record retention requirements or department policy.

I.    **EXECUTION PROCEDURES**:

1.    The execution of an offender shall generally occur between midnight and no later than an hour before sunrise on a date fixed by the sentencing court. The execution must not occur until, at least, one hundred (100) days after the conviction. An example of an execution schedule is located in 06-26 Appendix B.



2.

3.

4.

5.    The Warden or designee shall designate staff to monitor the communications systems put in place for the execution.

6.    Persons authorized to be in the facility command center are as follows: █████████████████████████████████████████████████ A list of approved persons will be maintained by the Warden.

7.    The ████████████████████ will record the steps taken during the execution process and log the times. In carrying out the execution process, the followings steps shall be taken:

    a.    Injection Team prepares the syringes to be used during the execution, according to the designated injection method. ██████ IV Team sets up IV trays.

    b.    ███████████████████████████

    c.    ██████████████████████

    d.    The Warden or designee and ███████████ report to the Execution Chamber.

    e.    Security staff escorts offender witnesses to the holding location. A chaplain is available if needed.

8

Exhibit I

The Warden calls the command center to ensure the execution is to proceed.

f.  The Extraction Team is notified by radio.

    i.  At the command of the Warden or designee, the Extraction Team will approach the holding cell and ask the condemned offender to approach the cell door and be handcuffed.

    ii.  The ███████████████ will then ask the offender to step back and place his hands above his head, on the wall in front of him.  (If the condemned offender refuses to cooperate, Departmental Extraction Policy will be used.)

    iii.  The ███████████████ will unlock the cell door to allow the Extraction Team to enter.  The offender will then be escorted from the cell and walked into the Execution Chamber.  He will be assisted onto a stationary gurney.  His legs will be secured to the gurney with soft leather restraints on his ankles, as well as a soft leather strap that will go across his chest and upper arms. His wrists will be secured to the gurney with soft restraints.  The team leader will ensure good circulation of the extremities. The Extraction Team will return to the holding cell staging area, out of view of any witnesses.

g.  The IV Team is notified by radio to move in.  The IV Team will insert a venous catheter in each arm, attach the necessary tubing, and start an IV flow by slow infusion consisting of a saline solution. Continued surveillance of the IV site will be conducted to monitor for infiltration. The catheter must be properly secured using tape. The IV process will be observed by the physician, Warden, Execution Director and Injection Team.

If a suitable vein cannot be discovered in an arm, the IV Team shall substitute a suitable vein in another part of the body under the supervision of the physician.

Upon completion, the IV Team announces "IV process completed," then proceeds to the holding cell staging area.

h.  If access cannot be established through peripheral intravenous cannulation, the physician will provide access by central venous cannulation or alternative means in accordance with reasonable medical standards.

Upon completion, the Execution Director announces "IV process completed." ███████████████████████

i.  The Warden or designee will then read the Execution Order to the condemned offender.

9

Exhibit I

    i.    After the Execution Order has been read, the Warden or designee will then ask the condemned offender if he has any last words. If he does, they will be recorded by the Warden, ███████████ and/or designee.

         NOTE: The condemned offender will be given ample opportunity to prepare a written statement prior to the execution.

    ii.    The ███████████ secures the recorder, checks IV lines and notifies the ███████████████ to transport the witnesses into the viewing area by radio.

    iii.    Victim witnesses will be escorted from the Deputy Warden's office or designated area to the Execution Chamber and seated left of the partition. ██████ and law enforcement will provide security.

         NOTE: The victim witnesses who do not wish to view the execution or cannot view the execution will remain in the Deputy Warden's office or designated area.

    iv.    Offender witnesses will be escorted from the holding location and seated to the right of the partition. ██████ and law enforcement will provide security.

j.    The ███████████████ provides notice that the witnesses are in place.

k.    The Warden checks with the Command Center to proceed.

l.    The Warden orders the lights to be dimmed and the viewing window blinds and louvered doors opened.

m.    The Warden instructs the Injection Team to proceed.

n.    The Injection Team proceeds, advising the Warden by radio after each syringe. Extreme care will be exercised during the selection of syringes. The Injection Team members will verify the syringe by number, color code, and description prior to use. Once the "Proceed" command is given, the injection procedure will begin with slow, even syringe pressure. IV lines will be constantly monitored for leaks or stoppage. The injection procedure will continue until all the chemicals in the syringe set have been injected into the condemned offender and the offender is pronounced dead.

o.    The Injection Team provides notice that the injection process is complete.

p.    Following the completion of the injection process, the Warden will then order the blinds and louvered doors to be closed and the lights turned up. The physician comes out and pronounces time of death, and then returns to the holding area.

Exhibit I

q.  If the offender's heart has not stopped, the physician will return to the holding area, the lights will be dimmed, the blinds and louvered doors will be reopened, and the Warden or designee shall order the injection procedure to be repeated. After this procedure is completed, the blinds and louvered doors will be closed, and the lights turned up.

The physician reenters and pronounces time of death, and then returns to the holding area.

r.  The Warden advises the Command Center of the time of death and of the last statement if there is one.

s.  The ████████████████████████████████ that the witnesses may leave.



Designated State Prison staff will be available to address questions from witnesses.

t.  The ████████████████████████████████ when the visiting areas are clear.

u.  IV Team, Injection Team, Extraction Team are authorized to leave by the Warden.

v.  ████████████████████

w.  The Warden returns to the facility Command Center.

x.  ████████████████████████████████ to assist the ID & Release Officer in the preparing, photographing and fingerprinting of the body. The Warden or designee may request that color photographs are taken and maintained by ████████████ ████████ staff.

y.  The Coroner is escorted to the Execution Chamber to photograph, claim, and prepare the body for transportation. The body will be released to the Coroner utilizing established departmental procedures.

11

Exhibit I

z.   The hearse enters the institution through ███████████ ███████████ The deceased is loaded into the hearse for transport to the funeral home.

**J.   CODES FOR COMMUNICATION:**



(2 members will have headsets)
(2 members will have headsets)
(2 members will have headsets)

**K.   POST EXECUTION PROCEDURES:**

1.   After the body has been removed from the facility, a representative of the facility or Department of Correction shall make a statement to the news media.

2.   Following the execution, any staff who request it shall meet with CISM staff for debriefing.

3.   The Warden or designee shall return the Execution Warrant to the Clerk of the sentencing court as soon as possible following the execution of the offender.

4.   The Warden shall conduct a debriefing, separate from the debriefing by CISM, to identify concerns with personnel involved with the execution process. This debriefing shall be conducted as soon as practical following the execution.

**L.   REVIEW:**

The contents of this document will be reviewed and/or revised as needed on an annual basis, in accordance with Policy 00-04-101, "THE DEVELOPMENT, and APPROVAL AND IMPLEMENTATION OF POLICY."

APPROVED: ____Signature on file_____     DATE: _____
                **Warden, Indiana State Prison**

Exhibit I

# CONFIDENTIAL

## ISP 06-26
## Appendix A

### PREPARATION AND ADMINISTRATION OF CHEMICALS

A.    **Procurement and Maintenance of Inventories**

1.    Procurement of pharmaceuticals is in accordance with applicable state and federal law. The Warden and the ▬▬▬▬▬▬▬▬ will manage all pharmaceuticals, once delivered to the Administration Building, for secured storage and inventory.

2.    Inventories must be adequate to cover expected usage. Sharps and controlled substances must be maintained under careful control at all times. A perpetual inventory of pharmaceuticals and supplies (e.g., needles, syringes, medications, trays, etc.) will be maintained.

3.    Expired and/or damaged pharmaceuticals may be used by the Execution Team for training purposes. These items will be clearly marked as expired and/or damaged and will be destroyed in accordance with established protocols.

B.    **Preparation of Chemicals**

1.    **Method 1**

The Injection Team prepares two sets equaling eight (8) injection syringes. One set is used as a backup in the event the first attempt fails. Safety precautions will be exercised when preparing the syringes, including the use of gloves and safety glasses. Spills will be promptly diluted with saline and absorbed with towels. Expiration dates of the drugs are verified prior to use. As each syringe is prepared, it is clearly numbered, color coded and described with the chemical name and amount.

-    Syringe 1: Sodium Pentothal, Pentobarbital (1.0 grams per vial) or Brevital (2.5 grams per vial) is carefully mixed with 50 mL of sterile saline. Two (2) vials are used. This process is under the direct observation of the physician. This syringe is color coded yellow.

-    Syringe 2: Sodium Pentothal, Pentobarbital (1.0 grams per vial) or Brevital (2.5 grams per vial) is carefully mixed with 50 mL of sterile saline. Two (2) vials are used. This process is under the direct observation of the physician. This syringe is color coded yellow.

-    Syringe 3: 60cc syringe is 50 mL of sterile saline and is color coded black.

-    Syringe 4: 60cc syringe is 50 mg of Pancuronium Bromide or Vecuronium Bromide and is color coded blue.

1

Exhibit I

- Syringe 5: 60cc syringe is 50 mg of Pancuronium Bromide or Vecuronium Bromide and is color coded blue.

- Syringe 6: 60cc syringe is 50 mL of sterile saline and is color coded black.

- Syringe 7: 60cc syringe is 50 mEq of Potassium Chloride and is color coded red.

- Syringe 8: 60cc syringe is 50 mEq of Potassium Chloride and is color coded red.

2.   **Method 2**

The Injection Team prepares three identical sets equaling nine (9) injection syringes. Two (2) of the sets will be used as backups. Safety precautions will be exercised when preparing the syringes, including the use of gloves and safety glasses. Spills will be promptly diluted with saline and absorbed with towels. Expiration dates of the drugs are verified prior to use. As each syringe is prepared, it is clearly numbered, color coded and described with the chemical name and chemical amount.

**Primary Set A**:

- Syringe 1A: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1A and color coded yellow.

- Syringe 2A: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2A and color coded yellow.

- Syringe 3A: 60 mL of a sterile saline solution, labeled 3A and color coded black.

**Backup Set B**:

- Syringe 1B: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1B and color coded yellow.

- Syringe 2B: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2B and color coded yellow.

- Syringe 3B: 60 mL of a sterile saline solution, labeled 3B and color coded black.

Exhibit I

**Backup Set C**:

- <u>Syringe 1C</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1C and color coded yellow.

- <u>Syringe 2C</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2C and color coded yellow.

- <u>Syringe 3C</u>: 60 mL of a sterile saline solution, labeled 3C and color coded black.

3.  After the Injection Team prepares all syringes with the proper chemicals and labels as provided above for the method selected, the IV Team must ensure that the IV setup is completed.

**C.    Administration of Chemicals**

1.  **Method 1**

    a.  Syringes 1 (yellow), 2 (yellow), 3 (black), containing Sodium Pentothal, Pentobarbital, or Brevital and the saline solution, are injected in order. The offender will be closely and vigilantly monitored to ensure the surgical depth or surgical plane is deep enough so that the offender is unconscious. The depth may be tested through the use of ammonia inhalant, pin prick, or other accepted stimuli.

    b.  Syringes 4 (blue), 5 (blue), and 6 (black), containing Pancuronium Bromide or Vecuronium Bromide and the saline solution, are injected in order.

    c.  The Warden signals approval to proceed. Syringes 7 (red) and 8 (red), containing Potassium Chloride, are injected in order.

    d.  At the completion of the process and after a sufficient amount of time for death to have occurred, the injection process will be completed.

2.  **Method 2**

    a.  The lethal chemicals from Syringes 1A and 2A shall be injected in order.

    b.  The saline solution from Syringe 3A shall be injected.

    c.  Following a sufficient amount of time for death to occur after the injection of Syringe 3A, the Physician shall examine the offender to determine if death has occurred.

3

Exhibit I

If the offender is still exhibiting visible signs of life, Syringes 1B and 2B shall be injected, followed by Syringe 3B.

If the offender is still exhibiting visible signs of life, Syringes 1C and 2C shall be injected, followed by Syringe 3C.

    d.    At the completion of the process and after a sufficient amount of time for death to have occurred, the injection process will be completed.

3.    Each chemical must be administered in the predetermined order in which the syringes are prepared and labeled. The full dose contained in each syringe must be administered to the offender. If all electrical activity of the heart ceases prior to administering all of the chemicals prepared, the Injection Team must continue to follow the protocol and administer all remaining chemicals in the set in the order and amounts set forth above.

4.    The IV lines will be constantly monitored for leaks or stoppage. If this situation should occur, the Injection Team shall immediately transfer to the alternate line to restart the injection procedure. The Injection Team will not proceed until approval is obtained from the Warden.

5.    The actual time of death will be when the physician pronounces death.

6.    All of the prepared chemicals must be used or properly disposed of no later than twenty-four (24) hours after the time designated for the execution to occur. Should a stay delay the execution beyond twenty-four (24) hours of the scheduled executions, another complete set of syringes must be prepared in accordance with this procedure when the execution is rescheduled.

**D.    Disposal**

All supplies and equipment used during an execution will be discarded or sanitized in accordance with established protocols.

4

Exhibit I



1

Exhibit I



USDC IN/ND case 3:25-cv-00798-CCB    document 1-7    filed 09/18/25    page 91 of 134

2

Exhibit I



3

Exhibit I



4

Exhibit I



Exhibit I



6

Exhibit I



7

Exhibit I



# FLAMMABLE TOXIC AND CAUSTIC INVENTORY / ISSUE LOG
State form 2173 (R / 9-88)

Name of facility: Indiana State Prison

1. Name of material: PENTOBARBITAL

2. Location: X-Ray Chemical Safety

3. Amount on hand at start of form: Ø - NONE

| 5. DATE | 6. AMOUNT NEW RECEIPTS | 7. AMOUNT ISSUED | 8. CONFIRMING INITIALS | 9. PERSON RECEIVING | 10. AMOUNT RETURNED | 11. CONFIRMING INITIALS | 12. BALANCE |
|---|---|---|---|---|---|---|---|
|  |  | Ø |  | Ø | N/A |  |  |
|  | Ø | Ø |  | Ø | N/A |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

DISTRIBUTION: Safety Hazard Manager, File

Exhibit I



**FLAMMABLE TOXIC AND CAUSTIC INVENTORY / ISSUE LOG**
State form 2173 (R / 9-98)

Name of facility: INDIANA STATE PRISON

1. Name of material: PENTOBARBITAL

2. Location: X-Ray Chemical Safe

3. Amount on hand at start of form: 0 - None

| 5. DATE | 6. AMOUNT NEW RECEIPTS | 7. AMOUNT ISSUED | 8. CONFIRMING INITIALS | 9. PERSON RECEIVING | 10. AMOUNT RETURNED | 11. CONFIRMING INITIALS | 12. BALANCE |
|---------|------------------------|------------------|------------------------|---------------------|---------------------|-------------------------|-------------|
|  |  | Ø |  | Ø | N/A |  |  |
|  | Ø | Ø |  | Ø | N/A |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

DISTRIBUTION: Safety Hazard Manager; File

Exhibit I



# Office of the Attorney General
## Washington, D. C. 20530

January 15, 2025

MEMORANDUM FOR THE DIRECTOR, FEDERAL BUREAU OF PRISONS

FROM:        THE ATTORNEY GENERAL

SUBJECT:    DETERMINATION FOLLOWING REVIEW OF THE FEDERAL EXECUTION
                    PROTOCOL ADDENDUM AND THE MANNER OF EXECUTION
                    REGULATIONS

On July 1, 2021, I issued a memorandum instituting a moratorium on federal executions pending the Department of Justice's (Department) review of certain policies and procedures. *See* Memorandum for the Deputy Attorney General and Others, *Moratorium on Federal Executions Pending Review of Policies and Procedures* (July 1, 2021) ("2021 Memorandum"). The memorandum declared that "the Department of Justice must ensure that everyone in the federal criminal justice system is not only afforded the rights guaranteed by the Constitution and laws of the United States, but is also treated fairly and humanely." *Id.* at 1. The memorandum directed the Office of Legal Policy, under the supervision of the Deputy Attorney General, to coordinate a review of the federal execution protocol addendum, and also a review of the Department's regulations governing the manner of federal executions.

The current regulatory regime, described in the addendum, provides that a federal "sentence of death shall be executed … [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons." 26 C.F.R. § 26.3(a)(4). The addendum states that "[t]he lethal substances to be utilized in federal lethal injections shall be Pentobarbital Sodium." 2019 Memorandum at 7. The then-Attorney General ordered the Bureau of Prisons to adopt the addendum on July 24, 2019. Following the adoption of the addendum, 13 federal executions took place between July 2020 and January 2021.

The 2021 Memorandum instituting the moratorium also noted:

> Although some medical experts have concluded that the use of pentobarbital may risk inflicting painful pulmonary edema, the Supreme Court found that this risk was insufficient "to justify last-minute intervention by a Federal Court" shortly before an execution was scheduled to occur. *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (per curiam). A risk need not meet the Court's high threshold for such relief, or violate the Eighth Amendment, to raise important questions about our responsibility to treat individuals humanely and avoid unnecessary pain and suffering.

2021 Memorandum at 1.

Successive Petition for Post-Conviction Relief -
Roy Lynn Ward
Memorandum for The Director, FBOP
Page 2
Subject: Determination Following Review of The Federal
Execution Protocol Addendum and the Manner of Execution Regulations

The Office of Legal Policy has coordinated review of the addendum and the Department's regulations governing the manner of execution, including, as directed by the 2021 Memorandum, in "consultation with all relevant Department components, including the Bureau of Justice Statistics, Bureau of Prisons, Drug Enforcement Administration, Civil Division, Civil Rights Division, Criminal Division, National Institute of Justice, and U.S. Marshals Service; other state and federal agencies, including the Department of Health and Human Services; medical experts; experienced capital counsel; and other relevant stakeholders, including members of the public, as appropriate." *Id.* at 2. Having assessed the risk of pain and suffering associated with the use of pentobarbital, the review concluded that there is significant uncertainty about whether the use of pentobarbital as a single-drug lethal injection for execution treats individuals humanely and avoids unnecessary pain and suffering.

Because it cannot be said with reasonable confidence that the current execution protocol "not only afford[s] the rights guaranteed by the Constitution and laws of the United States" but "also treat[s] individuals [being executed] fairly and humanely," *id.* at 1, that protocol should be rescinded, and not reinstated unless and until that uncertainty is resolved. In the face of such uncertainty, the Department should err on the side of treating individuals humanely and avoiding unnecessary pain and suffering.

The review also concluded that the amendments made to the Department's manner of execution regulation, made in November 2020, *see* Manner of Federal Executions, 85 Fed. Reg. 75,846 (Nov. 27, 2020), largely reflect statutory law and that thus there is no present reason to modify or rescind them. Nonetheless, the review has concluded that if a federal execution is to take place under this regulation by a manner of execution other than lethal injection of pentobarbital, the Department should, before proceeding, conduct the same kind of evaluation of that manner of execution as was done concerning pentobarbital, with the same consideration of the risks posed by that method.

Therefore, pursuant to the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509 and 510, I hereby direct the Director of the Federal Bureau of Prisons to rescind the addendum to the execution protocol of July 25, 2019, which provides for lethal injection of pentobarbital. I further direct the Director to assist the Office of Legal Policy, under the supervision of the Deputy Attorney General, to conduct evaluations of any other manner of execution, and of the State or local facilities and personnel involved in any such execution, before such other manner may be implemented. Accordingly, the moratorium on federal executions announced on July 1, 2021, remains in effect.

## AFFIDAVIT OF AMANDA JOHNSON

I, Amanda Johnson, after being duly sworn, declare under penalty of perjury, the following to be true to the best of my knowledge and belief:

1. I first met Benjamin Ritchie in school when I was in the sixth grade. At the time, he knew me by my maiden name, Amanda Kellermeier. Ben and I went to school together until he left school. We were boyfriend and girlfriend for several years.

2. I testified during a hearing in Ben's case years ago.

3. I was one of Ben's four witnesses asked to attend the execution. The other three witnesses were two attorneys, Steve Schutte and Mark Koselke, and Hannah Hall, one of Ben's mitigation specialists.

4. On the night of May 19, 2025, we met at a hotel where two Indiana Department of Corrections employees driving a white van picked us up and drove us to the Indiana State Prison. One employee was masked; the other one was not masked.

5. I kept my cellphone with me while we were driven to the prison. We left the hotel at 10:40 p.m. and arrived at the prison at 10:48 p.m. I know the exact times because I sent text messages to my fiancé to let him know what was happening. I texted him both before and after the execution.

6. When we arrived at the prison, I entered the front doors and went through the security screening. The screening was the same as it was for my visits with Ben. At that point, I placed my cellphone in one of the prison lockers. I did not have my phone from the time it was placed in the locker until Hannah gave it back to me after the execution.


Initials

Page 1 of 4

7.  After we were processed, we were taken through two gates to a room on the right. When I visited Ben before, I did not visit in this area. It was new to me. I remember it was very cold in the room. There were no clocks. It seemed like we were waiting in that room for a couple of hours.

8.  The two employees who drove us to the prison were in the room while we waited. When they told us it was time to go, we were taken back to the van we arrived in.

9.  When we got into the van to be moved to the execution building, I saw a clock in the van. I looked at the clock and it read 12:35 a.m. Ben's execution was scheduled for after midnight on May 20, 2025.

10. When we arrived in the witness room, the viewing window blinds were closed. There were 5 chairs in the room. The viewing area was stepped, like a theater. I sat in the second row, and Mark was to my right. Steve was behind me, and Hannah was to his right.

11. The room was oddly angled. The window to the execution chamber was small.

12.  About 30 seconds after sitting down, the blinds opened quickly. I believe it was less than a minute after we all sat down. I saw that it was a woman who opened the blinds and then sat in a chair in the execution chamber to Ben's left next to the window. There was a section of glass separating us from the execution chamber. I could see Ben on the gurney. The gurney was inclined. Benjamin's spiritual advisor was on Ben's right side in a chair seated next to him. Due to the way the viewing room was angled, when I was seated, I could not see Ben's legs unless I leaned toward Mark on my right. Then, I could see more. I believe Mark had a better view due to where he was seated. The


Initials

Exhibit K  Page 2

angle also prevented us from seeing Ben's right arm or hand well. I remember thinking it looked like they laid him out on a cross.

13. When the blinds opened, Ben was making small movements even though he was strapped to the table. His mouth was moving so I assumed he was talking with someone, but I could not hear anything. Ben looked in our direction. He smiled and made a sign with his left hand. I recognized the sign as a hand sign of "I love you." When Ben and I visited for the last time, we did not know what to expect and agreed to make the heart sign to each other. We assumed I would see him walk into the chamber and his hands would be free to make the sign. The sign he ended up making was with his pinkie raised. This was the "I". His index finger and thumb formed the "L" for love. The "U" was formed in the space between the index finger and pinkie which stood for you. I made my sign to Ben, the two-handed sign where your fingers form a heart to meaning "I love you."

14. Ben laid down and closed his eyes. I saw his left-hand clenching and unclenching. Then, Ben suddenly and strongly raised his torso up from the gurney and was held back by the restraints. Ben seemed to me to be trying to jerk out of the gurney. This was about 2 or 3 minutes after the blinds were opened. When he raised up, I hit Mark's arm and grabbed him. I thought Ben was lifted for 5-6 seconds. It was sudden and scared me because I did not expect for something like that to happen. I then said to Mark, "I don't think I can do this. I can't do this." Ben seemed, to me, to be trying to break out of something. He lifted like he was trying to sit up. I saw Ben twitch then he laid back down. It was not like he collapsed back into the gurney. I put my head down for a few seconds. When I pulled myself together and looked back at


Initials

Page 3 of 4

Ben, he seemed peaceful. An older man then walked into view, came to
Ben's left side, and looked at him.

15. After what seemed like a minute, the lady who pulled the blinds up stood up
and closed the blinds.

16. The other three witnesses and I remained in the witness room for only a few
minutes following the execution. Then, we were taken back to the van. I
looked at the clock in the van and saw that it was 12:51 a.m. We then went
back to the main prison building because we had our belongings in the
locker. Hannah ran into the building and gathered our stuff. She gave me my
cellphone and I turned it back on and messaged my fiancé that we were
headed back to the hotel. This was at 1:00 a.m.

_____
Amanda Johnson

**AFFIRMATION**

I, Amanda Johnson, affirm, under the penalties for perjury, that the foregoing
representations are true. This 9 day of July, 2025.

_____
Amanda Johnson

Initials

Page 4 of 4

## AFFIDAVIT OF STEVEN H. SCHUTTE

I, Steven H. Schutte, after being duly sworn, declare under penalty of perjury, the following to be true to the best of my knowledge and belief:

1. I am an attorney licensed to practice law in the State of Indiana. I have been licensed to practice law since June 15, 1990, and am in good standing.

2. I have been employed by the Indiana State Public Defender as a Deputy Public Defender since I was admitted to the bar.

3. I represented Benjamin Ritchie in successor post-conviction proceedings and clemency proceedings before his May 20, 2025, execution.

4. I was one of the four witnesses asked to attend the execution by Benjamin. The other three witnesses were my co-counsel, Mark Koselke, our mitigation specialist, Hannah Hall, and a friend of Benjamin's, Amanda Johnson.

5. We were brought to the Indiana State Prison on the night of May 19, 2025, in a van by two Indiana Department of Correction employees. One was masked and the other was not. The Warden informed me they would pick us up from our hotel at 10:30 p.m. However, I believe they arrived a few moments later. I never wore a watch. The only clock I saw was in the van.

6. When Benjamin's other witnesses and I arrived, we were taken to a room where we waited before being taken to the room next to the execution chamber. I believe we were taken from the room to the room next to the execution chamber at approximately 12:35 a.m., May 20, 2025. There was a clock in the van. There were two DOC employees in the room with us. They were the individuals who picked us up from the hotel

7. When I arrived in the room, I saw that there were 5 chairs in the room. The viewing area was stepped like a theater. I sat in one of the back two chairs. Hannah was to

Initials

Page 1 of 3

Exhibit L Page 1

my right. Amanda was in a chair directly in front of me and Mark was to her right. The remaining chair was in front and empty. The way the chairs were arranged gave the people on the right the better view in the execution chamber.

8. When we arrived, there were closed blinds covering the glass window which was the viewing window. The blinds were opened shortly after we arrived and were seated. I would guess it was about a minute after our arrival.

9. When the blinds opened, I saw Benjamin. Benjamin appeared to look in our direction. He raised his head, looked at us, smiled and signaled to us with his hand. I could only see his left hand because Benjamin was facing the viewing window at an angle. The chairs were angled in a manner that shielded my view of his right side. Shortly after Benjamin signaled us, he put his head back and closed his eyes. I watched as he clenched and unclenched his left hand. I could not see his feet. Then, his hand stopped moving. Seconds after this, he violently lurched forward and up as if to sit up, but he was restrained. It appeared almost like a spasm that lasted between 3 to 5 seconds. He then appeared to twitch and laid back onto the gurney. During the movements, I could not see Benjamin's eyes so I could not tell if they were opened or closed. I was also unable to see what reactions, if any, of anyone present in the execution chamber with Benjamin.

10. Within a minute after Benjamin laid back down, the warden approached the gurney and looked at Benjamin. Following this, a uniformed individual escorted Benjamin's Spiritual Advisor from the chamber. Then, the Assistant Warden approached the window and closed the blinds.

11. The other three witnesses and I remained in the witness room for a few minutes following the execution. I spoke with the others and asked what they saw. They confirmed that they too witnessed the violent movement. Ultimately, we were escorted out of the room. I made a statement immediately following the execution


Initials

Page 2 of 3

Exhibit L Page 2

outside the grounds of the Indiana State Prison to the media that had gathered. I

reported what I and the other witnesses saw during the execution.


_____
Steven H. Schutte



**AFFIRMATION**

I, Steven H. Schutte, affirm, under the penalties for perjury, that the foregoing

representations are true.  This _1st_ day of June 2025.


_____
Steven H. Schutte


_____
Initials

Page 3 of 3

Exhibit L Page 3

## AFFIDAVIT OF MARK KOSELKE

I, Mark Koselke, after being duly sworn, declare under penalty of perjury, the following to be true to the best of my knowledge and belief:

1.  I am an attorney licensed to practice law in the State of Indiana. I have been licensed to practice law since September 28, 2015, and am in good standing.

2.  I have been employed by the Indiana State Public Defender as a Deputy Public Defender since ~~I was admitted to the bar~~. 2017. _MK_

3.  I represented Ben Ritchie in successor post-conviction proceedings and clemency proceedings before his May 20, 2025, execution.

4.  I was one of the four witnesses asked to attend the execution by Ben. The other three witnesses were my co-counsel, Steve Schutte, our mitigation specialist, Hannah Hall, and a friend of Ben's, Amanda Johnson.

5.  We were brought to the Indiana State Prison on the night of May 19, 2025, in a van by two Indiana Department of Correction employees. I assumed I would neither be permitted to bring paper and pens nor wear a watch. So, when the van picked us up, I did not have any of the items with me. I believe we were picked up at around 10:30 p.m. on May 19, 2025.

6.  When Ben's other witnesses and I arrived at the Indiana State Prison, we were taken to the main entrance of the prison where we were screened like we were normally processed for visits. We were then taken through two gates and to a room on the right which I believe is the visiting room for regular family and friend visits. We waited there with the two employees that drove us to the prison. There was no clock in the room. We were given bottled water. Hannah pointed out that the water was expired and had beads at the bottom of the bottles. At some point, the two employees told us it was time to go. We



Initials

Exhibit M Page 1

were escorted back to the van we arrived in. We were taken to another building on the prison grounds.

7. When we arrived, we got out of the van and were taken to a room next to the execution chamber. The same two employees stayed in the room with us. I seem to remember that we were dropped off at 12:34-36. I was reminded that the Warden announced the time of death as 12:46 a.m. So, I believe we were dropped off between 12:34-36 a.m. because we were not there very long.

8. When I arrived in the room, the blinds covering the window to the execution chamber were closed. There were 5 chairs in the room. The viewing area was stepped, like a theater. I sat in the middle row of seats. Amanda was to my left. Hannah was in a chair behind me, and Steve was in the chair behind Amanda. The remaining chair was in front of me and empty.

9. After we arrived, the blinds were opened a short time later. There was a section of glass separating us from the execution chamber. I could see Ben's entire body on the gurney. The gurney had arm extenders, so Ben's arms were away from his body. The gurney was inclined. Ben's spiritual advisor was on Ben's right and seated next to him. Ben looked in our direction. He smiled and signaled to us with his left hand. I could not tell exactly what he was signaling. I could only see his left hand indicating to us. His feet were moving. It was like he was bopping along to a song. His feet were covered but the fabric was moving. Shortly after, he put his head back and closed his eyes. I watched as he clenched and unclenched his left hand. His hand remained partially closed, but you could see tiny movements. After a few moments, Ben seemed to shoot up. It seemed like he was doing a crunch because his head and shoulders lifted sharply from the gurney. It was so startling Amanda grabbed my arm. Ben lifted for about 3 to 5 seconds. I


Initials

Exhibit M Page 2

focused on Ben's chest at this point and counted 6 to 7 breaths. Each one became shallower and then he stopped breathing.

10. The movement when Ben lifted did not seem to me to be involuntary. It looked like panic. He was really pushing hard against the restraints.

11. After Ben stopped breathing, the Warden approached the gurney and looked at him. I do not know what he was doing because I did not see him touch Ben but seemed to look at his face.

12. Following this, Ben's Spiritual Advisor was escorted from the chamber. He looked horrified. He walked like he felt every step. The Assistant Warden approached the window and closed the blinds.

13. The other three witnesses and I remained in the witness room for a few minutes following the execution. I was not wearing a watch and did not see any clocks other than in the van they used to drive us around.

Mark Koselke

## AFFIRMATION

I, Mark Koselke, affirm, under the penalties for perjury, that the foregoing representations are true. This 2 day of July, 2025.

Mark Koselke

Initials

## AFFIDAVIT OF HANNAH HALL

I, Hannah Hall, after being duly sworn, declare under penalty of perjury, the following to be true to the best of my knowledge and belief:

1. I am a mitigation specialist at the Indiana State Public Defender. I began employment with the State Public Defender in January of 2019. I have a Master's Degree in Criminal Justice and Public Safety from Indiana University.

2. I was a member of the team that represented Ben Ritchie in successor post-conviction proceedings and clemency proceedings before his May 20, 2025, execution.

3. I was one of the four witnesses asked to attend the execution by Ben. The other three witnesses were the two attorneys from the team, Steve Schutte and Mark Koselke and a friend of Ben's, Amanda Johnson.

4. We were brought to the Indiana State Prison on the night of May 19, 2025, in a van by two Indiana Department of Correction employees. I did not think I would be allowed to bring paper and pens or wear a watch into the prison. So, when the van picked us up, I left those things at the hotel. I remember I had to have my identification. I had that and when they picked us up, I had to show it to the two men in the van. I believe we were picked up at around 10:15 or 10:30 p.m. on May 19, 2025.

5. When Ben's other witnesses and I arrived at the Indiana State Prison, we were taken to the main entrance of the prison where we were processed like we were normally processed for visits. We were then taken through two gates and to a room on the right which I believe is the visiting room for regular family and friend visits. The two employees who drove us to the prison were


Initials

Page 1 of 4

in the room with us. We waited there for a very long time. There was no clock in the room. I do not know how long we waited. We were given bottled water. I looked at the bottle and realized they had given us water that was expired. I pointed this out to Mark.

6. At some point, the two employees took us back to the van we arrived in. We got in and they drove the van north. We were taken through another series of gates. The first gate was manned. Then, I saw a large building. There were 2 more gates that were manually opened. We were then taken to a room next to the execution chamber. The same two DOC employees were in the room with us. I am unsure when we were dropped off and taken to the viewing room.

7. When I arrived in the room, the blinds covering the window to the execution chamber were closed. There were 5 chairs in the room. The viewing area was stepped, like a theater. I sat in the back row with Steve to my left. Mark was in the chair in front of me and Amanda was to his left. The remaining chair was in front and empty.

8. After we arrived and were seated, the blinds to the execution chamber opened pretty quickly. There was a section of glass separating us from the execution chamber. I could see Ben's entire body on the gurney. The gurney was inclined. Ben's spiritual advisor was on Ben's right and in a chair seated next to him. It seemed like the IV lines were in the wall behind Ben's head. The room was oddly angled. The angle meant that I could see his entire body but was angled so I saw his left side better than his right.

9. When the blinds opened, I could see Ben moving. It looked like he was pedaling his feet under the blanket. I could see the fabric moving. Ben looked in our direction. He smiled and waved with his left hand. He seemed to be


Initials

Page 2 of 4

talking or singing. However, I could not hear him. His mouth was moving though. It was odd because there were no announcements, and we heard nothing from the execution chamber. Ben seemed to settle down a little. He was not moving as much when the blinds were opened. I do not recall him ever being completely still. Then, his upper body jerked up. He was restrained but his head and shoulders came up. It was so violent and so unexpected Amanda punched Mark's arm. Ben lifted for about 2 to 3 seconds and then laid back down. I saw Ben's Spiritual Advisor,          startled and pushed back into the chair he was in. I could not tell if the chair had wheels or whether he scooted it back.

10. After Ben laid back down, the warden shuffled forward past Ben's feet and came around to Ben's left side and seemed to look at Ben. I do not know what he was doing because I did not see him touch Ben but seemed to look at his face. Then, the assistant warden tried to put the blinds down. It took her a couple tries but they were closed.

11. The other three witnesses and I remained in the witness room following the execution. We were only there for a minute or so. I could hear movement in the room next to us. We were then taken back to the van. I looked at the clock in the van and saw that it was 12:51 a.m.

Hannah Hall

Initials

Page 3 of 4

**<u>AFFIRMATION</u>**

I, Hannah Hall, affirm, under the penalties for perjury, that the foregoing representations are true.  This _2_ day of July, 2025.

Hannah Hall

Initials

## AFFIDAVIT OF KATHLEEN CLEARY

I, Kathleen Cleary, after being duly sworn, declare under penalty of perjury, the following to be true to the best of my knowledge and belief:

1. I am an attorney licensed to practice law in the State of Indiana. I have been licensed to practice law since October 14, 1988, and am in good standing.

2. I was employed by the Indiana State Public Defender as a Deputy Public Defender from August 1, 1988, until I retired from that position on April 5, 2019.

3. I am currently employed as a mitigation specialist in the Capital Habeas Unit at the Federal Defender's Office for the Western District of Missouri. I have been so employed since April 29, 2019.

4. I interviewed ▮▮▮ on June 5, 2025. Mr. ▮▮ was Benjamin Ritchie's spiritual advisor and was present in the chamber when Mr. Ritchie was executed on May 20, 2025.

5. Mr. ▮▮ informed me that while he was in the chamber, he was unable to see or hear any of the witnesses behind the glass windows in the execution chamber. However, he did not look in the direction of the windows in the execution chamber because he did not want to see or recognize anyone and does not know if he could see through the glass.

6. During the execution, Mr. ▮▮ was unsure of the time because he did not have a watch and there was not a clock in the chamber. He recalled that after the execution began, Mr. Ritchie lifted several inches off the gurney and against the restraints. This startled Mr. ▮▮, causing him to move back in his chair as Mr. Ritchie lifted against the restraints. Mr. ▮▮ informed me Mr. Ritchie's action was sudden and lasted about 2 seconds. After Mr. Ritchie laid back down, Mr. ▮▮ believes it was about 5 seconds later when Mr. Ritchie was "gone.".


Initials

Page __1__ of __2__

Exhibit O

7. I spoke with Mr. ██ in person on June 5, 2025, and by telephone on June 10, 2025, about potentially signing an affidavit regarding his observations of Mr. Ritchie lifting from the gurney. Mr. ██ was concerned because the warden had him sign a document promising not to identify anyone. He was also concerned that by signing an affidavit, he may no longer be permitted to enter the Indiana Department of Correction facilities as part of his ministry.

8. On July 11, 2025, I met with Mr. ██ again to ask whether he had changed his mind about an affidavit. He had not. I also explained I would be doing one about our conversation. Mr. ██ reviewed my affidavit and made few corrections to the affidavit. He asked that I remove the section on his fear of retaliation by the Department of Correction. However, he agreed that it was true. This affidavit represents the information he shared and the changes he asked to be made other than removing the threat of retaliation by the Indiana Department of Correction.

Kathleen Cleary

## AFFIRMATION

I, Kathleen Cleary, affirm, under the penalties for perjury, that the foregoing representations are true. This 30 day of July, 2025.

Kathleen Cleary

KC
Initials

Exhibit O

STATE OF INDIANA      )          IN THE SPENCER CIRCUIT COURT
                      ) SS:
COUNTY OF SPENCER )              CAUSE NO. _____


ROY LEE WARD,         )
                      )
        Petitioner    )
                      )
        v.            )
                      )
STATE OF INDIANA.     )
                      )
        Respondent    )


## PETITIONER'S FIRST SET OF INTERROGATORIES TO RESPONDENT

Comes now the Petitioner, Roy Ward, through counsel, Joanna Green and Laura Volk, Deputies Public Defender, and under Indiana Trial Rules 26 and 33, requests Respondent provide written answers to the attached interrogatories within thirty (30) days of receipt by service to the undersigned counsel at the Public Defender of Indiana, 1 N. Capitol Ave, Suite 800, Indianapolis, IN 46204 and electronically at lvolk@pdo.in.gov.

Space has been provided below each interrogatory for you to type or legibly write your answers. You may attach additional pages if necessary to provide a complete and truthful answer to the interrogatories. If you elect to respond to this interrogatory in a separate document, each answer must be preceded by setting out in full the interrogatory you are answering.

Exhibit P

1. Please describe the glass window that separates the execution chamber from the room where the convicted person's witnesses view the execution, including the dimensions of the window, whether the glass installed is one-way glass, and whether any item that has been applied to the glass such as a film that would prevent people in the execution chamber from seeing into the room.

   ANSWER:

2. With respect to future acquisitions to drugs that will be used in executions, will the state comply with Indiana's law including soliciting bids, requiring the state agency seeking contractors to post requests for proposals online for a minimum of thirty days prior to awarding the contract, and the requirement to post the contract within 30 days of its implementation.

   ANSWER:

Exhibit P

3. If the drugs the State of Indiana uses for executions are compounded, please provide the following information. Is the compounding entity compounding under 503(a) or 503(b). What testing methods are used to make sure the drugs are pure, effective, and not contaminated or degrading? Do the drugs have an expiration date or a BUD date? If so, what is the date? How long before the drug is used is it transported to IDOC's possession? How are the drugs transported to the IDOC's possession? Where are the drugs stored once the IDOC has possession of the drug? What temperature are the drugs stored at once it is in the possession of IDOC? How often is the temperature where the drug is stored monitored when it is in IDOC's possession?

ANSWER:

4. With respect to the IV line that is used to administer the drug to the convicted person's during the execution, please provide the following information. How many people push the drug through the IV? How long is the IV line? That is what is the length of the IV line from where the drug enters the IV line to where the IV line connects to the convicted person's body.

ANSWER:

Respectfully submitted,

AMY E. KAROZOS
Public Defender of Indiana
Attorney No. 14429-49

By: /s/ Joanna Green
    Joanna Green
    Deputy Public Defender
    Attorney No. 16724-53

By: /s/ Laura L. Volk
    Laura L. Volk
    Deputy Public Defender
    Attorney No. 16724-53

Exhibit P

STATE OF INDIANA    )          IN THE SPENCER CIRCUIT COURT
                   ) SS:
COUNTY OF SPENCER )         CAUSE NO. _____

ROY LEE WARD,     )
                    )
     Petitioner     )
                    )
     v.             )
                    )
STATE OF INDIANA.  )
                    )
     Respondent    )

## REQUEST FOR PRODUCTION OF DOCUMENTS

TO:   Tyler Banks,
      Supervising Deputy Attorney General
      Office of Indiana Attorney General
      302 West Washington Street
      Indianapolis, IN  46204

Comes now the Petitioner, Roy Ward, by and through counsel, Joanna Green and Laura Volk, Deputies Public Defender, and pursuant to Indiana Trial Rule 34(A) and (B) of the Indiana Rules of Trial Procedure, requests that the Respondent produce the following requested documents within thirty (30) days after service to the office of the Indiana Public Defender, One North Capitol, Suite 800, Indianapolis, Indiana, 46204-2026 or make the requested documents available at a mutually convenient time for all parties.

REQUEST 1:

Exhibit P

The quantity, including the number, size and concentration of vials, of any and all drug(s) intended or considered for use in executions currently in possession of IDOC.

RESPONSE:

REQUEST 2:

Any and all drug inventory logs and or drug chain of custody documents related to any drug intended or considered for use in executions from January 1, 2023, to present.

RESPONSE:

REQUEST 3:

Information verifying the amount of money paid by the State of Indiana for the drugs acquired that are intended or considered for use in an execution or executions.

RESPONSE:

REQUEST 4:

Any and all drug logs and/or documents related to the date the drug(s) was acquired from January 1, 2023, to present.

RESPONSE:

Exhibit P

REQUEST 5:

All DEA Form 41 documents that reference any execution drug that is in
possession of the Indiana Department of Correction for the period of May
2024 to present. Based on the governor's statements, at least two doses of the
drugs were destroyed which would necessitate filling out a DEA Form 41.

RESPONSE:

REQUEST 6:

All Flammable Toxic and Caustic Inventory/Issue Logs from May 2024 to
present.

RESPONSE:

REQUEST 7:

All Purchase Orders for any drug, ingredient, chemical, or medicine intended
to be use in lethal injection executions.

RESPONSE:

REQUEST 8:

Exhibit P

All copies of prescriptions for any drugs, chemicals, or medicines acquired for the purpose of anything related to lethal injections.

RESPONSE:

REQUEST 9:

All documents related to the quality or testing of the ingredients, or related to the final testing, of any chemical or substance intended or considered for the use in lethal injection executions, including but not limited to certificates of analysis, extended stability testing, testing lab sheets, chemical logs, purity analysis, or any other correspondence related to the quality of the constitution of any ingredient or chemical considered or intended for the use in lethal injections.

RESPONSE:

REQUEST 10:

All documentation and corresponded, including emails, letters, and faxes, whether internal or external, bearing on the ability to carry out an execution, the ability to acquire any drugs, chemical, or medicines intended for use in lethal injections executions, or discussing any topic related to the execution of prisoners, whether in Indiana or another jurisdiction. This includes all correspondence with any other state department of corrections or any federal agency regarding anything related to executions.

RESPONSE:

Exhibit P

REQUEST 11:

Any and all documentation regarding the qualifications of the person or people who set the intravenous lines that deliver the lethal substance to the inmate being executed.

RESPONSE:

REQUEST 12:

ISP 06-26 lists Method 1 and Method 2 under Preparation and Administration of Chemicals. We are requesting any and all documentation of which method was used in executions since December 2024 and which method the Department of Correction intends to use in any upcoming execution this year.

RESPONSE:

REQUEST 13:

According to Gov. Mike Braun it is now public knowledge that $1,200,000 was paid for execution drugs, "at $300,000 a pop" and because competitive bidding is required for purchases above $150,000, pursuant to I.C. 5-22-7-1, all bidding materials, protocols or other documents prepared and utilized by the Indiana Department of Correction to ensure full compliance with the law in the legally required bidding process.

RESPONSE:

Exhibit P

REQUEST 14:

It is now public knowledge that drugs on two occasions expired, in September
2024 and in April 2025. A previous log provided pursuant to a public records
request, which was ultimately delivered in December 2024, only contained a
single entry. We request the entirety of the logs given it seems apparent
matters were withheld which should have been turned over.

RESPONSE:

REQUEST 15:

All certificates of analysis of any and all execution drugs in the possession of
the Indiana Department of Correction from June 2024 until current day.

RESPONSE:

REQUEST 16:

Exhibit P

All DEA Form-222s of the execution drugs in the possession of the Indiana Department of Correction from June 2024 until current day.

RESPONSE:

REQUEST 17:

Documentation of the expiration dates of the drugs actually used in the executions.

RESPONSE:

REQUEST 18:

It is not immediately transparent in available public records where the $1,200,000 expenditure was accounted for in the Indiana Department of Correction's FY 2023 – FY 2025 budget. We request all documentation related to the preparation of the Indiana Department of Correction's budget for FY 2023 – FY 2025 which pertains to proposed and/or predicted costs of the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs, including the budget line-item breakdown.

RESPONSE:

REQUEST 19:

Exhibit P

All documentation related to the preparation and/or submittal of off-year budget action requests made from January 2024 to current day by the Indiana Department of Corrections regarding the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs.

RESPONSE:

REQUEST 20:

All documentation submitted to the Indiana Auditor of State by the Indiana Department of Corrections regarding the $1,200,000 expenditure, and any other expenditures, made in the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs.

RESPONSE:

REQUEST 21:

All documentation submitted to the Indiana Office of State Comptroller by the Indiana Department of Corrections regarding the $1,200,000 expenditure, and any other expenditures, made in the acquisition, purchase, retrieval, storage, maintenance, and/or use of execution drugs.

RESPONSE:

Exhibit P

Respectfully submitted,


AMY E. KAROZOS
Public Defender of Indiana
Attorney No. 14429-49


By:  /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By:  /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 16724-53

STATE OF INDIANA    )         IN THE SPENCER CIRCUIT COURT
                       ) SS:
COUNTY OF SPENCER )         CAUSE NO. _____


ROY LEE WARD,     )
                        )
     Petitioner     )
                        )
     v.             )
                        )
STATE OF INDIANA    )
                        )
     Respondent   )


## PETITIONER'S REQUESTS FOR ADMISSION TO RESPONDENT

Comes now, Roy Ward, through counsel, Joanna Green and Laura Volk, Deputies Public Defender, and under Indiana Rule of Trial Procedure 36, requests the State of Indiana make the following admissions for the purposes of this action, within thirty (30) days from the date of service to the office of the Indiana Public Defender, 1 North Capitol Ave., Suite 800, Indianapolis, IN 46204 or lvolk@pdo.in.gov.  If denied, detail the reason for the denial.  When good faith requires a party to qualify his answer or deny only a part of which an admission is requests, the party shall specify which part of it is true and deny the remainder.  If an objection is made, the reasons for the objection shall be stated.


1.  A person in the execution chamber cannot see into the room/area where the people the convicted person invited to attend the execution are located.

    RESPONSE:




2.  There is a glass window that separates the execution chamber from the room/area where the convicted person's witnesses observe the execution are located.

Exhibit P

RESPONSE:




3.  The glass window is the only means by which a person in the death chamber
    can see the people who the convicted person invited to witness the execution.

    RESPONSE:




4.  The glass window that separates the death chamber from the room where the
    people the convicted person invited to witness the execution has been altered
    to prevent anyone inside the execution chamber from seeing those witnesses.

    RESPONSE:




5.  The glass window that separates the death chamber from the room where the
    convicted person's witnesses observe the execution has one-way glass in it.

    RESPONSE:




6.  The glass window that separates the death chamber from the room where the
    convicted person's witnesses observe the execution has had a film applied to it
    that prevents people from seeing into the area where the witnesses are located.

    RESPONSE:


Exhibit P

7. A person in the room where the convicted person's witnesses watch the execution cannot hear what is said in the execution chamber.

RESPONSE:

8. A person in the room where the convicted person's witnesses watch the execution cannot hear what is happening in the execution chamber.

RESPONSE:

9. A person in the room where the convicted person's witnesses watch the execution cannot hear anything that occurs in the execution chamber.

RESPONSE:

10. The drugs that will be used in the execution of Roy Ward will be compounded drugs.

RESPONSE:

Exhibit P

11. The drugs used to execute Benjamin Ritchie were compounded drugs.

   RESPONSE:

12. The drugs used to execute Joseph Corcoran were compounded drugs.

   RESPONSE:

13. After a drug was administered to Benjamin Ritchie during his execution, his head lifted off the gurney.

   RESPONSE:

14. After a drug was administered to Benjamin Ritchie during his execution, his shoulders lifted off the gurney.

   RESPONSE:

15. After a drug was administered to Benjamin Ritchie during his execution, his torso lifted off the gurney.

   RESPONSE:

Exhibit P

16. After a drug was administered to Benjamine Ritchie during his execution, at least one part of his body tugged against the restraints used.

RESPONSE:

Respectfully submitted,

AMY E. KAROZOS
Public Defender of Indiana
Attorney No. 14429-49

By: /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 16724-53

Exhibit P