**In the**
**Indiana Supreme Court**

**No. 25S-SD-00167**

Roy Lee Ward,                    )
               Appellant,    )
                     )
     v.                         )      **This is a Capital Case**
                     )
State of Indiana,                )
               Appellee.    )

# Corrected Reply in Support of Successive
# Petition for Post-Conviction Relief

The crux of all Ward's claims is whether the State of Indiana can constitutionally carry out his execution. The State repeatedly claims that Ward is merely seeking public documents so he can "possibly later challenge the method of execution." Opposition at 18, 28. Ward is not looking for *later* litigation—his successor is challenging Indiana's *current* execution practice. That is the core of the Successive Petition for Post-Conviction Relief.

This Court has previously held that methods of execution claims are available under Indiana law immediately preceding the issuance of an execution warrant. *Isom v. State*, 170 N.E.3d 623 (Ind. 2021). As noted in *Isom*, "The post-conviction court denied Isom's request based on the *State's objection* that it had no execution date set for Isom and did not know which substances or method would be used to execute him." *Id.* at 653 (emphasis added).

1

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

Additionally, this Court recognized the availability of other remedies in

*Corcoran v. State*, 240 N.E.3d 701, 702 (Ind. 2024). Now, with the satisfaction of

the basis of the State's position in *Isom,* and consistent with *Corcoran*, Ward

properly and timely avails himself of an available remedy.

The State seeks to create a false narrative—a false narrative premised

upon an inconsistent position taken in another capital case. The State insists

Ward has fully "exhausted" the remedies this Court has held are available to

him. This ignores *Isom*. The State fails to address and distinguish *Isom*'s

unambiguous principle and promise of eventual ripeness. Indeed, the State

**never** cited *Isom* because even attempting to do so would demonstrate that just

four years ago, they argued one position, but now they argue the exact opposite.

Such changing of positions itself implicates Due Process under the federal and

Indiana constitutions.

The State incorrectly asserts that Ward has failed to provide an

alternative means of execution. Opposition at 34. This makes no sense when

Ward has challenged one method in a protocol with **two separate methods**.[1]

*See* Exhibit A at 13-14 (Method 1), 14-15 (Method 2). And even as to the

second method, the straight pentobarbital method that Ward deduces the State

used to execute Mr. Corcoran and Mr. Ritchie and assumes the State plans to

---

[1] Ward does not take the State's discussion of no alternative (*see* Opposition at 35) to
mean the State is conceding that Method of Execution 1 of Indiana's protocol is
unconstitutional under the Eighth Amendment.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

use in his execution, Ward necessarily has offered an alternative of using sterile,

stable, and correct potency drugs—drugs that are formulated in a way that they

work as the State intends in an execution. Ward simply asserts that the current

Method-2 of Indiana's execution protocol as currently applied does not

constitutionally work and needlessly leads to the infliction of pain as

demonstrated by the recent troubling execution.

The pentobarbital did not work as designed during Mr. Ritchie's

execution, **a fact that the State does not contest**. There simply should be no

movement that late in an execution if the pentobarbital was working as the

State desired in an execution. Such sudden and violent movement demonstrates

the obvious pain Mr. Ritchie felt as what must have been defective

pentobarbital coursed through his veins. To permit Ward's execution to

proceed under the same conditions would create "a substantial risk of serious

harm" and an "objectively intolerable risk of harm" that would prevent prison

officials from pleading that they were "subjectively blameless for purposes of

the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 50 (2008). Indeed, given

what is known regarding Mr. Ritchie's problematic execution, the State would

be intentionally causing needless and excessive pain.

The State, without reasonable explanation, refuses to comply with its

public records disclosure obligations, even as the shreds of information that *are*

public heavily imply that the State has engaged in unconventional dealings to

procure overpriced drugs. The State omits that in every fashion, as the Attorney

3

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

General, they make every effort to delay disclosure of any information related

to the surreptitious acquisition of scheduled narcotics. They are paying, at least,

a quarter of a million more for the drugs than they should. Stated numerically,

$250,000 more than its real value. Exhibit Q at ¶ 65-66(Affidavit of Dr.

Almgren attached to this pleading) ("[T] the state spent $1.175 million on four

doses of execution drugs.  This means that the state overpaid by a factor of over

130 times the typical market price."). They refuse to comply with any Indiana

laws related to the bidding process. They simply declare it will lead to the

identity of the supplier without any proof of this alleged fear being anything

more than paranoia. Yet they simultaneously release heavily redacted records

that have led to nothing—disproving their point altogether.

In conclusion, Ward asks this Court to follow *Corcoran* and *Isom*, where

new evidence exists and additional legal proceedings should precede the setting

of a date. Thus, this Court should recall the tentative date and permit the

previously unavailable second post-conviction proceeding to occur in the

regular course of proceedings.

### A. The State Conducts the Execution and They Must Do So Consistent with the Constitution.

The State asks this Court to deny the opportunity to pursue the claim

they said was proper but unripe in *Isom*, because the State is not a party to an

execution. The State illogically argues if they cannot use lethal injection with

this questionable pentobarbital, there is no way to remedy it because there is no

4

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

available party, as IDOC or the Warden is not the State.[2] It is absurd to suggest

that IDOC and/or the Warden are not state actors. This Court has previously

addressed these constitutional claims and recognized the proper party is the

State. The Attorney General represents IDOC and the Warden in legal

complaints. The State's argument in this regard is just plain wrong.

Setting aside the absurdity of such contention,[3] this ignores the troubling

execution that recently occurred. It is an attempt to deflect from a disturbing

and problematic execution. The State of Indiana failed to offer any proof that

Ward's execution will proceed in a manner consistent with the Constitutions.

That should be the beginning and end point of this Court's analysis; there

would be the intentional infliction of excessive pain.

Further, it is telling that the State could not produce a single witness to

say everything went as planned or that the pentobarbital worked as designed.

Nothing in the record refutes the allegations of Constitutional error. The State

accuses Ward of relying on "raw speculation" (Opposition at 10), despite the 5

affidavits and multiple records supporting Ward's allegations. The State offers

nothing but—unsupported rhetoric to counter Ward's evidence. There were

---

[2] The Attorney General omits that federal proceedings properly name the party as the
Warden, the respondent, in a federal challenge to a State conviction.

[3] The Attorney General trots out this shell-game when it says it has no ability to
control Indiana Department of Correction while simultaneously requesting extensions
in order not to respond in cases involving the IDOC as their client.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

multiple accounts that something went very wrong, but the State insists,

unsupported by any evidence to the contrary, that everything was fine.

The State falsely argues that Ward seeks injunctive relief. Opposition at

10, 11, 14. He made no such request. Ward simply requests he not be executed

in an unconstitutional manner. The State ignores the reality that the State could

use Method One of their protocol, assuming they have been using Method

Two. The State could also pass legislation implementing a new Constitutional

execution method Alternatively, the State could offer transparency and

assurances that the drugs being used are sterile, stable, and the correct potency

to the satisfaction of Eighth Amendment requirements. The answer is not, as

the State suggests, to simply ignore information they do not like and proceed to

execute Ward unconstitutionally. The answer is the death sentence can be

imposed with an alternative method already contained in the protocol or using

chemically appropriate drugs that can lead to a constitutional execution under

the second method.

**Mr. Ritchie's execution was flawed.** After the drug began to flow, he

sat up "violently" and strained against the restraints. The **five** uncontested

affidavits paint a horrifying moment:

- "Ben suddenly and strongly raised his torso up from the
  gurney and was held back by the restraints. Ben seemed to
  me to be trying to jerk out of the gurney. This was about 2
  or 3 minutes after the blinds were opened. When he raised
  up, I hit Mark's arm and grabbed him. I thought Ben was
  lifted for 5-6 seconds. It was sudden and scared me because
  I did not expect for something like that to happen. I then

6

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

said to Mark, 'I don't think I can do this. I can't do this."
Exhibit K ¶ 14;

- "[H]e violently lurched forward and up as if to sit up, but he
  was restrained. It appeared almost like a spasm that lasted
  between 3 to 5 seconds." Exhibit L ¶ 9;

- "Ben seemed to shoot up. It seemed like he was doing a
  crunch because his head and shoulders lifted sharply from
  the gurney. It was so startling Amanda grabbed my arm.
  Ben lifted for about 3 to 5 seconds." Exhibit M ¶ 9;

- "Then, his upper body jerked up. He was restrained but his
  head and shoulders came up. It was so violent and so
  unexpected Amanda punched Mark's arm. Ben lifted for
  about 2 to 3 seconds and then laid back down. I saw Ben's
  Spiritual Advisor [] startled and pushed back into the chair
  he was in." Exhibit N ¶ 9; and,

- "He recalled that after the execution began. Mr. Ritchie
  lifted several inches off the gurney and against the restraints.
  This startled Mr.- causing him to move back in his chair as
  Mr. Ritchie lifted against the restraints. Mr. -informed me
  Mr. Ritchie's action was sudden and lasted about 2 seconds.
  After Mr. Ritchie laid back down. Mr.- believes it was about
  5 seconds later when Mr. Ritchie was 'gone'." Exhibit O ¶
  6.

Something happened, and that something never should have happened if the

pentobarbital acted in the manner it should have.

    After accusing Ward of "raw speculation" (even though his

"speculation" is based on the affidavits of five witnesses), the State then engages

in some speculation of their own. The State speculates against medical science

and logic that Mr. Ritchie might have voluntarily struggled against his

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

restraints. Opposition at 37.[4] Setting this unsupported assertion aside, all

eyewitnesses indicated that the movement appeared to be a relatively long

period of time after the shades opened. Exhibit K ¶ 14; Exhibit L ¶ 9; Exhibit M

¶ 9; Exhibit N ¶ 9; Exhibit O ¶ 6. Indeed, the timing of the movement was long

after the drugs were due to be administered. The State does not square corners

with the Coroner's opinion that death occurred in mere "seconds." Exhibit S

(County Coroner Death Certificate).

        Further, if pentobarbital is working as designed, there is no way to move

voluntarily or involuntarily. As immediately noted in news articles after the

execution, a professor emeritus from the Ohio State University College of

Medicine said, "It should be really, really effective – really fast. No one should

move . . . It's just lights out, go to sleep, no reaction, no coughing, no nothing.

They just don't move." *See* Casey Smith, *"'Violent' moment during Indiana*

*execution draws scrutiny; DOC official deny 'botched' process,"* INDIANA CAPITAL

CHRONICLE (May 22, 2005),

https://indianacapitalchronicle.com/2025/05/22/violent-moment-during-

indiana-execution-draws-scrutiny-doc-officials-deny-botched-process/.

In further support, Ward offers Dr. Almgren who indicated such movement is

impossible when pentobarbital is working:  "Due to its rapid distribution and

---

[4] Ward objects to this apparent testimony from the Attorney General not supported by
any evidence in the record. To the extent it is based upon conversations had with
others, Ward objects to hearsay being considered by the Court. Finally, it is wholly
speculative.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

predictable pharmacologic profile, the drug should act quickly and evenly . . .

ensuring the person simply falls asleep and remains unconscious without

experiencing distress or abnormal reactions." Exhibit Q at ¶ 78. However, this

dispute, while seemingly a scientific impossibility, does merit further

consideration before a factfinder. *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099

(7th Cir. 1994) ("[T]he appropriate proceedings for such fact-finding is a bench

trial and not the disposition of a summary judgment motion."); The Analysis

and Decision of Summary Judgment Motions, 139 F.R.D. 441, 474 (1992)

("When evidentiary facts are in dispute, when the credibility of witnesses may

be in issue, when conflicting evidence must be weighed, a full trial is clearly

necessary regardless of whether it is a bench or jury trial.").

It's much more likely Mr. Ritchie's reaction was due to a problem with

the drug being administered. *See* Exhibit Q at ¶ 74-79. Dr. Almgren reviewed

the witnesses' accounts and notes the reactions they observed and reported were

not consistent with what is expected if the drug was not compromised in some

way. *Id*. at ¶ 76-78. Specifically, Dr. Almgren stated, "Overall, the witnesses'

accounts were highly consistent in describing Mr. Ritchie's intense and forceful

movements, raising concerns about both the drug's effect and potential gaps in

the execution protocol." *Id*. at ¶ 77. The Doctor concluded, "The unexpected

reaction raises questions about the quality and effectiveness of the pentobarbital

used, as it did not produce the expected effect. Concerns include the drug's

potency, purity, overall quality, pH and stability, as well as the possibility that it

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

may have precipitated or undergone oxidation over time, potentially reducing

its strength and effectiveness." *Id*. at ¶ 79.

In addition, Dr. Almgren points out there are concerns with the Indiana

State Prison's execution protocols. *Id*. at ¶ 80 – 86. Her review of the protocols

revealed numerous gaps and deficiencies throughout the process that are

troublesome. One area of concerns is "[t]he staff selected for the Execution

Team are not licensed to perform medical procedures or to compound and

prepare drugs." *Id*. at ¶ 81. Although proficiency in placing IVs requires

extensive training and practice, the protocols do not specify whether the

selected individuals on the execution team are so qualified. *Id*. at ¶ 82.

The concerns with the protocol do not stop with the training of the staff.

Dr. Almgren points out that the protocols do not mention how the drug will be

handled. Specifically, there appears to be no chain of custody requirements

which leaves "significant risk that the drug could be manipulated,

contaminated, or otherwise compromised at any point before use." *Id*. at ¶ 85.

Additionally, storing pentobarbital properly is essential for potency and

stability. *Id*. at ¶ 84. "Storage environments should be continuously monitored

for temperature and humidity to ensure the drug remains uncompromised, with

all measurements carefully recorded. However, the current execution procedure

makes no mention of such monitoring or documentation, raising significant

concerns about the integrity and quality of the drug used in lethal injections."

*Id*.

10

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

In short, the State seeks summary judgment without presenting any

contrary evidence because the claim is not cognizable. Summary judgment is

not appropriate because the facts are not disputed and convincingly support that

the previous execution was flawed. Given the authority from this Court that

this claim is cognizable, this Court should deny this as a basis as well.

Ward does not challenge the conditions of his confinement, nor does he

seek to open the door to those challenges for others. He simply states that the

method of execution is an available constitutional challenge and **as the State**

**argued successfully in *Isom* it is only now available**. The slippery slope the

State now argues exists simply is not an accurate recitation of the claims raised

here.

Indeed, the State relegates to a footnote this Court's long-standing

precedent recognizing these claims as cognizable in post-conviction and direct

appeal proceedings. Opposition at 14 n.1 (citing *Bieghler v. State*, 839 N.E.2d

691 (Ind. 2005); *Johnson v. State*, 827 N.E.2d 547 (Ind. 2005); *Moore v. State*, 771

N.E.2d 46 (Ind. 2002)). This Court did nothing wrong in those cases and this

Court should not reconsider those rulings.[5] Furthermore, the State cannot

reconcile this Court's reliance in *Isom* that was "based on the State's objection

---

[5] *Stare decisis* is a "maxim of judicial restraint supported by compelling policy reasons
of predictability." *Snyder v. King*, 958 N.E.2d 764, 776 (Ind. 2011). Under the doctrine,
a court will overturn a rule established by precedent only when there are "urgent
reasons and a clear manifestation of error." *Clifton v. McCammack*, 43 N.E.3d 213, 220
(Ind. 2015) (quoting *Snyder*, 958 N.E.2d at 776). The State makes no attempt to
overcome the doctrine of *stare decisis* employed by this Court.

that it had no execution date set for Isom and did not know which substances or method would be used to execute him." *Id.* at 653.

The State repeatedly asserts Ward "inexplicably" raised his claims in the wrong forum and should pursue a federal §1983 action instead of a state post-conviction proceeding, noting (wrongly) a "paucity of precedent allowing such challenges." Opposition at 12-13. The State's assertion is incorrect. To the contrary, this Court has ample precedent where this Court allows lethal injection claims to be raised in Indiana courts. Ward does not dispute that there may be other remedies—but this Court has recognized the validity of *this* remedy.

This Court has addressed lethal injection claims several times. In one instance, the claim was raised and this Court addressed it on direct appeal. *Moore*, 771 N.E.2d at 55-56. This Court has addressed the same claim in the successor context. *Johnson*, 827 N.E.2d at 552-53; *Biegler*, 839 N.E.2d 691. Tragically, another time the claim was raised and addressed by this Court in a capital defendant's first post-conviction petition was *Ritchie v. State*, 809 N.E.2d 258, 262 (Ind. 2004). As this Court noted in *Ritchie*, 809 N.E. 2d at 263, the claim was cognizable before this Court concluded: "We conclude that the Court sees no merit in the contention that lethal injection is a per se violation of the Eighth Amendment."

Contrary to the State's assertion, there is precedent from varied procedural presentations where this Court recognized the cognizable nature of

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

the Eighth Amendment claim. Ward points to specific circumstances creating

an unusual risk in his case where lethal injection may inflict excessive pain. In

sum, Ward has unquestionably raised his Eighth Amendment challenge in a

manner consistent with the precedent of this Court all the State's rhetorical

protestations to the contrary.

Ward's Successive Petition for Post-Conviction claims are ripe, asserted

in the correct forum and must be litigated to ensure he is not executed in

violation of the state and federal constitutions. The State offers no reason to

depart from this Court's long-standing precedent recognizing these claims as

being cognizable in Indiana and specifically in post-conviction proceedings.

This Court should respect the rule of law, apply that law, recall the tentative

date, and permit the successor to proceed.

**B. The State's Lack of Transparency is Relevant and States a Claim,
But Enough is Known to Support the Need for Further
Proceedings.**

An execution, the state-sanctioned taking of the life of one of Indiana's

own should be a solemn and dignified event, regardless of who the condemned

may be. The State's lackadaisical and dismissive tone as they refuse to answer

questions from the people of Indiana about the execution, which is carried out

in the name of the people of Indiana, insultingly detracts from what should be a

serious process. The people of Indiana and this Court deserve more.

The State accuses Ward of maliciousness. Opposition at 33. By no means

is Ward acting maliciously, he simply points to a pattern of non-disclosures and

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

silence when a human life hangs in the balance. But some facts can be inferred

or discerned by what has been stated publicly.

Indiana is likely using compounded pentobarbital in executions. This can

be ascertained from Governor Braun's comments to the media about the drugs

purchased expiring, *See* Tim Spears, "*Indiana allowed some lethal injection drugs to*

*expire,"* WISHTV.COM (June 4, 2025), https://www.wishtv.com/news/i-

team-8/indiana-allowed-some-lethal-injection-drugs-to-expire/, and his

reluctance to purchase more drugs with a 90 day shelf life, *See* Casey Smith,

"*Braun says Indiana is out of execution drugs, signals willingness to debate capital*

*punishment,"* INDIANA CAPTIAL CHRONICLE (June 4, 2025),

https://indianacapitalchronicle.com/2025/06/04/braun-says-indiana-is-out-of-

execution-drugs-signals-willingness-to-debate-capital-punishment/.

Manufactured drugs have a shelf life of two to three years. Exhibit Q at ¶ 35.

Compounded drugs have a much shorter shelf life. *Id.* at ¶ 36. The reasonable

conclusion based on Gov. Braun's comments is that Indiana purchased

compounded drugs. *Id.* at ¶ 37

The difference between manufactured and compounded drugs is not just

their longevity. Compounded drugs are less stable, and errors are common. *Id.*

at ¶ 40, 67-69. Compounded pentobarbital must be dissolved in a liquid and

precipitates and suspensions can form which can cause extreme pain and

suffering from severe tissue injury, thromboembolism, suffocation or other

respiratory distress. *Id.* at ¶ 50-57. These can all lead to an excruciatingly painful

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

death. *Id.* at ¶ 57 ("leading to a slow and excruciatingly painful death . . . effects causing a prolonged death where the prisoner experiences suffocation, drowning or other severe respiratory distress."). Only pharmacies with extensive experience should prepare injectable pentobarbital and it should be done on special equipment. *Id.* at ¶ 58. Instead, Indiana allows execution drugs to be produced by unregulated entities that are not even considered pharmacies.

Compounding pharmacies are unregulated. They are not monitored by the FDA. *Id.* at ¶ 39-40. Indiana law specifically exempts entities making drugs for executions from regulation. I.C. 35-38-6-1(e) states compounding of lethal chemicals for execution (1) does not constitute the practice of pharmacy, and (2) is not subject to the jurisdiction of the Indiana board of pharmacy, the medical licensing board of Indiana, the Indiana department of health, or the Indiana professional licensing agency. This language was slipped into the biennial budget on the last day of the 2017 legislative session at 2:00 a.m. without a public hearing or comment. Exhibit R. To Ward's knowledge, this subsection of the statute has never been constitutionally tested, and certainly, its manner of introduction avoided public scrutiny.

The instability of compounded pentobarbital and the resulting potential pain it can cause is the reason Ward needs access to the public records he requested months ago. Injectable pentobarbital must be:

- Made precisely. Exhibit Q at ¶ 51-55;

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

- Transported correctly. *Id.* at ¶ 68 ("Transportation
  conditions can significantly impact the quality and stability
  of compounded drugs. Factors such as exposure to extreme
  temperatures, excessive humidity, and direct light can
  accelerate chemical degradation, reduce potency, or
  promote microbial growth. Timing is also critical, as
  prolonged transit or delays can allow these environmental
  factors to compromise the product."); and,

- Stored properly. *Id.* at ¶ 69 ("Storage conditions play a
  critical role in maintaining the quality of compounded
  drugs. Improper temperature, humidity, or light exposure
  can lead to chemical degradation, reduced potency, or
  microbial contamination.")

If the drug has precipitate out of the solution, the potency is lower and can lead
to a slow, excruciating death. *Id.* at ¶ 56-57. Much can go wrong in the making,
transporting, storing and administration of the lethal injection drugs. It seems
that in Indiana's last execution, something did—a physical response to what
was likely excruciating pain.

Similarly, the State tries to distance Ward from his public records
requests. Opposition at 17, 32-33.[6] The requests were filed by Ward's attorney
on his behalf and this Court long ago noted the existence of agency theory.
*Chase v. Chase*, 163 Ind. 178 (1904). While the box indicating the requests were
made on behalf of another person was not checked, Attorney Volk requested

---

[6] The State claims the statute informs the person making the request that the request is
deemed denied within a certain amount of time citing I.C. § 5-14-3-9(c). Opposition at
32-33. However, that subsection of the statute applies to records requests made by
mail or fax. Ward submitted his request through the Public Records Portal. I.C. 5-14-
3-9 prescribes the way requests will be deemed denied if those requests were made in
person, I.C. 5-14-3-9(b), by mail or fax, I.C. 5-14-3-9(c), or orally in person or by
phone, I.C. 5-14-3-9(d). The statute does not address request made through the portal.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

the records in her capacity as Ward's lawyer. She indicated the request was

made from the Office of the Public Defender with her work email and address

The State asserts that assuming there are records, and they can be

disclosed, there is no undue interference with Ward's ability to seek redress.

Opposition at 20. It is hard to accept this as true given the Attorney General

asked for an extension of time in *McLachlan v. Indiana Department of Correction,*[7]

Case #49D06-2505-PL-022086, after Mr. Ritchie was already executed. This is

a litigation strategy which has the effect of depriving Ward of his rights to seek

redress of his methods claim.  This demonstrates the fallacy in the State's

argument that Ward should pursue a public records lawsuit. Opposition at 23.

Instead Ward properly seeks records through a request to file a successive post-

conviction petition.

The State's position is extreme. For example, Ward has asked how the

drugs are shipped to and stored and maintained by IDOC. It is unfathomable to

believe that an individual could extrapolate from that information who the

supplier was. Ward and the public are entitled to know what steps the State,

IDOC, is taking to ensure the quality of something on which they are spending

$1.2 million over their actual value. And as noted by Dr. Almgren, adequate

safeguards in shipping and storing are critical to the drug's use effectiveness.

Exhibit Q at ¶¶ 68-69; *see also* ¶ 84 ("[P]entobarbital['s] chemical composition

---

[7] This lawsuit was filed by the Ritchie's federal habeas attorneys on his behalf.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

makes it particularly vulnerable to degradation under improper conditions.

Storage environments should be continuously monitored for temperature and

humidity to ensure the drug remains uncompromised, with all measurements

carefully recorded. However, the current execution procedure makes no

mention of such monitoring or documentation, raising significant concerns

about the integrity and quality of the drug used in lethal injections.")

Ward claims no right to raise a particular claim or succeed on the merits

of a particular argument. But he is not engaged in a fishing expedition given the

uncontested description of 5 affiants (*see* Exhibits K-O) regarding the problems

at the recent execution and the medical science regarding pentobarbital. *See*

Exhibit Q. Based on the evidence as it currently exists, there is a substantial risk

of future harm because IDOC intends to use the same flawed drugs previously

used. *See Baze*, 553 U.S. at 49. Ward is not seeking these records so he can try to

think up a claim from what he finds—the IDOC's refusal to hand over records

they are required to produce under statute prevents him from fully detailing a

viable methods claim[8].

---

[8] Ward's rights protected by *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v. Whitley*,
514 U.S. 419 (1995), *Strickler v. Greene*, 527 U.S. 263 (1999) and *Banks v. Dretke*, 540
U.S. 668 (2004)), are implicated. The obligation to disclose exculpatory evidence
includes information possessed not only by the prosecutor's office but also by State
actors. *Kyles*, 514 U.S. at 437-438. A state statute cannot supersede the State's *Brady*
obligation. Rather, there is no "public records exception" to the *Brady* obligation.
*Anderson v. South Carolina*, 709 F.2d 887, 888 (4th Cir. 1983). At minimum, to balance
all competing interests, the State should deliver materials to a court for an *in camera*
inspection. *See State v. Barrett*, 952 N.W.2d 308 (Iowa 2020).

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

### C. Ward's Reply to Various State Arguments.

The State argues Ward is not being denied his First Amendment right to petition for redress of grievances because he has access to courts if he would only make the effort. Opposition at 21-23. Ward is doing just that—he filed the successor request. IDOC through their attorney agents, the Attorney General, refuse to answer any public records request. Thus, Ward is seeking to litigate this claim in post-conviction. He will seek redress through discovery as shown by Exhibit P filed with his Successive Petition for Post-Conviction Relief. Those requests are reasonably calculated to develop evidence to further support his constitutional claims raised here.

Ward has a constitutionally protected interest in not suffering cruel and unusual punishment during his execution. That is the constitutional right that underlies his due process claim. In his Successive Post-Conviction Petition, Ward identified his liberty interest as his right to use state law to obtain public records to ensure compliance with the Eighth Amendment's and Article One, Section 16's ban on cruel and unusual punishment. The meaning of the records and what they may demonstrate, *see supra*, is tangible.

The State argues Ward should file a lawsuit to challenge the denial of his right to access public records in accordance with I.C. § 5-14-3-9(e). Opposition at 28, 33. First, the IDOC has not yet denied Ward's requests for public records.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

It just has not responded at all.[9]  Second, filing a lawsuit seeking public records

would not prevent Ward from being unconstitutionally executed. Mr. Ritchie's

attorneys filed such a lawsuit before his execution. He was executed regardless

without gaining *any* information from IDOC. To this day, IDOC, represented

by the Attorney General, has still refused to disclose any public records to his

counsel even after requesting an extension. *See McLachlan v. Indiana Department*

*of Correction,* Cause No. #49D06-2505-PL-022086.

While the United States Supreme Court has "never invalidated a State's

chosen procedure for carrying out a sentence of death," people tasked with

reviewing lethal injection procedures have found it extremely problematic. On

January 5, 2025, Former Attorney General Merrick Garland determined:

"Having assessed the risk of pain and suffering associated with the use of

pentobarbital, the review concluded that there is significant uncertainty about

whether the use of pentobarbital as a single-drug lethal injection for execution

treats individuals humanely and avoids unnecessary pain and suffering."

Exhibit J at 2.

In Arizona, the Governor hired a retired federal magistrate to review

execution procedures after several botched executions. He concluded lethal

---

[9] Prior to Corcoran's execution, his legal team sough public records. In response, they
received some heavily redacted records and a letter explaining most of the records
were withheld. Setting aside the paucity of IDOC's response, at least it was
something. There is no explanation as to why this request is receiving less than the
previous request.

20

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

injection was not a "viable method of execution in actual practice." However,

the Governor dismissed the magistrate prior to his report being finalized and

released. *See* Emily Holshouser, "*Death penalty foes want Hobbs to publish the*

*independent report she spiked,*" AZ MIRROR (December 12, 2024),

https://azmirror.com/2024/12/12/death-penalty-foes-want-hobbs-to-publish-

the-independent-report-she-spiked/.

     This month, Tennessee carried out a lethal injection using pentobarbital

which resulted in a scene like Mr. Ritchie's execution. The prisoner, Mr. Byron

Black, lifted his head off the gurney several times and, because the witnesses

can hear what is happening inside the execution chamber, said "oh, it's hurting

so bad" as the drugs flowed. *See* Jonathan Mattise, "Attorney says heart device

did not shock Tennessee man in execution who said he was 'hurting so bad'",

AP (August 8, 2025), https://apnews.com/article/tennessee-execution-

defibrillator-

beb6d03ec645080f4e26d67b0bd61a41?user_email=e26d88715de7c2cc4ded7dcb

d3cde741ce674ea5baf7aacc4b2bfeabba952e5b&utm_medium=Afternoon_Wire

&utm_source=Sailthru_AP&utm_campaign=AfternoonWire_Fri_Aug8_2025

&utm_term=Afternoon%20Wire.

     Indiana "has its own constitutional provision against cruel and unusual

punishment" which "affords even greater protection than its federal

counterpart." *Corcoran v. State,* 774 N.E.2d 495, 503 (Ind. 2002) (Rucker, J.,

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

dissenting). This Court should permit factual development consistent with *Isom*

and *Corcoran* when:

> Given the unknown origin of the drug, uncertainty about whether
> it was manufactured, or compounded in an appropriate
> environment by qualified personnel, an unclear chain of custody,
> and unknown storage conditions, along with the absence of
> documented drug quality reports, there are serious questions about
> the integrity and safety of the substances used in lethal injections.
> When these factors are combined with the documented gaps in the
> lethal injection protocol—such as lack of procedures to verify
> potency, purity, and expiration, limited training of personnel, and
> no standardized monitoring for complications—they raise
> significant concerns regarding both the safety and reliability of
> future executions. These deficiencies create a substantial risk of
> ineffective administration, adverse reactions, or other
> complications that could result in unnecessary pain and suffering,
> highlighting the urgent need for comprehensive review and reform
> before any further executions are carried out

Exhibit Q at ¶ 87.

If Ward's execution is needlessly and intentionally painful, it will violate

the Eighth Amendment and Article One, Section 16. Disclosure of the records

he has requested under the APRA is one step in preventing a violation of the

Constitutions.

The State claims Ward has not identified a fundamental right from the

"select list" of unenumerated fundamental rights. Opposition at 31 (citing *Dobbs*

*v. Jackson's Women's Health Organization,* 597 U.S. 215, 237 (2022)). The Court

discusses this "select list of rights that are not mentioned anywhere in the

Constitution," but the first category of fundamental rights includes the "rights

guaranteed by the first eight Amendments." *Id.* Thus the right to be free from

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

cruel and unusual punishment is a fundamental right. There is no need to look

deeper to ascertain whether it is right "rooted in history or tradition or essential

to ordered liberty." Opposition at 31.

 The State tries to distance itself from the execution it seeks. It claims

Ward is proceeding against the wrong party because it is the Warden of the

Indiana State Prison who will carry out the execution. Opposition at 15. But the

Warden will carry out the execution at the State's request. The State is the State

regardless of what entity it takes. *Kyles v. Whitley,* 514 U.S. 419, 438 (1995) (the

government's obligation to disclose evidence extends to police and other

agencies).

 The State cavalierly responds to Ward's suggestions that it is cruel and

unusual to deprive him of the ability to receive support from his witnesses as he

ends his corporal existence. No execution is "pleasant," and Ward is not

suggesting an execution as "pleasant as possible"—it is undignified to respond

in the manner the State has. Ward simply asserts that once the witnesses are

approved, he should have the ability to see them and receive their support

pursuant to his Eighth Amendment right to not be subjected to cruel and

unusual punishment.

 Presumably, at least part of the reason witnesses are allowed is to provide

such support. The State's meandering discourse about Ward maybe not

choosing witnesses or witnesses having the choice not to attend is a red herring.

The State omits that Ward absolutely has the right to have at least one witness

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

present—or at least they should, since they quickly settled a spiritual advisor

suit just prior to the execution of Mr. Corcoran.

However, this demonstrates the State's and IDOC's disregard for

condemned's ability to see and be comforted by his witnesses, which is cruel

and unusual and out of step with the governmental interest in "maintaining the

solemnity and decorum in the execution chamber." *Ramirez v. Collier,* 595 U.S.

411, 430 (2022). During executions, it has never been intended for the

condemned to die alone. It is cruel and unusual to prevent Ward from seeing

his witnesses.

And according to the State, nor should the condemned be heard.

Opposition at 42. Given what occurred in Mr. Ritchie's execution, this leads to

the destruction of evidence. As noted in the recent Tennessee execution, the

ability to speak provides evidence that something was going wrong.

Ward claims his own First Amendment right to be heard from the

chamber, so he absolutely does have standing. Ward does not claim he has a

right to have people listen to or take in what he's saying—it's that he can

physically be heard if they want to listen.

Lastly, throughout its pleading, the State argues Ward has waived certain

claims due to lack of argument. Opposition at 16, 23, 29, 34, 38, 42. This is not

a brief. It is a Successive Petition for Post-Conviction Relief. Petitions for Post-

Conviction Relief are notice pleadings with liberal amendment procedures.

"Post-conviction proceedings are governed by rules and statutes applicable to

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

civil proceedings." *Jackson v. State,* 676 N.E.2d 745, 749 (Ind. Ct. App. 1997);

Ind. Post-Conviction Rule 1(5). The post-conviction rules have a more liberal

amendment procedure than the trial rules. *Jackson*, at 750. Indiana Trial Rule

8(A) requires "only 'short and plain statement of the claim showing that the

pleader is entitled to relief.'" *Trail v. Boys and Girls Club of Northwest Indiana,* 845

N.E. 2d 130, 135 (Ind. 2006). Recently this Court determined "the Post-

Conviction Rules empower post-conviction courts to permit amendments to

successive petitions." *Kelly v. State,* 257 N.E.3d 782, 794 (Ind. 2025).

There is no requirement of pleading specificity requiring a party to argue

all legal claims with precision raised in a successor post-conviction petition. In

fact, the Form for Successive Post-Conviction Relief provide in the Appendix to

the post-conviction rule tells petitioners "citation of authorities should be

avoided and is only appropriate if there is a change in the law since the

judgment you were attacking was entered." Ind. P-C 1, App. Ward has not

waived any claims presented.

**D. Conclusion.**

It has not been refuted that something unusual happened when the State

used Method 2 to execute Mr. Ritchie. What is known is the State exorbitantly

and wastefully overpaid by $1.1 million for drugs that did not work as intended.

Medical science dictates working drugs means no movement—but here there

was abrupt and violent movement a likely response to extreme pain. The State

refuses to answer public records responses and otherwise deprives Ward access

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

to the information—when they fully intend to use the same type overpriced, non-working drugs on him.

Ward asks this Court to faithfully hew to its precedent. New evidence exists and additional legal proceedings may be pursued without setting a date as this Court recently concluded in *Corcoran*, 240 N.E.3d at 702. In conjunction with this Court's *Isom* authority, this Court should recall the tentative date and permit the previously unavailable second post-conviction proceeding to occur in the regular course of proceedings. This Court has identified a legally cognizable claim and process in *Isom* that Ward has now initiated, and this Court should respect its own precedent.

Respectfully submitted,

AMY E. KAROZOS
Public Defender of Indiana
Attorney No. 14429-49

By: /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward

## Verification of Word Count

Roy Lee Ward, by counsel, files this verified certification that the total

amount of words in the Reply in Support of Successive Petition for Post-

Conviction Relief has not exceeded 6,600 words.


/s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender


## Certificate of Service

I certify that on August 21, 2025, the foregoing **Corrected Reply in**

**Support of Successive Petition for Post-Conviction Relief** was served upon the

Tyler Banks, Supervising Deputy Attorney General, via the e-filing system with

the Clerk of the Indiana Supreme Court, Court of Appeals, and Tax Court.


/s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender


Public Defender of Indiana
One North Capitol, Suite 800
Indianapolis, Indiana  46204-2026
Telephone:  (317) 232-2475

## Expert Affidavit of Dr. Michaela Almgren

**Introduction:**

1. My name is Michaela Almgren, Pharm.D., M.S. I am over the age of eighteen and competent to testify to the truth of the matters contained herein. After being duly sworn, I declare under the penalty of perjury the following to be true to the best of my knowledge and belief.

2. I earned my Doctor of Pharmacy degree from the University of South Carolina College of Pharmacy in 2010. I also earned a Master's degree in Pharmaceutical Chemistry from the University of Florida. Based on my education, I am referred to as a Doctor of Pharmacy. A copy of my CV is attached.

3. I am a Clinical Associate Professor in the Department of Clinical Pharmacy and Outcomes Sciences at the College of Pharmacy at the University of South Carolina. I teach courses on the topics of pharmacy law and regulations, including principles of sterile compounding per U.S. Pharmacopeia ("USP") Chapters 797 and 800, aseptic technique, pharmacy standards applicable in 503B compounding environments, pharmacokinetics and biopharmaceutics. I specialize in sterile compounding, medication safety and pharmacy regulations that relate to pharmacy compounding practices per USP 797 and cGMP. I also provide continuing education courses for pharmacists covering those and other topics.

4. I also currently maintain a pharmacy practice site at a 503B outsourcing pharmacy where I am an outsourcing pharmacist, clinical advisor and pharmacy student preceptor. I previously worked in pharmacy operations in a large local teaching hospital as a pharmacist. I have over fifteen years of experience in sterile compounding and aseptic

Affidavit of Dr. Michaela Almgren

MA ____ Initials

**Exhibit Q**

technique.  Prior to joining the faculty at the University of South Carolina, I worked in pharmaceutical manufacturing where I was involved in drug formulation, quality assurance, quality control and analytical method development.

5. Roy Ward's legal team asked me to render professional opinions about whether Indiana's lethal injection protocol presents risks of harm and unnecessary suffering caused by its use of injectable pentobarbital to carry out executions.

**Definitions and Terms of Art:**

6. **Pharmaceutical Manufacturing.**  Pharmaceutical manufacturing refers to the industrial scale process of producing therapeutic agents.  Pharmaceutical manufacturing is regulated by the FDA and only FDA-approved medications are manufactured in the United States.  Pharmaceutical manufacturers adhere to strict current Good Manufacturing Practices ("cGMP") to ensure product safety and efficacy.

7. **Pharmaceutical Compounding.**  Compounding is a practice in which a licensed pharmacist, a licensed physician or an outsourcing facility combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient or, in the case of an outsourcing facility, to produce large batches of drugs for medical office use or to address a drug shortage.  Compounded drugs are not FDA approved, which means the agency does not verify their safety, effectiveness or quality before they are marketed.  (See distinction between 503A and 503B compounding pharmacies below).

8. **Parenteral Drug Compounding**: Parental drug compounding is the process of preparing sterile medications for intravenous or other non-oral administration routes. This process is governed by strict quality and sterility requirements (e.g., USP 797, cGMP) because

Affidavit of Dr. Michaela Almgren

_МА_____ Initials

**Exhibit Q**

parenteral products bypass natural protective barriers, making contamination risks
particularly dangerous.

9. **USP Chapter 797 (or USP 797).** It is a federally recognized standard that establishes the
requirements for compounding sterile preparations to protect patients from harm caused
by microbial contamination, excessive bacterial endotoxins, variability in intended
strength, and the use of inappropriate ingredients. It regulates how pharmacies, hospitals,
and other facilities prepare sterile drugs, covering areas such as personnel training,
environmental controls, aseptic technique, documentation, and assignment of beyond-use
dates (BUDs). Importantly, USP 797 serves as the key guideline for 503A traditional
pharmacy compounding, where current Good Manufacturing Practice (cGMP)
requirements do not apply, ensuring a consistent quality framework in these settings. The
overarching goal of USP 797 is to ensure that compounded sterile products (CSPs) are
prepared under conditions that maintain sterility and quality, thereby reducing the risk of
infections, medication errors, and compromised patient safety.

10. **Current Good Manufacturing Practices ("cGMPs").** Current Good Manufacturing
Practices are a set of FDA regulations to ensure the quality, safety and efficacy of the
products from various industries including the pharmaceutical industry. The regulations
aim to prevent harm to consumers by ensuring products are consistently manufactured to
meet standards for identity, strength, purity and quality. For sterile manufacturing, cGMP
requires highly controlled cleanroom environments, validated aseptic processes,
sterilization of equipment and components, strict personnel training and gowning, and
comprehensive quality systems with testing for sterility, endotoxins, and particulates
before product release. These legally binding requirements are designed to prevent

Affidavit of Dr. Michaela Almgren

MA _____ Initials

**Exhibit Q**

contamination and ensure patient safety, distinguishing sterile drug manufacturing from pharmacy compounding under USP 797, where cGMP does not apply. U.S. cGMP regulations for drug manufacturing are found in 21 CFR Parts 210 and 211.

11. **Active Pharmaceutical Ingredients ("APIs").** An API is the component of a drug that produces its intended therapeutic effect. Thus, in compounded pentobarbital solution, pentobarbital sodium powder is the API.

12. **USP Compendium.** An authoritative collection of public standards published by the United States Pharmacopeia (USP) for the identity, strength, quality, purity, packaging, labeling, and storage of drugs, excipients, and compounded preparations. It includes monographs for drug substances, drug products, excipients, and compounded preparations. The compendium also provides general chapters describing procedures, tests, and quality standards (e.g., chapter 797 for sterile compounding, chapter 800 for handling of hazardous drugs). Compliance with USP standards is legally enforceable under the Federal Food, Drug, and Cosmetic Act by FDA.

13. **503A Compounding Facilities**: Section 503A of the Federal Food, Drug, and Cosmetic Act (FDCA) outlines the conditions under which drug compounding by a licensed pharmacist is exempt from certain FDA requirements. A 503A compounding pharmacy may compound a drug only after receiving, or reasonably anticipating, a valid prescription for an individual patient. These pharmacies are generally overseen by state Boards of Pharmacy and/or Departments of Health rather than the FDA, and they are typically exempt from routine FDA inspections. 503A compounding facilities are also exempt from compliance with Current Good Manufacturing Practices (cGMPs); instead, they must follow USP 795 for nonsterile compounding and USP 797 for sterile

Affidavit of Dr. Michaela Almgren

*MA*_____ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB    document 1-11    filed 09/18/25    page 32 of 88

compounding. Additionally, 503A pharmacies are generally prohibited from producing "essentially a copy of an approved drug," which the FDCA defines as a drug that is identical or nearly identical to an FDA-approved or marketed drug, or a drug whose active component is such an approved or marketed drug.

14. **503B Compounding Outsourcing Facilities**: A 503B compounding pharmacy is a facility that manufactures and distributes sterile compounded medications directly to healthcare providers, either in response to clinical demand or for drugs listed on the official FDA Drug Shortage List. These pharmacies specialize in producing large batches of compounded medications rather than individual patient prescriptions, very similar to pharmaceutical manufacturing. Unlike 503A compounding pharmacies, 503B facilities must comply with current Good Manufacturing Practices (cGMPs), which are rigorous standards for quality control and safety. They are also subject to regular FDA inspections based on a risk-based schedule, as well as specific adverse event reporting requirements and other conditions designed to mitigate the risks associated with the drug products they compound.

15. **Pharmacokinetics**. Pharmacokinetics is a branch of pharmacology that studies what the body does to drugs after administration, including how drugs are absorbed, distributed, metabolized, and excreted.

16. **Pharmacodynamics**. Pharmacodynamics is the study of what a drug does to the body, including the specific way a drug interacts with the body's systems to produce clinical effects. Clinical effects include intended therapeutic effects and unwanted side effects.

17. **USP**. USP stands for United States Pharmacopeia. It is an independent scientific nonprofit organization that sets legally recognized standards for the identity, strength,

Affidavit of Dr. Michaela Almgren

MA ___ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward
USDC IN/ND case 3:25-cv-00758-CCB    document 1-11    filed 09/18/25    page 33 of 88

quality, and purity of medicines, food ingredients, and dietary supplements in the United States.

18. **Certificate of Analysis (CoA).** A Certificate of Analysis is an official document that verifies a drug's quality and conformity to specified standards. A typical CoA includes the drug name and identification, test results concerning the drugs physical, chemical and microbiological characteristics, specifications concerning the composition, purity and quality of the drug, the testing methods employed to reach these conclusions, an interpretation of the results and a certification that the drug meets accepted standards. CoAs are important because they certify regulatory compliance and quality assurance. They are also important to ensure traceability because CoAs include batch numbers and manufacturing dates.

19. **Beyond Use Date ("BUD").** A beyond-use date (BUD) is the date after which a compounded drug preparation should not be used, stored, or transported. A BUD is assigned to compounded medications to indicate when the drug may no longer be safe or effective due to factors such as chemical or physical degradation or microbial contamination.

20. **pH.** pH is a scale that measures how acidic or basic a substance is, ranging on a scale from 0 to 14. A pH of 7 is neutral, like water. Values below 7 indicate acidity and values above 7 indicate alkalinity or basicity.

21. **Chemical Precipitate (or precipitate):** A chemical precipitate is a solid substance that forms and separates from a solution during a chemical reaction or when the solution becomes saturated and the solubility limit of the dissolved substance is exceeded. This

Affidavit of Dr. Michaela Almgren

_____ Initials

**Exhibit Q**

can occur for a variety of reasons, such as changes in temperature, exposure to UV light, or changes in pH.

22. **Chemical Suspension (or suspension).** A chemical suspension is a solid substance that is dispersed in a solution rather than dissolved. The solid particles are finely divided but stay suspended throughout the liquid. The suspension may be a result of formation of a precipitation.

23. **Potency.** Drug potency is a measure of how much of a drug is needed to produce a specific effect. It can also be defined as drug's strength or concentration.

24. **Sterility.** Drug sterility refers to the absence of viable microorganisms in a pharmaceutical product. Sterility is crucial for ensuring the safety and efficacy of medications, particularly those administered by injection. Sterility testing is a critical quality control process used to verify the absence of contamination.

25. **Assay.** A drug assay is a laboratory test used to measure the amount, purity, or concentration of a drug to ensure it meets the required strength and quality standards. It is a critical part of quality control to confirm that a medication is safe, effective, and consistent.

26. **Stability.** Drug stability refers to the extent to which a drug maintains its chemical, physical, microbiological, and therapeutic properties over time under specific storage and usage conditions. It is a measure of whether a drug remains safe, effective and of good quality throughout its shelf life. It is tested utilizing stability-indicating assays.

27. **Stability-indicating assays.** Stability-indicating assays are validated analytical methods used to assess the stability of drug substances and drug products by specifically detecting and quantifying the drug and any degradation products formed over time. These methods

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

are crucial for ensuring the safety and efficacy of pharmaceuticals by identifying

potential issues with drug stability. They are also used to establish BUDs and expiry of

drugs.

28. **Oxidation.** Drug oxidation refers to the degradation of a drug or API due to oxidation

chemical reactions. Degradation causes the formation of unintended products or

impurities, typically resulting in the loss of potency.

29. **American Society of Health-System Pharmacist (ASHP) Handbook for Injectable

Drugs**. The ASHP Handbook for Injectable Drugs is the reference resource for injectable

drug information and includes over 400 monographs on injectable drugs with tables for

compatibility of drugs in solution and syringes.

30. **USP Drug Monograph for Quality Testing**. The USP Monograph outlines specific

quality standards and testing procedures for drug substances. It includes specific

analytical methods, such as tests for identity, assay, impurities, dissolution, and other

relevant parameters, with the goal of ensuring consistent and reliable results.

31. **Red Book**. The "Red Book" refers to the Micromedex RED BOOK database, a resource

that provides comprehensive drug product and pricing information, including

manufacturer details.

32. **Orange Book**. The "Orange Book" is an FDA publication officially titled "Approved

Drug Products with Therapeutic Equivalence Evaluations," and is a list of drugs approved

by the FDA as safe and effective. For generic drug manufacturers, the Orange Book is

used to identify generic drug equivalents of brand-name drugs and patent information

which dictates when a generic drug can enter the market.

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

**The Indiana Department of Correction is likely using compounded injectable pentobarbital to carry out executions.**

33. I have reviewed post-mortem toxicology reports from the two people most recently executed by the State of Indiana. Both men's toxicology reports indicated the presence of pentobarbital in their blood. Since no other protocol drug was found, the Indiana Department of Correction appears to be following a one-drug lethal injection protocol using a lethal dose of pentobarbital in an injectable form.

34. Manufactured pentobarbital sodium, marketed under the trade name Nembutal, is available as an API in powder form or as a sterile solution for intravenous injection, containing 50 mg of pentobarbital sodium per mL.

35. Manufactured pentobarbital in sterile solution has a typical shelf life of two to three years before it expires.

36. Compounded injectable pentobarbital has typically significantly shorter shelf life because typically compounded drugs do not have long term stability data. While commercially manufactured products are produced in highly controlled environments under cGMP requirements, compounding pharmacies, even when following USP 797 generally operate in less stringent conditions than large-scale manufacturing facilities, increasing the risk of contamination over time. Furthermore, compounding processes often involve more open handling, which increases exposure to light, heat, air, or moisture—factors that accelerate degradation. According to USP 797, the beyond-use date (BUD) for sterile compounded preparations varies by facility type and environmental controls, ranging from as short as 12 hours in less controlled settings to several days or months in facilities with more stringent environmental standards.

Affidavit of Dr. Michaela Almgren

_MA_ ____ Initials

**Exhibit Q**

Compounded drugs have shorter BUDs because they lack the rigorous stability testing,

sterile manufacturing controls, and validated expiration dating of commercially

manufactured drugs. USP assigns conservative default limits to protect patients from loss

of potency or contamination.

37. Recently, Indiana Governor Mike Braun told members of the media[1] that two doses of its

lethal injection drug expired before they could be used which necessitated the purchase of

additional doses.  Given Indiana just resumed executions in December of 2024 after a

long break from executions, it is most likely Indiana is purchasing compounded

injectable pentobarbital to carry out executions because manufactured doses would not

most likely have expired before they could have been used.

38. It is more likely for the Indiana Department of Correction to obtain compounded

pentobarbital from a 503A pharmacy than from a 503B outsourcing facility because 503A

pharmacies are far more common, operate on a smaller scale, and are not required to

meet the extensive and costly cGMP standards that 503B facilities must follow.

Additionally, 503B facilities typically focus on large-batch production of drugs in

shortage or high clinical demand, and pentobarbital is neither on the FDA Drug Shortage

List nor in clinical demand for compounding, making it less practical and less likely for

503B facilities to compound pentobarbital injection.

**If the Indiana Department of Correction is purchasing injectable pentobarbital from a
503A compounding pharmacy, it is obtaining the drug from a source not verified by the
FDA. Since the identity of the compounding pharmacy is not disclosed due to the
Indiana's "Shield Law" (Indiana Code § 35-38-6-1 (2024)) it is also unclear whether the**

---

[1] https://indianacapitalchronicle.com/2025/06/24/braun-clarifies-indiana-acquisition-of-execution-drugs-reveals-more-than-1m-spent/

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

**pharmacy is in good standing with the Indiana Board of Pharmacy or meeting
requirements for patient safety and drug quality.**

39. 503A compounding pharmacies are exempt from routine FDA oversight because they
compound patient-specific prescriptions under state regulation, do not engage in large-
scale manufacturing, and are required to follow USP standards rather than full cGMPs.
They are considered traditional pharmacies serving specific patient needs, rather than
large-scale drug manufacturers. The FDA generally defers to state authorities for these
patient-specific compounding activities.

40. Because the pharmacy source of the compounded drug is not disclosed, it is unclear
whether the compounding pharmacy is operating in compliance with applicable
compounding guidelines, including the regulations set forth by the state of Indiana. This
raises concerns that the facility may not meet the rigorous requirements for sterile
compounding set forth in USP 797, including proper environmental controls, personnel
training, equipment maintenance, sterility testing, and quality assurance procedures.
Many of the standards outlined in USP 797 cannot be independently verified without
knowing the identity of the pharmacy, leaving uncertainty about whether the compounded
product was prepared under conditions that ensure patient safety and drug quality, and
compliance with state regulations.

**Due to relatively limited oversight, many Indiana pharmacies have been found to operate
under unsanitary conditions—even among those inspected by the FDA. Inadequate
regulatory enforcement and resource constraints allow such unsafe practices to continue.**

41. Pharmacy is one of the most highly regulated areas in healthcare, and for good reasons:
ensuring medication safety and quality is critical. State Boards of Pharmacy conduct
regular audits of pharmacies to verify compliance with laws and regulations. When issues

Affidavit of Dr. Michaela Almgren

_MA___ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward
USDC IN/ND case 3.25-cv-00758-CCB    document 1-11    filed 09/18/25    page 39 of 88

are identified, the Boards may issue citations requiring pharmacists to make corrections.

However, in some cases, violations are severe enough that more significant enforcement

actions are necessary, and the facility may receive an Administrative Complaint from the

Board of Pharmacy. The following are just a few examples drawn from the Indiana Board

of Pharmacy[2] records to illustrate some of the concerns regarding compliance with

pharmacy regulations:

- **Hook-Super RX, April 2024** – Improperly labeled drugs, expired medications on the shelves for dispensing, some over one year past the expiration;

- **Walgreens #07788, March 2023** – Unsanitary conditions: dark staining liquid running down the wall from the ceiling inside the pharmacy; plastic bucket collecting dark liquid dripping in the medication processing area;

- **Walgreens #07926, January 2022** – Dirt and debris in the pharmacy, medications scattered on the floor of the pharmacy, expired medications on shelves for dispensing, including compounded medications and products used for compounding, lack of documentation, unlabeled bottles of liquid on the shelf, drug in the compounding area that expired in 1/2014, scales used in compounding that were not certified since 2019;

- **Paul's Pharmacy, March 2023** – Multiple violations including compounded medications assigned incorrect beyond-use dates (some up to 1 year, outside USP standards), mislabeled medications, food items stored with medications, equipment used in pharmacy practice not maintained or cleaned, adulterated drugs due to expiration or improper handling, and pharmacist not up to date on current compounding guidelines;

- **Edge Pharma (503B outsourcing facility), February 2023** – This pharmacy, subject to FDA oversight as well as the Indiana Board of Pharmacy, received FDA Warning Letters (formal notices issued when significant regulatory violations are identified that could affect drug safety or quality) due to numerous serious violations, including deficiencies in aseptic processing areas, cleaning and disinfecting procedures, written procedures to prevent microbiological contamination, batch review practices, stability testing programs, employee training, validation of supplier testing, laboratory facilities and controls, computer system controls, master production record procedures, and labeling controls.

---

[2] https://www.in.gov/apps/pla/litigation/searchresults.aspx?mode=adv

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

42. This list is not comprehensive but is intended to illustrate systemic problems and how pharmacies can violate regulations, potentially resulting in medications that do not meet safety and quality standards. Unfortunately, State Boards of Pharmacy cannot provide continuous, tight oversight of every pharmacy.

43. Drugs that are expired or contaminated should never be used, as they may be unsafe and ineffective. Expired medications can lose potency over time, resulting in reduced therapeutic effect and possible treatment failure. Contaminated drugs pose an even greater risk, as they may contain microorganisms or toxins that can cause further quality degradation. For these reasons, expired or contaminated drugs cannot be considered reliable or appropriate for patient use.

44. The examples above highlight that even pharmacies operating under regulatory oversight can experience problems and, in some cases, violate established rules. This underscores the importance of carefully reviewing the source of compounded medications to ensure that the drugs are prepared under safe, controlled conditions and meet required quality standards.

**There is also the possibility that the Indiana Department of Correction may obtain lethal injection drugs from completely unqualified and unregulated sources.**

45. It is deeply concerning that the Indiana Shield Law (Ind. Code § 35-38-6-1) excludes the compounding of lethal injections from being recognized as the practice of pharmacy and places it outside the oversight of state regulatory bodies.

46. Specifically, the law states that "the issuance or compounding of a lethal substance does not constitute the practice of pharmacy and is not subject to the jurisdiction of the Indiana Board of Pharmacy, the Medical Licensing Board of Indiana, the Indiana Department of

Affidavit of Dr. Michaela Almgren

_MA_ Initials

Page **13** of **29**

**Exhibit Q**

Health, or the Indiana Professional Licensing Agency." This indicates that the medications used for lethal injection are prepared without oversight, and their quality cannot be verified. As a result, an incorrect API could be used, or a drug could be improperly prepared, potentially causing unnecessary pain and suffering.

47. There is also a concern that the medication used in Indiana's lethal injection procedure may be prepared by an individual who is neither qualified nor appropriately trained, and who may not even be a licensed pharmacist. If an unqualified person compounds drugs, the risk of medication errors and contamination is significantly higher. They may lack the technical knowledge to ensure correct drug, dosage, sterile technique, and proper handling, leading to variations in potency, degradation, or microbial contamination. Such mistakes can result in ineffective or harmful medications.

48. Furthermore, the drugs may be compounded in a facility not intended for the preparation of human drug products. Compounding drugs in an unregulated space can severely compromise their quality and safety. Such environments lack proper sterile conditions, controlled temperature and humidity, and validated equipment, all of which are essential to maintain drug stability and potency. Contamination with bacteria, fungi, or particulate matter is highly likely, and the resulting medication may be degraded, or ineffective.

49. Since there is no regulatory oversight or enforced quality control, the potency and quality of these drugs are inherently uncertain. No Certificate of Analysis is available to verify the quality of the drug prior to use. Without standardized testing, verification, or monitoring, there is no assurance that the drug contains the correct active ingredient at the intended strength or that it is free from degradation and contamination. This lack of

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB    document 1-11    filed 09/18/25    page 42 of 88

oversight creates significant risks, as recipients may be exposed to ineffective or harmful

substances, causing unnecessary pain and suffering.

**Compounding injectable pentobarbital is a complex process with risks of variations in
potency, degradation and contamination. Proper training, education, and access to
specialized equipment are essential to safely perform this task and ensure the drug's
accuracy, sterility, and stability.**

50. There is more than one "recipe" to produce compounded injectable pentobarbital, but all

recipes require addition of several chemicals to maintain the delicate balance needed for

the pentobarbital sodium powder to remain in solution at the correct pH and without

suspension particles. Deviations from the appropriate compounding procedure can

significantly impact the efficacy and safety of the pentobarbital injection. Compounded

products are typically formulated to mimic the commercially produced drug.

51. According to the ASHP's Handbook of Injectable drugs[3], a manufactured injection of

pentobarbital 50 mg/mL (trade name Nembutal, AHFS classification 28:24.04) is

prepared as a mixture containing pentobarbital sodium powder, propylene glycol 40%

v/v, and alcohol 10%. Additional ingredients such as sodium hydroxide and hydrochloric

acid may be used to stabilize the solution and to produce the final pH of 9.5.

52. Compounded injectable pentobarbital is made by adding water to pentobarbital sodium

powder along with sodium hydroxide pellets to bring the pH to 12. Hydrochloric acid is

then added to the solution to bring the pH back down to around 9.8, a point at which the

powder pentobarbital sodium just barely stays in solution. Then propylene glycol is

added (40% v/v) as is alcohol. Then, the solution is filtered using a .22 micron filter to

---

[3] American Society of Health-System Pharmacists. Pentobarbital Sodium. In: ASHP® Injectable Drug
Information™. 10th ed. Bethesda, MD: American Society of Health-System Pharmacists; 2021:chap 308. Available
from: https://publications.ashp.org/abstract/book/9781585286850/ch308.xml

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

assure sterility. To assure filter integrity a quality assurance report should be issued documenting that the filter has undergone and passed pressure testing. Any changes in pH can cause precipitation out of the solution, formation of a suspension and a change in the potency of the drug solution.

53. Injectable pentobarbital may also be compounded by dissolving pentobarbital sodium powder in alcohol first and then adding just enough polypropylene glycol and water to achieve the correct pH to keep the pentobarbital in solution without a precipitation forming.

54. It is important that all ingredients used for compounding are of pharmaceutical grade with expiration dates past the BUD of the compounded product. The API in compounded injectable pentobarbital is USP grade pentobarbital sodium powder.

55. If the final compounded product pH is incorrect, the solution could cause severe pain and suffering upon injection because the body's tissues are sensitive to acidity and alkalinity. Deviations in pH trigger pain signals, burning and stinging sensations, even tissue injury in severe cases. In addition, an improper pH can lead to the formation of a suspension, making the drug unsafe for administration.

56. If a precipitate or suspension forms, the pentobarbital cannot be safely injected because it would cause extreme pain and suffering to the prisoner. Injection of a solution containing particles may lead to directly causing severe tissue injury and occlusion of the affected vasculature can result in thromboembolism which can be extremely painful.

57. Additionally, if the drug has precipitated out of solution, the potency of the injection will be lower leading to a slow and excruciatingly painful death. Subpotent pentobarbital containing particulate matter can produce unpredictable pharmacokinetic and

Affidavit of Dr. Michaela Almgren

_MA_____ Initials

**Exhibit Q**

pharmacodynamic effects causing a prolonged death where the prisoner experiences
suffocation, drowning or other severe respiratory distress.

58. As illustrated above, compounding sterile injection of pentobarbital should only be
performed by a well-trained pharmacy professional because the process requires
extensive knowledge, skill, and experience to ensure product efficacy. A trained
professional understands the underlying chemistry of the procedures, the role of each
ingredient, and the importance of accurate measurements and proper handling to achieve
the intended therapeutic effect. They know how to select and operate the appropriate
equipment, follow validated aseptic techniques, and oversee the sterilization process,
including identifying potential issues that could compromise quality. Additionally, they
are trained to implement quality assurance procedures, such as pH and filter integrity
testing, and to determine which tests are necessary to verify the quality and potency of
the finished product. This combination of scientific understanding, technical skill, and
procedural knowledge ensures that compounded medications meet strict quality
standards. A layperson without this specialized training would not be able to perform
sterile compounding safely and could easily compromise the quality and safety of the
medication.

**The USP 797 places a strong emphasis on the compounding environment as a critical factor
in determining beyond-use dates (BUDs) for sterile preparations.**

59. USP 797 highlights that the environmental control of the compounding area—including
air quality, surface sanitization, and personnel practices—directly influence the sterility
and stability of compounded drugs. Consequently, BUDs must be assigned based not only
on the drug's chemical characteristics but also on the risk level associated with the

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB   document 1-11   filed 09/18/25   page 45 of 88

compounding, with stricter controls enabling longer BUDs and higher-risk or less
controlled environments requiring shorter BUDs to ensure patient safety.

60. According to USP 797 sterile compounds are divided into three categories, and the
assigned beyond-use dates (BUDs) depend heavily on the environmental controls in
which the preparation occurs, as well as additional quality testing.

61. Category 1 preparations, compounded in less controlled environments such as a
segregated compounding area, have the shortest BUDs—no more than 12 hours at room
temperature or 24 hours if refrigerated—due to the higher risk of contamination. A
segregated compounding area is a designated, unclassified space outside of a cleanroom
suite where a primary engineering control (such as a laminar airflow workbench or
isolator) is placed for sterile compounding, but which allows only short beyond-use dates
due to limited environmental controls.

62. Category 2 preparations are made in more controlled cleanroom environments and may
be assigned longer BUDs if sterility testing and stability data are available. A more
controlled cleanroom environment for Category 2 compounding refers to a cleanroom
suite that includes an ISO Class 5 primary engineering control, such as a laminar airflow
workbench or biological safety cabinet, located within an ISO Class 7 buffer room and
supported by an ISO Class 8 or better ante-room, providing stricter air quality, pressure
differentials, and contamination controls than a segregated compounding area. The
beyond-use dates (BUDs) for Category 2 preparations depend on the storage conditions
and sterility assurance: up to 4 days at controlled room temperature (20–25 °C), 10 days
refrigerated (2–8 °C), and 45 days frozen (-25 to -10 °C). These limits can be extended
(up to 60 days if frozen) if extensive sterility testing and stability data studies support

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

**Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward**
USDC IN/ND case 3:25-cv-00798-CCB  document 1-11  filed 09/18/25  page 46 of 88

longer storage, reflecting the increased environmental control and reduced risk of contamination compared with Category 1 compounding.

63. Category 3 preparations, compounded under the most stringent conditions with enhanced sterility assurance and extended testing, allow for the longest BUDs, in some cases up to 180 days depending on storage conditions. For USP 797 Category 3 sterile compounding, the environment is highly controlled to ensure maximal sterility and product quality. All aseptic manipulations occur within an ISO Class 5 primary engineering control (PEC), such as a laminar airflow workbench, biological safety cabinet, or compounding aseptic isolator, which is located within an ISO Class 7 buffer room and supported by an ISO Class 8 ante-room for personnel entry and gowning. The facility maintains strict air quality, pressure differentials, temperature, and humidity controls, with routine cleaning and disinfection of all surfaces. Personnel must follow proper garbing, hand hygiene, and aseptic techniques, including wearing sterile garments that cover all skin and hair, to prevent contamination. The environment is also regularly monitored through air and surface sampling to detect microbial contamination. These rigorous environmental controls are essential for minimizing contamination risk and supporting the longest beyond-use dates for Category 3 sterile preparations. Preparations stored at controlled room temperature (20–25 °C) generally have shorter BUDs than those refrigerated or frozen, while refrigerated storage (2–8 °C) can extend the BUD by slowing microbial growth and chemical degradation. Frozen storage (-25 to -10 °C) typically allows the longest BUDs, as extremely low temperatures minimize both microbial proliferation and chemical instability. The exact BUD assigned depends on the level of environmental control during compounding, the results of any sterility or stability testing, and the

Affidavit of Dr. Michaela Almgren

 Initials

**Exhibit Q**

specific formulation, ensuring that each preparation remains safe and effective throughout its storage period. Because Category 3 compounding involves complex requirements, relatively few pharmacies are equipped or authorized to perform compounding under this category.

64. The beyond-use date (BUD) must be strictly observed in sterile compounding because it defines the time period during which a preparation is expected to remain sterile, chemically stable, and therapeutically effective under specified storage conditions. BUDs must be supported by stability studies to provide scientific evidence that the drug maintains its intended strength, purity, and sterility for the assigned duration. These studies ensure that the compounded product will perform as expected throughout its shelf life, giving end users confidence in both the safety and effectiveness of the medication.

**The Indiana Department of Correction is acquiring injectable pentobarbital, potentially at a premium price for a drug that is typically not expensive.**

65. Wholesale Acquisition Cost (WAC) and Average Wholesale Price (AWP) are two commonly used pricing benchmarks in the pharmaceutical industry that serve different purposes. WAC represents the manufacturer's list price for a drug sold to wholesalers or direct purchasers, before any discounts, rebates, or other price concessions. It provides a baseline for estimating acquisition costs but does not necessarily reflect the actual price paid. AWP, on the other hand, is a benchmark or suggested price that wholesalers use when selling to pharmacies and is often referred to as a "sticker price." It is typically higher than the WAC and is primarily used for reimbursement and insurance billing purposes rather than reflecting actual transaction prices. In essence, WAC reflects the manufacturer's set cost to distributors, while AWP serves as a reference for pricing and

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

reimbursement in the pharmacy supply chain. According to the Red Book, the Wholesale Acquisition Cost (WAC) per package of manufactured pentobarbital sodium injectable formulation 50 milliliter vial with 50 milligrams per milliliter strength is $2,257.00 (Hikma) and $2,100.00 (Sagent). The Average Wholesale Price (AWP) per package is listed as $2,708.40 (Hikma) and $ 2,520.00 (Sagent).

66. According to the article published by Indiana Capitol Chronicle,[1] the state spent $1.175 million on four doses of execution drugs. This means that the state overpaid by a factor of over 130 times the typical market price. There is no disclosure about how the price was negotiated and agreed upon.

**Compounded injectable pentobarbital is less stable than manufactured pentobarbital and it will degrade if not transported and stored correctly.**

67. Compounded drugs are generally less stable than manufactured drugs due to several factors. Unlike commercially manufactured products, which are produced in large batches under strict cGMP conditions and undergo extensive stability testing, compounded drugs are made in small, patient-specific batches without the same level of rigorous testing. Stability can be further compromised by variations in compounding techniques, environmental conditions, and the quality of raw materials. Packaging also plays a critical role; manufactured drugs are typically sealed in tamper-evident, sterile, and protective containers designed to maintain stability over the shelf life, whereas compounded drugs are often stored in simpler containers that may not provide the same protection from light, moisture, or air. These factors combined mean that compounded drugs are more susceptible to chemical degradation, microbial contamination, and loss of potency over time.

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

68. Transportation conditions can significantly impact the quality and stability of compounded drugs. Factors such as exposure to extreme temperatures, excessive humidity, and direct light can accelerate chemical degradation, reduce potency, or promote microbial growth. Timing is also critical, as prolonged transit or delays can allow these environmental factors to compromise the product. For example, drugs that require refrigeration may lose efficacy if exposed to heat during transport, while light-sensitive compounds can degrade if not properly protected from sunlight or strong artificial light. Proper packaging, temperature control, and timely delivery are therefore essential to ensure that compounded medications maintain their intended safety, potency, and sterility.

69. Storage conditions play a critical role in maintaining the quality of compounded drugs. Improper temperature, humidity, or light exposure can lead to chemical degradation, reduced potency, or microbial contamination. Therefore, storage conditions must be carefully monitored not only to prevent theft but also to ensure that the medications remain safe, effective, and stable for their intended use.

**If the Indiana Department of Correction is purchasing injectable pentobarbital from a 503A compounder, the compounder is supplying compounded injectable pentobarbital without a valid prescription in violation of federal law.**

70. Under Section 503A of the Federal Food, Drug, and Cosmetic Act, a pharmacy may only compound a drug after receiving a valid prescription for an individual patient, or if a prescription is reasonably anticipated. Compounding a drug without such a prescription is a direct violation of federal law. Pharmacies that fail to adhere to this requirement are not only operating outside the scope of 503A regulations but may also be subject to enforcement actions by state Boards of Pharmacy or other regulatory authorities.

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

**If the Indiana Department of Correction is not purchasing injectable pentobarbital from a compounding pharmacy, it is maybe purchasing manufactured injectable pentobarbital from a source of supply not authorized to sell it.**

71. According to the Red Book the current manufacturers for Nembutal are Hikma Pharmaceuticals and Sagent Pharmaceuticals. According to the listing in the Orange Book, Rising Pharma and BPI Labs also provide injectable pentobarbital.

72. Major manufacturers of pentobarbital, including companies like Hikma, refuse to sell the drug for execution purposes, adamantly opposing the use of their products in capital punishment (https://lethalinjectioninfo.org/industry-statements/). Some of these companies have taken the drastic step of ceasing the production of their drugs to prevent any possibility of their products being utilized in executions. Additionally, certain manufacturers, such as Fresenius Kabi[4], have initiated legal actions to prevent the use of their drugs in execution procedures.

73. Distributors and drug purchasers are generally required to agree to specific stipulations regarding the end use of certain medications, including those intended for lethal injection. These agreements typically prohibit the sale or distribution of such drugs to correctional facilities for execution purposes. This ensures that the drugs are used only for legitimate medical purposes and prevents pharmacies, distributors, or manufacturers from being complicit in executions, which could violate ethical standards, regulatory requirements, or state and federal laws. Therefore, obtaining manufactured pentobarbital for use in

---

[4] https://www.theguardian.com/us-news/2018/aug/08/german-drug-maker-sues-to-halt-planned-execution-in-nebraska

Affidavit of Dr. Michaela Almgren

_____ Initials

**Exhibit Q**

executions would violate these stipulations and could expose suppliers to significant legal
and regulatory consequences.

**Based on the affidavits of multiple witnesses to Benjamin Ritchie's execution by lethal
injection, concerns have been raised about unusual and unexpected observations reported
during the procedure. This raises significant concerns regarding the quality of the drug
being used.**

74. Intravenous pentobarbital pharmacokinetics[5] are characterized by rapid onset of action, as
the drug is delivered directly into the bloodstream and quickly distributes to highly
perfused tissues, including the brain. It is highly lipophilic and approximately 45–55%
protein-bound, allowing extensive tissue distribution. Pentobarbital is primarily
metabolized in the liver through oxidation and conjugation, and both the parent drug and
metabolites are excreted mainly in the urine. The elimination half-life ranges from 15 to
50 hours, depending on the dose and individual factors. These properties result in a fast-
acting sedative effect with a duration influenced by tissue distribution and metabolism.

75. Pentobarbital pharmacodynamics describe how the drug affects the body, particularly the
central nervous system. When pentobarbital is administered intravenously, it rapidly
enters the bloodstream and reaches the brain, where it acts as a central nervous system
depressant. It enhances the effects of GABA, a natural inhibitory neurotransmitter, which
reduces the activity of nerve cells, producing sedation, sleep, and anesthesia. At higher
doses, pentobarbital profoundly depresses brain function, including the brainstem, which
can slow or stop breathing and heart activity, leading to unconsciousness and death. The

---

[5] https://www.ncbi.nlm.nih.gov/books/NBK545288/

Affidavit of Dr. Michaela Almgren

_M_ Initials

**Exhibit Q**

rapid onset and potent effects of IV pentobarbital make it effective for inducing deep sedation or medically induced coma.

76. Based on the pharmacodynamics and pharmacokinetics of pentobarbital, administration of the drug during lethal injection should result in a rapid and peaceful procedure. However, reports and observed outcomes indicated that this was not the case using the most recent drug products.

**Based on the affidavits of Steven H. Shutte, Mark Koselke, Hannah Hall, and Amanda Johnson, all of whom witnessed the execution of Mr. Benjamin Ritchie, it appears that the procedure did not proceed smoothly, raising concerns about both the quality of the drug used and potential gaps in the execution protocol.**

77. As per the Indiana Department of Correction Facility Directive ISP 06-26, titled Execution of Death Sentence, offender witnesses are brought in to view the execution immediately before the lethal injection infusion begins. All witnesses noted that Mr. Ritchie initially lay on the gurney without any visible struggles, even giving a signal to them. However, once the lethal injection began flowing into his body, he experienced an extreme and unexpected reaction. According to all four independent affidavits, Mr. Benjamin Ritchie appeared to struggle while restrained on the gurney. Steven H. Shutte observed him "violently lurching forward and up as if to sit up, but he was restrained." Hannah Hall described the reaction as very "violent and so unexpected," noting that, although he was restrained, "his head and shoulders came up." Mark Koselke similarly remarked, "The movement when Ben lifted did not seem to me to be involuntary. It looked like panic. He was really pushing hard against the restraints." Overall, the witnesses' accounts were highly consistent in describing Mr. Ritchie's intense and

Affidavit of Dr. Michaela Almgren

_____ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward
USDC IN/ND case 3:25-cv-00758-CCB    document 1-11    filed 09/18/25    page 53 of 88

forceful movements, raising concerns about both the drug's effect and potential gaps in the execution protocol.

78. Based on the pharmacodynamics and pharmacokinetics of pentobarbital, when administered in a high intravenous dose, the drug is expected to rapidly distribute throughout the bloodstream and reach the brain, where it enhances the activity of GABA, the primary inhibitory neurotransmitter. This action reduces neuronal activity, producing sedation and ultimately loss of consciousness, without causing pain, shock, or panic. At high doses, pentobarbital's pharmacologic effects include deep central nervous system depression, respiratory suppression, and cardiovascular depression, which together result in unconsciousness and, if continued, cessation of vital functions. Due to its rapid distribution and predictable pharmacologic profile, the drug should act quickly and evenly, producing these effects in a controlled manner, ensuring the person simply falls asleep and remains unconscious without experiencing distress or abnormal reactions. This did not appear to be the case according to the witnesses.

79. The unexpected reaction raises questions about the quality and effectiveness of the pentobarbital used, as it did not produce the expected effect. Concerns include the drug's potency, purity, overall quality, pH and stability, as well as the possibility that it may have precipitated or undergone oxidation over time, potentially reducing its strength and effectiveness.

80. Additionally, there are concerns regarding the execution protocol issued by the Indiana State Prison, which may have contributed to the observed complications.

**Indiana's State Prison Facility Directive ISP 06-26: Execution of Death Sentence protocol contains numerous gaps and deficiencies.**

Affidavit of Dr. Michaela Almgren

MA____ Initials

**Exhibit Q**

81. The staff selected for the Execution Team are not licensed to perform medical procedures or to compound and prepare drugs. The IV team appears to be composed of prison personnel trained to start IVs. Although a licensed physician is designated to provide guidance on the preparation and administration of the lethal chemicals, the directive lacks detailed instructions on several critical aspects, including the handling, storage, transfer, and environmental conditions of the lethal injection agents.

82. Becoming proficient at IV insertion typically requires both formal training and hands-on practice under supervision. Most nursing and medical programs include didactic instruction on anatomy, technique, and safety, followed by practical experience on mannequins or simulation arms[6]. Competence generally develops after performing 20 or more supervised successful insertions on real patients, though some individuals may require more practice depending on dexterity and confidence[7]. It is uncertain whether the Execution Team personnel have sufficient experience or have received the necessary training.

83. There is no documented procedure to verify that the drug intended for lethal injection meets appropriate standards of potency, and purity, and no review of the Certificate of Analysis is performed. Personnel handling the drug, and even the physician overseeing the process, may lack the training and experience to visually assess the drug for potential physical changes such as change of color or precipitant formation.

---

[6] Gorski, L. A. (2024). Update: The 2024 Infusion Therapy Standards of Practice. Home Healthcare Now, 42(1), S1–S285. https://doi.org/10.1097/NHH.0000000000001270

[7] https://www.ncbi.nlm.nih.gov/books/NBK594499/

Affidavit of Dr. Michaela Almgren

_____ Initials

Exhibit Q

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief, Roy Lee Ward
USDC IN/ND case 3:25-cv-00758-CCB   document 1-11   filed 09/18/25   page 55 of 88

84. Proper storage conditions are critical for all medications, but in particular for compounded drugs, as they can be highly sensitive to environmental factors that affect their stability and potency. This is especially true for pentobarbital, whose chemical composition makes it particularly vulnerable to degradation under improper conditions. Storage environments should be continuously monitored for temperature and humidity to ensure the drug remains uncompromised, with all measurements carefully recorded. However, the current execution procedure makes no mention of such monitoring or documentation, raising significant concerns about the integrity and quality of the drug used in lethal injections.

85. There does not appear to be any requirement for maintaining a chain of custody for the lethal injection chemical. Because the drug's chain of custody is unknown and there does not appear to be any documentation of it, there is a significant risk that the drug could be manipulated, contaminated, or otherwise compromised at any point before use. Without clear documentation of handling and storage, the drug may be exposed to inappropriate conditions that could degrade its potency or alter its chemical composition.

86. Due to the gaps in the execution procedure described above, there are uncertainties that raise serious concerns about quality of the drug used in the execution, increasing the potential for ineffective administration and adverse outcomes, and creating a substantial risk of unnecessary suffering during its use, as exemplified by the case of Mr. Benjamin Ritchie.

**Conclusion**

87. Given the unknown origin of the drug, uncertainty about whether it was manufactured, or compounded in an appropriate environment by qualified personnel, an unclear chain of

Affidavit of Dr. Michaela Almgren

_MA_ Initials

**Exhibit Q**

custody, and unknown storage conditions, along with the absence of documented drug

quality reports, there are serious questions about the integrity and safety of the substances

used in lethal injections. When these factors are combined with the documented gaps in

the lethal injection protocol—such as lack of procedures to verify potency, purity, and

expiration, limited training of personnel, and no standardized monitoring for

complications—they raise significant concerns regarding both the safety and reliability of

future executions. These deficiencies create a substantial risk of ineffective

administration, adverse reactions, or other complications that could result in unnecessary

pain and suffering, highlighting the urgent need for comprehensive review and reform

before any further executions are carried out.

I affirm, under the penalties for perjury, that the foregoing representations are true.

Executed on this 18th day of August 2025.

*Michaela M. Almgren*

Michaela Almgren, Pharm.D, M.S.

Affidavit of Dr. Michaela Almgren

MA_____ Initials

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3.25-cv-00798-CCB   document 1-11   filed 09/18/25   page 57 of 88

# Michaela M. Almgren, PharmD, MS

161 Wilmont Drive
Lexington, SC 29072
almgren@cop.sc.edu
(803) 622-5231

## EDUCATION

**Doctor of Pharmacy, 2010** *Magna Cum Laude*
South Carolina College of Pharmacy, University of South Carolina, Columbia, SC

**Master of Science in Pharmacy, 2010** *Magna Cum Laude*
**Pharmaceutical Chemistry (Industrial Pharmacy focus)**
University of Florida, Gainesville, FL

**Bachelor of Science, 1997** *Magna Cum Laude, Graduated with Honors*
**Major: Biology, Chemistry**
Columbia College of South Carolina, Columbia, SC

## EMPLOYMENT HISTORY AND EXPERIENCE

**Clinical Associate Professor**
**University of South Carolina, College of Pharmacy, Columbia, SC**
**August 2013 – present**

- Teach lectures in pharmacokinetics, pharmacotherapy, pharmacology and biopharmaceutics.
- Teach lectures in pharmacy law and ethics, and moderate in-class discussions, including ethics debates.
- Deliver ACPE-accredited comprehensive training on sterile compounding in accordance with USP 797, USP 800, and cGMP regulations for pharmacists and pharmacy technicians.
- Provide lectures at the USC School of Medicine on topics including natural medicine, pain management pharmacology, opioid and non-opioid analgesia, and multimodal analgesia.
- Teach women's health lectures in the USC School of Medicine PA program.
- Formerly served as Institutional Lab Course Coordinator, teaching basic and advanced institutional pharmacy practice laboratory courses with a focus on sterile compounding and aseptic technique for second-year pharmacy students, with a typical class size of 110 students.
- Developed, designed, and implemented course content for basic sterile compounding training, focusing on USP Chapters 797 and 800, and introduced students to current institutional pharmacy practices.

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief – Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB    document 1-11    filed 09/18/25    page 58 of 88

- Developed and implemented a 6-hour module to train students on regulations in 503A versus 503B compounding environments, emphasizing critical differences in cGMP (per 21 CFR 210 and 211) versus USP standards.
- Established practical assessment criteria to evaluate students' competency in performing basic sterile compounding procedures in accordance with USP 797 and 800 guidelines, demonstrating preparedness for IPPEs and APPEs.
- Revised course content and objectives for laboratory sessions to align with ASHP-ACPE Task Force guidelines for entry-level competencies required in hospital and health-system pharmacy practice.
- Enhanced and updated the content of the advanced sterile compounding course (PHMY 791), including TPN compounding, neonatal TPN formulation and compounding, chemotherapy and hazardous drug compounding, and IV access line introduction and maintenance.
- Introduced hazardous drug handling guidelines and USP Chapter 800, with emphasis on training students in the use of all closed system transfer devices available in the U.S.
- Provided competency testing and certification for students to participate in institutional pharmacy practice site sterile compounding activities, including media fill testing and fingertip testing.
- Served as a consulting pharmacist, performing duties as a permit holder (SCBOP Non-dispensing Pharmacy Permit #4956) and taking full responsibility for facility maintenance, inventory control, and daily operations.
- Mentor students in research by offering a variety of independent study projects.
- Serve as a clinical seminar evaluator and advisor for students.
- Developed and implemented an ACPE-accredited course titled *Basic Aseptic Technique* for the Kennedy Pharmacy Innovation Center, offering 23.5 hours of continuing education credit for pharmacists and pharmacy technicians. The course includes a two-day live hands-on session and a home study component.

**Outsourcing Pharmacist and Clinical Specialist**
**Preceptor for University of South Carolina College of Pharmacy APPE Program**
**Nephron Pharmaceuticals Company, West Columbia SC**
**September 2018 - present**
- Conduct complex product investigations to ensure quality and compliance.
- Prepare and submit FDA responses and maintain ongoing correspondence with regulatory bodies following FDA audits.
- Perform pharmacovigilance investigations, including adverse event analysis and reporting, in compliance with regulatory requirements.
- Conduct research and prepare product medical risks and hazards assessments as requested by the FDA.
- Conduct regulatory oversight tasks by reviewing package inserts and labeling to ensure compliance with FDA and USP requirements.
- Lead various innovative, research-oriented projects (Yaskawa, Staubli, SteraMist) for manufacturing and outsourcing facilities.
- Oversee formulation and filling operations for a 503B outsourcing pharmacy.
- Perform product development, including scale-ups, for outsourcing pharmacy

**Exhibit Q**

products.
- Troubleshoot quality events to develop safe solutions and establish clinical limits for quality excursions.
- Develop new standard operating procedures and provide staff training as needed.
- Research new products and develop support materials for marketing purposes.
- Respond to clinical questions from customers seeking product guidance.
- Established and maintain an award-winning APPE site for 4th-year pharmacy students, consistently precepting record numbers of students each year.
- Assist with FDA quality inquiry investigations and management.
- Provide information to support product development and production planning.
- Offer essential guidance on labeling for new products.
- Support the DocMatter clinician Q&A website.
- Train the sales force through live lectures, seminars, and pre-recorded presentations.

**Hospital Staff Pharmacist**
**Palmetto Health Richland Hospital Pharmacy, Columbia SC**
**August 2013 – September 2018**
- Performed duties of staff pharmacist—review orders, medication utilization review, order entry.
- Preparation and checking of sterile and non-sterile medication compounds.
- Medication history pharmacist—collect medication history via patient interviews, perform medication reconciliation, clinical consultations, patient education, medication use evaluation, and medication history consults.
- Maintained USC College of Pharmacy practice site.

**Assistant Professor of Clinical and Pharmaceutical Sciences**
**South University School of Pharmacy, Columbia, SC**
**May 2010 -- August 2013**
- Taught lectures in large number of courses in pharmaceutical sciences as well as pharmacy practice in distance education setting, managing two classrooms and collaborating with faculty members located in Savannah, GA. Typical class size was 80 students in the Columbia campus classroom, with 90 additional students at the distant site in Savannah.
- Completely redesigned Pharmaceutical Calculations course structure to flipped classroom model in order to increase effectiveness of teaching, significantly reducing the number of students needing remediation and improving overall test scores in the capstone course.
- Applied several active learning teaching techniques and team-based learning to traditionally taught courses to enhance student learning.
- Developed laboratory exercises to increase student understanding by applying learned material to practice using hands-on experiments.
- Developed and delivered elective course on animal envenomation pharmacology, medicinal chemistry and drug management.

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB   document 1-11   filed 09/18/25   page 60 of 88

- Taught majority of hospital-related lab coursework including TPN compounding, IV and chemotherapy preparation, and USP<797> training.
- Provided competency testing and certification for students to be able to participate in institutional pharmacy practice site sterile compounding activities (media fill testing, fingertip testing).
- Evaluated student performance of Objectively Structured Clinical Examination (OSCEs).
- Provided APhA certified immunization training for pharmacy students.
- Initiated student chapter of Student Society of Health Systems Pharmacists and guided students to the ASHP national recognition of the chapter.
- Served as faculty advisor for Rho Chi chapter.
- Academic advisor to 30 students per year.
- Faculty advisor to Student Society of Health Systems Pharmacists chapter.
- Research interests:  use of complementary medicine in treatment of chronic disease states, smoking cessation and electronic cigarette utilization, new and engaging teaching methods in pharmacy education.
- Precepted Advanced Pharmacy Practice Experience students in elective academia setting.

**Adjunct Faculty, University of Florida Graduate Distance Programs**
**University of Florida, School of Pharmacy**
**January 2011-- May 2014**
- Supported distance education learning for UF Masters and Doctorate degree programs.
- Met with students on-line in small group setting as well as large discussion groups.
- Led chat sessions, communicate via email.
- Graded assignments, tests and presentations.

**Consulting/Dispensing Pharmacist PRN**
**United Healthcare, Lexington, SC**
**August 2010 - August 2012**
- Performed patient medical chart reviews, clinical monitoring, and managed appropriate drug therapy in accordance with federal and state regulations.
- Evaluated physician medication orders regarding dosage, appropriateness of drug, potential interactions, stability and route of administration.
- Analyzed, retrospectively and prospectively, drug utilization for the institutional drug formulary maintenance.
- Reviewed and checked technician prepared orders for delivery and dispensing.
- Consulted with advanced practitioners, healthcare professionals and managers of pharmaceutical services to develop and implement best working practices.

**Hospital Pharmacy Student Intern**
**Lexington Medical Center, West Columbia, SC**
**June 2008 - May 2010**

*Curriculum Vitae for Michaela M. Almgren, PharmD, MS*                    *Page 4*

**Exhibit Q**

- Prepared IV compounded medications, interpreted and prepared orders per medications orders in CPOE.
- Ensured proper control and dispensing of narcotics.
- Interacted with clinical pharmacists, physicians, and nurses regarding drug therapy.
- Compounded a wide variety of specialty preparations including chemotherapy and TPN.

**Retail Pharmacy Student Intern**
**Rite Aid Pharmacy, Columbia, SC**
**September 2006 – May 2010**
- Accurately interpreted, processed, and filled prescriptions.
- Effectively communicated with physicians' offices and insurance companies regarding patients' pharmacy needs.
- Counseled and answered patients' questions concerning their prescriptions, OTC medications, nutritional supplements, and herbal products.
- Assisted with appropriate recordkeeping to assure compliance with federal and state laws.
- Maintained pharmacy inventory and supplies.
- Provided excellent customer support and follow-up.

**Senior Pharmaceutical Formulation Scientist**
**Pfizer Inc., December 2004 – August 2006**
- Worked with formulation team in determining of yields (actual and theoretical), performed batch production record verification, ingredient review, and conditional quality releases, all per company's SOPs (standard operating procedures) and following guidance of cGMPs.
- Performed OOS (Out-Of-Specifications) investigations and reported process deviations on products not meeting all quality criteria set by QC department (for example, content uniformity, particle size and other quality issues.)
- Collaborated with drug formulation research team in development of new products and their test methods, with focus on natural products, supplements, and vitamins.
- Assisted with development of new medication delivery system of liquid drug products (Licaps), assisting with taking the products through ANDA process.
- Developed and validated methods for analytical testing of raw materials and finished products for QC department to test for identity, purity and strength to meet quality standards set by FDA and USP.
- Assisted with improvements in stability studies, including utilizing USP 71 guidance in new products.
- Supported all activities involving new product transfers, compliance, testing and various manufacturing process validations.
- Authored, updated and edited SOPs for training of new employees, changes in process control as well as laboratory manuals, then trained personnel to assure proper understanding of the methodology and troubleshooting.

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3.25-cv-00798-CCB    document 1-11    filed 09/18/25    page 62 of 88

- Comfortable with regulatory environment as set by cGMPs per 21CFR 210 and 211, USP, BP, EP, ISO, ICH and FDA regulations.
- Assisted with management of five laboratory technician team.
- Certified emergency responder.

---

## OTHER PROFESSIONAL ACTIVITIES

**Member of the South Carolina Pharmacy Practice Act (SC PPA) Revision taskforce**
- Chair of the Sterile Compounding Section Revision Committee, leading a group of pharmacy experts and professionals to update the sterile compounding section of the SC Pharmacy Practice Act.
- Member of the team aligning the SC PPA with the National Association of Boards of Pharmacy (NABP) Model Pharmacy Act.
- Member of the task force focused on expanding pharmacy practice.

**Sterile Compounding Committee Volunteer Expert**
**SC Board of Pharmacy, Columbia SC**
**August 2019-present**
- Member of the committee responsible for leading the update of the South Carolina Pharmacy Act to revise pharmacy practice laws related to sterile compounding.
- Serving on a special committee to update the South Carolina Pharmacy Practice Act to provide guidance on sterile compounding and facility requirements compounding under section 503B.
- Provide expertise on sterile compounding practices to the Board of Pharmacy members to help with updating of the assessment forms for inspections of pharmacy facilities.
- Consult members of state legislature on options in regulatory areas of pharmacy practice, specifically in the area of compounding.

**Expert Witness**
- Area of expertise includes sterile compounding, compounding, general pharmacy practice, pharmacokinetics, USP 797, drug preparation.
- Expert in 503B and 503A regulations.
- Possess a strong understanding of pharmaceutical quality implications, regulations, and product quality attributes.
- Provide medicolegal consulting for state and federal court cases.
- Analyze evidence provided and consult the legal team with options for further actions.
- Prepare expert reports, testimony statements, depositions, testify in court.

**Lexington School District 1 Health Sciences Advisory Committee Member**
- Provide guidance and recommendations on development of health and science related courses in the district's curriculum for high school students.

*Curriculum Vitae for Michaela M. Almgren, PharmD, MS*                    *Page 6*

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB   document 1-11   filed 09/18/25   page 63 of 88

**Lexington School District 2 Health Sciences Advisory Committee Member**
- Provide guidance and recommendations on how to initiate and develop health and science related courses in the district's curriculum for high school students.

---

## FACULTY APPOINTMENTS AND TEACHING EXPERIENCE

**DIDACTIC TEACHING EXPERIENCE**
**Clinical Assistant Professor in Department of Clinical Pharmacy and Outcomes Sciences, University of South Carolina, Columbia SC**
**August 2013 to present**
- PHMY 885: Pharmacy Law and Ethics (3 credit hours, principal lecturer and course coordinator)
- PHMY 790: Pharmacy Skills Laboratory III: Introduction to Health-Systems Pharmacy I (1 credit laboratory course, course coordinator)
- PHMY 791: Pharmacy Skills Laboratory IV: Advanced Health System Pharmacy Practice (1 credit laboratory course, course coordinator)
- PHAR 401: Introduction to Pharmacy as a Profession
- PHMY 710: Biopharmaceutics, Pharmaceutics and Pharmacokinetics (3 credit hours)
- PHMY 999: Clinical Seminar
- PHMY 757: Independent Study

**KPIC Master instructor, University of South Carolina, Columbia SC**
**August 2014 to March 2015**
- Basic Aseptic Technique course, 23.5 hours of CE, Master instructor
- Advanced Aseptic Technique course 16 live hours of CE, Master instructor

**Assistant Professor of Pharmacy**
**South University School of Pharmacy, Columbia SC,**
**May 2010 to August 2013**
- PHA 4367 Integrated Sequence IV Autonomic Nervous System (Pharmacology and Pharmacotherapy lectures), 8 credit hours
- PHA 3159 Introduction to Integrated Sequence: Basic Pharmacology Modules, Medicinal Chemistry, 6 credit hours
- PHA 3107 Pharmaceutical Calculations (use of pre-recorded lectures and in-class hands-on exercises), 3 credit hours (course coordinator)
- PHA 3113 Pathophysiology I (topics include geriatrics, inflammation, cancer, HIV, immune response), 4 credit hours (course coordinator)
- PHA 3114 Pathophysiology II (topics include autonomic nervous system, wound healing, gout, RA), 4 credit hours
- PHA 3109 Microbiology and Immunology (lectures in immunology, virology), 5 credit hours

*Curriculum Vitae for Michaela M. Almgren, PharmD, MS*                     *Page 7*

**Exhibit Q**

**Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward**
USDC IN/ND case 3.25-cv-00758-CCB    document 1-11    filed 09/18/25    page 64 of 88

- PHA 5335 Animal Venoms and Poisons (developed and implemented this elective), 3 credit hours (course coordinator)
- PHA 5332 Applied Pharmaceutical Care II (topics including, OA, RA, BPH, ED), 4 credit hours
- PHA 4265 Integrated Sequence III Inflammation (Pharmacology and Pharmacotherapy of osteoarthritis, rheumatoid arthritis, gout, would healing, lupus), 6 credit hours
- PHA 3162 Integrated Sequence I: Introductory Pharmacology and Medicinal Chemistry, 5 credit hours
- PHA 4212 Pharmacokinetics I (Implemented team-based learning), 4 credit hours
- PHA 4228 Pharmacokinetics II (Implemented team-based learning), 4 credit hours
- PHA 3135 Integrated Pharmacy Skills Lab I, 3 credit hours
- PHA 3136 Integrated Pharmacy Skills Lab II, 3 credit hours
- PHA 3137 Integrated Pharmacy Skills Lab III, 3 credit hours
- PHA 4238 Integrated Pharmacy Skills Lab IV, 3 credit hours
- Longitudinal Pharmacy Practice Experiences I – V: PHA 3135, 3163, 4266, 4369, 5330, 1 credit hour, course coordinator

**Adjunct Faculty, UFL Graduate Distance Programs**
**University of Florida, School of Pharmacy, January 2012—April 2016**
- Medicinal Chemistry I
- Fundamentals of Medicinal Chemistry, course coordinator
- Herbal and Dietary Supplements

**EXPERIENTIALTEACHING EXPERIENCE**
**Advanced Pharmacy Practice Experience (APPE) Elective INDUSTRY—University of South Carolina College of Pharmacy,** Preceptor for PharmD students.

**Advanced Pharmacy Practice Experience (APPE) Academic Rotation—South Carolina College of Pharmacy,** Preceptor for PharmD students.

**Advanced Pharmacy Practice Experience (APPE) Academic Rotation—South University School of Pharmacy,** Preceptor for PharmD students.

## COLLEGE OF PHARMACY COMITTEES
- South University SOP Curriculum Committee, member, chair 2013
- South University SOP Curriculum Subcommittee for Pharmaceutical Calculations course advisory member, 2010-2012
- South University SOP Committee for Professional Outreach, member 2011-2013

- South University SOP Technology Committee, member 2010-2013
- South University SOP ACPE Self-Study and Assessment Committee, member 2012-2013
- South University SOP Admissions Committee, member 2012-2013
- University of South Carolina COP Continuing Education Committee, member 2013-2016
- University of South Carolina COP Search Committee for Lab assistant, chair, 2014-2016
- University of South Carolina COP Curriculum Committee, member 2017-2019
- University of South Carolina COP Admissions Committee, member 2019-present

## AWARDS

2018: SC College of Pharmacy CPOS Department Service Award
2020: SC College of Pharmacy CPOS Department Service Award
2022: University of South Carolina Clinical Teaching Award
2023: USC College of Pharmacy Innovation and Entrepreneurship Award

## INVITED LECTURES AND PRESENTATIONS

M. Almgren. What will your path be? CAPPS USC student chapter speaker, April 11th, 2023.

Almgren M. Mitigation Strategies of COVID-19 in the Workplace. Palmetto Business Forum. Presented Webinar September 13, 2021.

Almgren M. CDB: Exploring Regulations, Trends and a Potential role in Opioid Epidemic. Annual Continuing Education Conference. Presented live April 21st, 2021.

Emelia Beam PharmD, Michaela Almgren, PharmD, MS. Update on COVID19 Vaccines. Nephron Pharmaceuticals, May 3, 2021.

Almgren, M., COVID-19 Prevention Myth vs. Fact: Assessment of Complementary Therapies as Preventative Measures for Safety and Efficacy. SCSHP Fall 2020 Meeting, Columbia, SC, October 2020.

2020 Immunization Update. 1.0 ACPE accredited CE presentation at Nephron Pharmaceuticals, October 2020.

COVID 19 Prevention: Myth versus Fact. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia, SC June 8th, 2020.

Update on COVID19 Vaccines. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia SC, May 3rd, 2021.

*Curriculum Vitae for Michaela M. Almgren, PharmD, MS*                    *Page 9*

**Exhibit Q**

M. Almgren. My Path to Pharmacy. CAPPS USC student chapter speaker, February 4th, 2021.

USP Updates in Sterile Compounding. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia, SC, April 13th and 15th, 2020.

Multimodal Analgesia Basics. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia SC, April 1st and April 3rd, 2020.

COVID19—Separating Facts from Fiction. SC Palmetto Business Forum Quarterly Meeting in Columbia SC, March 9th, 2020.

New Approaches to Pain Management: Multimodal Opioid Free Analgesia. 1.0 credit hour ACPE accredited presentation at UofSC COP CE Conference, February 1st, 2020.

Medication Safety of Hazardous Drugs: Can We All Be Safe? 1.0 credit hour ACPE accredited CE presentation at SCSHP Fall Meeting in Columbia SC, October 17th 2018.

Review of Sterile Compounding per USP 797. 1.0 credit hour ACPE accredited CE presentation at SCSHP Fall Meeting in Columbia SC, October 17th 2018.

M. Almgren. Current Status and Future Trends in Sterile Compounding as Defined by USP Chapters 797 and 800. 1.0 ACPE Live CE accreditation awarded. SCSHP Annual Meeting March 11-13, 2018, Hilton Head Island, SC.

M. Almgren. Who wants to be a pharmacist? CAPPS USC student chapter speaker, April 11th, 2018.

M. Almgren. Importance of unification of performance protocols for CSTD testing per NIOSH. November 7, 2016, Cincinnati, OH.  NIOSH Public Comment meeting, invited speaker.

M. Almgren. Important role of CSTD utilization in compounding of hazardous materials to enhance protection of the compounder. 2016 ASHP Midyear, Las Vegas. Hazardous Drug Task Force speaker for USP 800 implementation.

M. Almgren. Sterile Compounding and Implementation of USP Chapter 797: Where we came from, where we are and where we might be headed. 1.0 ACPE Live CE accreditation awarded.  SCSHP Annual Meeting, March 2015, Hilton Head Island, SC.

M. Almgren. Pharmacy school pathways.  CAPPS USC student chapter speaker, April 2015.

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3.25-cv-00798-CCB   document 1-11   filed 09/18/25   page 67 of 88

## PEER-REVIEWED PUBLICATIONS

**Almgren M., PharmD, MS;** Baker J., PharmD; Sease J., PharmD, FCCP, BCPS, CDCES, BCACP. Strategic Partnership with a Pharmaceutical Manufacturer to Develop Innovative Non-Traditional Training Throughout the PharmD Curriculum. June 2022 Annual AACP meeting. American Journal of Pharmaceutical Education: Volume 86, Issue 5, Article 9171. https://doi.org/10.5688/ajpe9171.

**Almgren M**., Cooper C., Maxwell W., Baker J. Instruction on compounded sterile preparations at U.S. schools of pharmacy—a ten year follow up study. American Journal of Health-System Pharmacy, Volume 75, Issue 12, 15 June 2018 Pages 845-847, https://doi.org/10.2146/ajhp170641

**Textbook chapter**: Khazan M., Phillips C., **Almgren M**. "Pharmaceutical Calculations" In: Sutton S. Scott. McGraw Hill's NAPLEX Review Guide. 3rd Edition, McGraw Hill 2018

**Textbook chapter: Almgren M**. "Sterile Compounding Regulations" In: Sutton S. Scott. *McGraw Hill's NAPLEX Review Guide*. 3rd Edition.

**Almgren M.** "USP Chapter 800—Hazardous Drug Handling in Healthcare Settings" In: Sutton S. Scott. McGraw Hill's NAPLEX Review Guide.4th Edition. 2020.

Karyn I. Cotta, Samit Shah, PhD, RPh, MBA, **Michaela M. Almgren**, PharmD, MS, Lilia Z. Macías-Moriarity, PhD, MPH, Vicky Mody. Effectiveness of flipped classroom instructional model in teaching pharmaceutical calculations. *Currents in Pharmacy Teaching and Learning*. 2016. Volume 8, Issue 5, Pages 646–653. https://doi.org/10.1016/j.cptl.2016.06.011

Braga S, **Almgren M**. Complementary Therapies in Cystic Fibrosis:  nutritional supplements and herbal products.  *Journal of Pharmacy Practice*. 2013 Feb;26(1):14-7.

Wynn W, **Almgren M**, Stroman R, Clark K.  Pharmacist's Toolbox for Smoking Cessation.  *Journal of Pharmacy Practice.* 2012 Dec;25(6):591-9.

## POSTERS WITH ABSTRACTS

Jennifer McCrary; Payton R. Jackson; Julia Geith;  **Michaela Almgren PharmD, MS**. Remediation Strategies for Most Frequent Food and Drug Administration (FDA) Form 483 Observations in 503B Outsourcing Facilities. ASHP Midyear, New Orleans December 2024.

Pranay Singla; Olivia Lefever; Noah Raganschmalz; Payton Jackson; **Michaela Almgren, PharmD, MS**. Impact of State-Specific Regulatory Stringency on FDA

**Exhibit Q**

Regulatory Compliance of 503B Outsourcing Facilities. ASHP Midyear, New Orleans December 2024.

Noah Raganschmalz;  Olivia Lefever; Pranay Singla; **Michaela Almgren, PharmD, MS**. Regulatory Evaluation of the State-by-State Landscape for 503B Licensing Requirements and Their Impact on Manufacturers. ASHP Midyear, New Orleans December 2024.

Payton R. Jackson; Jennifer McCrary; Julia Geith**;  Michaela Almgren PharmD, MS**. Addressing Common Non-Compliance Issues Among 503B Outsourcing Facilities: A Systematic Review and Analysis of Food and Drug Administration (FDA) Published Form 483 Citations. ASHP Midyear, New Orleans December 2024.

Jessica Chen, PharmD Candidate; Julia Geith, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Evaluating Risk Factors: Unveiling Clinical Risks in Potentially Contaminated Compounded Medications December 2023 ASHP Midyear Clinical Meeting, Anaheim, CA.

Julia Geith, PharmD Candidate; Joyce Ji, PharmD Candidate; Regan Dennis, PharmD Candidate; Nikki Chen, PharmD Candidate; Moji Awe, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Assessment of Prevalence of the United States Pharmacopeia Chapter 797 Guidance in the State Oversight of Patient-Specific Sterile Drug Compounding Across the United States. December 2022 ASHP Midyear Clinical Meeting, Las Vegas NV.

Jessica Chen, PharmD Candidate; Ryan Gourdine, PharmD Candidate; Julia Geith, PharmD Candidate; Amber Burroughs, PharmD Candidate; Bria Diorio, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Assessment of Advantages of Ropivacaine Wound Infiltration Used for Analgesia in Orthopedic Surgeries Compared to Standard of Care Pain Management. December 2022 ASHP Midyear Clinical Meeting, Las Vegas NV.

Dalan J. Solomon, PharmD. Candidate; Jordan Franklin, PharmD. Candidate; Alex Corley, PharmD. Candidate; **Michaela Almgren, PharmD, MS**. Utilization of Ultraviolet (UV) C Light as a Supplement to Standard Cleanroom Sterilization Procedures in Effort to Decrease Microbial Burden. December 2022 ASHP Midyear Clinical Meeting, Las Vegas NV.

Rachel Lehn, BS, PharmD Candidate; Kayla Hutto, BS, PharmD Candidate; Nikki Chen, PharmD Candidate; Lauren Caines, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Comparison of Impact of Facial Coverings Mandate as Mitigation Strategy on Positivity Rates of COVID-19 in a Workplace versus Community Rates Prior to Vaccine Availability. December 2021 ASHP Midyear Virtual Clinical Meeting.

Kara Taylor, PharmD Candidate; Lauren Caines, PharmD Candidate; Cole Colemander, PharmD Candidate; Zach Altenberg, PharmD Candidate; **Michela Almgren, PharmD,**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3.25-cv-00798-CCB   document 1-11   filed 09/18/25   page 69 of 88

**MS**. Safety Evaluation of a New Container Closure System Design of a Blow Fill Seal Type of IV Bottles. December 2021 ASHP Midyear Virtual Clinical Meeting.

Lauren Caines, PharmD Candidate; Kara Taylor, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Impact of Implementation of Mandatory Facial Coverings as Mitigation Strategy on Rates of Positive Cases of COVID19 in a Workplace Prior to Vaccine Availability. December 2021 ASHP Midyear Virtual Clinical Meeting.

Petscavage Katie, PharmD Candidate; **Almgren Michaela, PharmD, MS**.  Assessment of complementary therapies as preventive measures for COVID-19 for safety and efficacy. December 2020 ASHP Midyear Virtual Clinical Meeting. Poster #SP-243.

Aya Ahmed PharmD Candidate; **Michaela Almgren PharmD, MS**; Ryan McCormick PharmD Candidate; Carolyn McNamara PharmD Candidate; Robert Singleton PhD. Establishing a Coronavirus (COVID-19) Testing Lab in 40 Days. December 2020 ASHP Midyear Virtual Clinical Meeting.

Ryan McCormick PharmD Candidate; **Michaela Almgren, PharmD, MS**; Sarah Arnold PharmD Candidate, Madeline Dean PharmD Candidate, Marianna Vinson, PharmD Candidate. Process improvements and validation of a syringe-filling robot though collaboration between pharmacy and engineering student teams. December 2020 ASHP Midyear Virtual Clinical Meeting.

Alexis Caronis, PharmD Candidate 2021; **Michaela Almgren, PharmD, MS**; Samantha Lindeman, PharmD Candidate 2021; Kristen Kilby, PharmD Candidate 2021. Evaluation of medication safety effectiveness training in a workplace environment. 2020 APHA Annual Meeting, Baltimore MD, March 2020.

Caroline Hansen PharmD Candidate; **Michaela Almgren PharmD, MS**; Kristen Kilby PharmD Candidate; Alexis Caronis PharmD Candidate; Ryan McCormick PharmD Candidate; Benjamin Tabor PharmD Candidate. College of Pharmacy and School of Engineering Student Teams' collaboration to design pharmacy compounding system using robotic arm to perform aseptic syringe filling. 2020 SCSHP Annual Meeting, Charleston SC, March 2020.

Alexis Caronis, PharmD Candidate 2021; **Michaela Almgren, PharmD, MS**; Kristen Kilby, PharmD Candidate 2021; Caroline Hansen, PharmD Candidate 2021; Benjamin Tabor, PharmD Candidate 2021; Ryan McCormick, PharmD Candidate 2022. Development of the Masterflex L/S peristaltic pump process validation in a 503B outsourcing pharmacy. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-445.

Ashton Holley, PharmD Candidate**; Michaela Almgren, PharmD, M.S**.; Normando Sandoval, PharmD Candidate; Priya Patel, PharmD Candidate; Xiaoxia Wang, PharmD Candidate; Lauren  Moran, PharmD Candidate. Evaluation of cleaning effectiveness of

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3.25-cv-00798-CCB — document 1-11   filed 09/18/25   page 70 of 88

7.8% ionized hydrogen peroxide mist versus 7.8% hydrogen peroxide mist in a cleanroom environment. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-449.

Caroline Hansen PharmD Candidate; **Michaela Almgren PharmD, MS**; Kristen Kilby PharmD Candidate; Alexis Caronis PharmD Candidate; Ryan McCormick PharmD Candidate; Benjamin Tabor PharmD Candidate. College of Pharmacy and School of Engineering Student Teams' collaboration to design pharmacy compounding system using robotic arm to perform aseptic syringe filling. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-432.

Kristen Kilby PharmD Candidate**; Michaela Almgren PharmD, MS**; Alexis Caronis PharmD Candidate; Caroline Hansen PharmD Candidate; Ryan McCormick PharmD Candidate, Benjamin Tabor PharmD Candidate, Noah Smith MBA, PharmD Candidate**.** Performance comparison of the Baxter repeater pump and the Masterflex peristaltic pump using high flow tubing set L/S 24. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-446.

Samantha Lindeman, PharmD Candidate 2021; **Michaela Almgren, PharmD, MS**; Alexis Caronis, PharmD Candidate 2021; Kristen Kilby, PharmD Candidate 2021; Noah Smith, Pharm D Candidate 2020; Caroline Hansen, PharmD Candidate 2021; Ashton Holley, PharmD Candidate 2021; Priya Patel, PharmD Candidate 2021. Evaluation of naloxone safety effectiveness training in a workplace environment. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-440.

Tristan Gore, PharmD Candidate 2022. Noah Smith, PharmD Candidate 2020. Dana Nelson, PharmD Candidate 2020. **Michaela Almgren, PharmD, MS**. Incidence and clinical impact of particulate matter in injectable drug products. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-422.

**Almgren M**, Maxwell W, Grant A, Hembree H, Shah A. Disability and Accommodations in Pharmacy Practice and Education. 2019 AACP Annual Meeting, Chicago 2019. Abstract #53.

Cooper C., **Almgren M.**, Maxwell W., Baker J. Instruction on compounded sterile preparations at US pharmacy schools. 2018 SCSHP Annual Meeting poster session, Hilton Head Island, SC.

Cooper C., **Almgren M**. Maxwell W., Baker J. Instruction on compounded sterile preparations at US pharmacy schools. Poster presentation at 2017 ASHP Midyear in Orlando, FL, poster # 368.

Parth Parikh, PharmD. Candidate; Paul Philavong, PharmD Candidate, Sam McCallum, PharmD Candidate, Nhung Nguyen, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Assessing Microbial Growth Rates of Sterile Versus Non-Sterile Gloves Used

During Sterile Compounding. 2017 SCSHP Annual Meeting Hilton Head, SC, poster session.

Cotta K, **Almgren M**. "Effectiveness of Blended Teaching Method for Pharmaceutical Calculations." Poster presentation at 2012 AACP Annual meeting in Kissimmee FL.

**Almgren M**., Clark K. "Laboratory Exercise to Enhance Integration and Application of Basic Sciences to Pharmacy Practice in Students." Poster presentation at 2012 AACP Annual meeting in Kissimmee FL**.**

## Peer Review/Editorial Boards/Editorships for Journals
Reviewer for AJPE
Reviewed: Prerequisite Courses: Barriers to Pharmacy Admission or the Keys to Student Success?

Reviewer for Currents in Pharmacy Teaching and Learning.
Reviewed: Book review of the Handbook on Injectable Drugs

Reviewer for AJHP
Reviewed: Commentary: Impact of revised USP 797 guidance and how we might mitigate risk: A real-world example

Reviewer for AJHP
Reviewed: Third Consensus Development Conference on the Safety of Intravenous Drug Delivery Systems – 2018

Peer Reviewer for The Joint Commission Journal on Quality and Patient Safety
Reviewer and member of editorial board of Alternative Medicine Studies Journal
Reviewer for Journal of Dietary Supplements
Reviewer for Natural Standard Research Collaboration
Reviewer for Currents in Pharmacy Teaching and Learning
Reviewer for AACP Annual Meeting Research/Education Abstracts for Poster Session

## PROFESSIONAL AFFILIATIONS
American Pharmacist Association (APhA), 2006-2018

American Society of Consultant Pharmacists (ASCP), 2008-2013

American Society of Health-System Pharmacists (ASHP), 2008-present
- Pain management SIG 2011-2013

*Curriculum Vitae for Michaela M. Almgren, PharmD, MS*                    *Page 15*

**Exhibit Q**

SC Pharmacist Association (SCPhA), member 2006-2018
- Professional Affairs committee 2010-2011, 2017-2018
- Legislative Affairs Committee 2011-2012

SC Society of Health Systems Pharmacists member (SCSHP) 2008-present
- Education Committee 2014-2016
- Professional Affairs Committee 2015-2016
- Legislative Committee 2017-2018

American Association of College of Pharmacy (AACP), member 2010-present
- AACP Pharmacy Practice Strategic Plan, Bylaws, and Resolutions Committee member 2018-2020
- Member of the Scholarship Committee of the Curriculum SIG for AACP 2018-2020
- AACP Audit Committee member 2018-present
- House of Delegates representative for USC College of Pharmacy 2017-2018
- AACP Pharmacy Practice Strategic Plan, Bylaws, and Resolutions Committee member 2018-2019
- Lyman Award Committee Member 2012-2013

Parenteral Drug Association Member (PDA) 2019-2022

**Exhibit Q**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC INND case 3:25-cv-00798-CCB-SCB document 1-11 filed 09/18/25 page 73 of 88

STATE OF INDIANA   )        IN THE MARION CIRCUIT COURT
                    ) ss:
COUNTY OF MARION   )        CAUSE NO.: 49C01-1501-PL-003142

A. KATHERINE TOOMEY    )
                       )
     Plaintiff,          )
                       )
     v.                )
                       )
INIDIANA DEPARTMENT OF   )
CORRECTIONS,            )
                       )
     Defendant.        )

FILED

(223) JUN 1 2 2019

Myla a. Eldridge
CLERK OF THE MARION CIRCUIT COURT

## ORDER FOR PLAINTIFF'S FEE PETITION

This matter is before the Court on Plaintiff ("Toomey") Petitions for Fees. The Defendant is the Indiana Department of Correction ("The Department"). The Court held a hearing with witness testimony on February 21, 2019. Toomey without objection was granting until March 4, 2019 to submit their supplemental fee petition. The Court took the matter under advisement starting with March 4th. Both Toomey and the Department waived the 90 days to issue a ruling. The Court, having read the parties' pleadings and having heard witness testimony now issues the following order:

## PROCEDURAL HISTORY

1. On January 30, 2015, Toomey filed suit, generally alleging that the Department refused to provide her public records containing basic information regarding the drugs it maintains to carry out executions by lethal injection. A week later, she filed an amended complaint. The Department filed its answer on July 1, 2015. On April 18, 2016, Toomey sought summary judgment. On June 6, 2016, the Department filed its cross-motion for summary judgment. The Court held a hearing on August 4, 2016, and on October 24,

1

**Exhibit R**

Corrected Reply in Support of Successive Petition for
USDC IN/ND case 3:25-cv-00798-CCB Ward document 1-11 filed 09/18/25 page 74 of 88
Post-Conviction Relief - Roy Lee Ward

2016, it entered summary judgment for Toomey and against the Department, leaving only

the question of Toomey's attorney fees as provided in the Access to Public Records Act

(APRA), Ind. Code § 5-14-3-9(i).

2. The Order required the Department to "provide to the plaintiff all public records in its

possession, including 'product packaging' that identify the manufacturers and vendors of

pharmaceuticals used in the lethal injection process within 30 days of this order." The

Court scheduled a hearing on fees for December 6, 2016.

3. On November 22, 2016, the Department filed a notice of appeal and asked the Court to

stay execution of judgment without bond. It did not seek certification of the judgment as

final under Ind. Trial Rule 54(B) or seek a discretionary interlocutory appeal under

Appellate Rule 14(B).

4. On December 1, 2016, the Court granted the stay while the appeal was pending "or the

Indiana Court of Appeals dismiss[es] the appeal for lack of a final judgment." On January

6, 2017, the Court of Appeals dismissed the appeal. On April 27, 2017, the Supreme

Court denied the Department's petition seeking transfer of the dismissal.

5. On May 4, 2017, Toomey asked this Court to schedule the hearing on attorney fees as

provided by APRA. The next day the Department objected, pointing to a newly enacted

Statute at Ind. Code § 35-38-6-1(e)-(f) ("Statute").

6. On June 16, 2017, the Department filed a motion to modify the October 2016 judgment

in light of the Statute's provisions. The parties thereafter engaged in discovery. On

February 22, 2018, Toomey filed her response, accompanied by documents she had

obtained during discovery under a confidentiality agreement.

**Exhibit R**

Corrected Reply in Support of Successive Petition for
Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB Document 1-11 filed 09/18/25 page 75 of 88

7. On May 14, the Department filed its reply. The next day the Court held a hearing on whether the documents submitted with Toomey's response should be publicly accessible.

8. On July 12, 2018, the Court issued its ruling that the unredacted documents should remain under seal. On September 20, 2018, the parties appeared by counsel for a hearing on the Department's motion to modify the summary judgment Order.

### FACTUAL BACKGROUND

9. On May 29, 2014, Toomey requested under APRA that the Department provide public records in its possession concerning drugs that the Department had purchased, maintained, intended, or considered for use in carrying out executions. *See* Ind. Code §§ 5-14-3-1-1 to -10 (APRA).

10. The Department refused to produce any documents. As it later did in this Court, the Department first claimed that product packaging is not a public record under APRA. Second, it asserted that Ind. Code § 35-38-6-6 exempted documents that would identify persons who assisted in an execution. Third, it argued that 210 Ind. Admin. Code 1-6-2(3)(C) exempted documents because the information might result in physical harm to another person. Fourth, it contended that Ind. Code § 5-14-3-4(b)(8) exempted certain records because they would jeopardize a security system.

11. On July 18, 2014, Toomey filed a formal complaint with the Office of the Public Access Counselor challenging the Department's refusal to provide any documents. After receiving a copy of the complaint, the Department produced some responsive documents. The produced documents responded to Ms. Toomey's request 8 above.

3

**Exhibit R**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC INND case 3:25-cv-00798-CCB-SCB   document 1-11   filed 09/18/25   page 76 of 88

12. On August 19, 2014, the Public Access Counselor rejected every one of the Department's
    grounds for withholding information, concluding the Department had violated APRA. On
    August 27, Toomey wrote the Department, asking the Department to produce the rest of
    the documents and pointing out that the produced correspondence was incomplete,
    including cut-off e-mails and missing attachments. The Department never responded.

13. In October 2015, the Department produced a second limited set of documents. This set
    included documents the Department characterized as "purchase orders" and invoices for
    execution drugs and a facility directive for the carrying out of death sentences.

14. After the 30(B)(6) deposition, the Department produced a fourth set of documents. This
    set included two logs, one for items held for executions and one for items held for
    training. Counsel's cover letter stated, "I believe the Department of Correction has
    produced all documents that are responsive to Ms. Toomey's request, either in redacted
    form or with the exception of the product packaging." The Department continues to
    withhold, at a minimum, records identifying the manufacturers and vendors of the drugs
    it uses in executions and the labels on the vials containing those drugs.

15. In April 2016 Ms. Toomey sought summary judgment. On June 23, 2016, the
    Department's Director of Legislative Services sent an e-mail to the Governor's Policy
    Director for Public Safety attaching a document titled "2017 Legislative Ideas." Among
    the ideas presented to the Governor was a proposed bill that would become the Statute.

16. On October 24, 2016, the Court issued an order granting Toomey's Motion for Summary
    Judgment and denying the Department's Cross-Motion for Summary Judgment. The
    Court concluded, among other things, that the Department was required to provide

4

**Exhibit R**

**Corrected Reply in Support of Successive Petition**
**for Post-Conviction Relief — Roy Lee Ward**
USDC INND case 3:25-cv-00798-CCB-LEE document 1-11    filed 09/18/25    page 77 of 88

Toomey with documents identifying the manufacturers and vendors of the drugs that the Department uses in executions.

17. On April 18, 2017, the Department's deputy commissioner e-mailed the Governor's legislative chief, saying, "[Name redacted] – I spoke with [name of Department's legislative services director redacted] about this. I believe these [sic] version is substantially similar to the earlier draft, and should be helpful in resolving the Toomey case, and serve the other purposes. I have no recommendations [sic] to make to it."

18. The language sent to the Governor's office found its way into a bill in the early hours of April 21, the last day of the 2017 session. The conference committee, without public hearing or notice, added the language in the final version of House Bill 1001, now Public Law 217-2017. That bill was the biennial budget. It was titled "An Act to amend the Indiana Code concerning state offices and administration and to make an appropriation."

19. On April 21, 2017, at approximately 2:00 a.m., an amendment was posted to House Bill 1001, which added Section 161 to the bill.

20. Section 158 of the Budget Bill added two subsections to the chapter on execution of death sentence in the Indiana Code:

> (e) The department of correction may make and enter into a contract with an outsourcing facility, a wholesale drug distributor (as defined in IC 25-26-14-12), a pharmacy (as defined in IC 25-26-13-2), or a pharmacist (as defined in IC 25-26-13-2) for the issuance or compounding of a lethal substance necessary to carry out an execution by lethal injection. A lethal substance provided to the department of correction

5

under this subsection may be used only for the purpose of carrying out an execution by lethal injection …

A pharmacist, a pharmacy, a wholesale drug distributor, or an outsourcing facility that provides a lethal substance to the department of correction under this subsection shall label the lethal substance with the name of the lethal substance, its dosage, a projected expiration date, and a statement that the lethal substance shall be used only by the department of correction for the purpose of carrying out an execution by lethal injection.

(f) The following are confidential, are not subject to discovery, and may not be introduced as evidence in any civil or criminal proceeding:

(1) The identity of a person described in subsection (e) that enters into a contract with the department of correction under subsection (e) for the issuance or compounding of lethal substances necessary to carry out an execution by lethal injection.

(2) The identity of an officer, an employee, or a contractor of a person described in subdivision (1).

(3) The identity of a person contracted by a person described in subdivision (1) to obtain equipment or a substance to

6

**Exhibit R**

**Corrected Reply in Support of Successive Petition**
**for Post-Conviction Relief - Roy Lee Ward**
USDC IN/ND case 3:25-cv-00798-CCB  document 1-11   filed 09/18/25   page 79 of 88

facilitate the compounding of a lethal substance described in
subsection (e) …

This subsection applies retroactively to any request for information,
discovery request, or proceeding, no matter when made or initiated.
Ind. Code § 35-38-6-1(e)-(f). These subsections constitute the
Statute.

21. The Department filed its Motion to Modify the Summary Judgment Order
on June 16, 2017, arguing that Indiana Code section 35-38-6-1, as amended
and retroactively applied, designates as confidential the information sought
by Toomey in the Complaint. The Department further argued that because
the law had been changed since the Court issued its summary judgment in
a manner that affects the substance of the order, that order should be
modified to comply with the current law concerning the confidentiality of
execution drug suppliers and manufacturers.

22. On February 22, 2018, Toomey filed her Response Opposing the
Department's Motion to Modify the Judgment, in which she (1) raised four
constitutional challenges to the Statute, (2) argued that the items sought in
the Complaint were not covered by the Statute, and (3) argued that
modification of the summary judgment order was not proper under the
Indiana Trial Rules.

23. The Department filed a Reply Brief in support of its Motion to Modify on
May 14, 2018, addressing each of the challenges raised in Toomey's

**Exhibit R**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC INND case 3:25-cv-00798-CCB    document 1-11    filed 09/18/25    page 80 of 88

response. The Court heard oral argument from both parties on September 20, 2018.

24. On November 29, 2018, the Court denied the Department's Motion to Modify this Court's October 24, 2016 Summary Judgment Order.

25. After an agreed Continuance, the Court heard evidence and testimony on Toomey's Fee Petition Pursuant to I.C. 5-14-3-9 on February 21, 2019.

## DISCUSSION

26. The Court carefully examined Toomey's witnesses' testimony to judge their credibility and finds those witnesses testimony at the February 21, 2019 hearing credible. The Court notes the Department did not call any witnesses to testify at the February 21, 2019 hearing on Toomey's Fee Petition.

27. In addition, the Court has carefully reviewed all filings regarding Toomey's Fee Petition including the Department's Response as well as Toomey's Supplemental Fee Petition filed March 4, 2019 that was without objection.

28. Toomey submitted her initial fee petition on November 23, 2016, requesting an award of attorney fees incurred as of that date. The two subsequent fee petitions were following the Court's denial of the Department's Motion to Modify this Court's Summary Judgment Order dated November 29, 2018.

29. The Court has carefully considered I.C. 5-14-3-9(i), "in any action filed under this section, a court shall award reasonable attorney's fees, court costs, and other reasonable expenses of litigation to the prevailing party if: (1) the plaintiff substantially prevails; or (2) the defendant substantially

**Exhibit R**

prevails and the court finds the action was frivolous or vexatious". The Court has researched related Indiana Case Law.

30. In fact, I.C. 5-14-3-9(i), "[t]he APRA mandates an award of attorney fees to a plaintiff who 'substantially prevails' if that party has first sought an advisory opinion from the public access counselor." *Shephard Props. Co. v. Int'l Union of Painters & Allied Trades,* 972 N.E. 2d 845, 852 (Ind. 2012) (emphasis added); *see also Indianapolis Newspapers v. Ind. State Lottery Commission,* 739 N.E.2d 144, 156 (Ind. Ct. App. 2000) (finding and award of attorney fees is mandatory when the requirements of the statute or met).

31. In this case Toomey did first seek an advisory opinion from the Indiana Public Access Counselor and prevailed. Toomey prevailed on the Court's Summary Judgment Order dated October 24, 2016 as well as the Court's Order Denying the Department's Motion to Modify Summary Judgment dated November 29, 2018.

32. The Department argues that Toomey did not prevail and had an unsuccessful attempt in 2018 to force the public disclosure of e-mails and legislative materials.

33. If the Department had not gone to the General Assembly without knowledge to Toomey or the Court to get a retroactive statute to essentially vacate this Court's Order for Summary Judgment dated October 24, 2016 in favor of Toomey and file an improper appeal to the Indiana Court of Appeals and the Indiana Supreme Court to prolong the Attorney Fee hearing, then Toomey

**Exhibit R**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB    document 1-11    filed 09/18/25    page 82 of 88

would not have needed to file its pleading to force the public disclosure of
e-mails and legislative materials.

34. The Court finds the Department's argument fails. As such, the Court finds
that Toomey substantially prevailed for the Court to award reasonable
attorney fees, court costs, and other reasonable expenses of litigation.

35. The Court now moves to Rule 1.5(A) of the Indiana Rules of Professional
Conduct and relevant Indiana Case Law. The Court has carefully reviewed
all elements of this rule and the testimony of Toomey's witnesses as well as
all of Toomey's exhibits. The Department failed to present any witness
testimony or exhibits on their behalf at the evidentiary hearing. The
Department only cross examined Toomey's witnesses and gave opening and
closing arguments.

36. The Court notes at the evidentiary hearing that the Department stated it
credits Toomey's attorneys on their billing statements, and the Court
concurs. Furthermore, at the evidentiary hearing the Department did not
state specific issues or objections to Toomey's billings accuracy.

37. The Department at the February 21, 2019 witness testimony hearing did
object to the pre-judgment interest Toomey requested and the travel
expenses, hourly rates of both firms representing Toomey.

38. The Department argued in closing a fair fee for Toomey was in the range of
$325, 000 to $375,000.

39. Toomey, the Plaintiff, is a partner at the Washington D.C. law firm Lewis
Baach Kaufmann Middlemiss PLLC ("Lewis Baach"). Toomey was

10

**Corrected Reply in Support of Successive Petition**
**for Post-Conviction Relief - Roy Lee Ward**
USDC IN/ND case 3.25-cv-00798-CCB-LEE document 1-11 filed 09/18/25 page 83 of 88

represented by Lewis Baach and the Indianapolis law firm of Plews Shadley Racher & Braun LLP ("Plews Shadley").

40. Toomey is an attorney and chose to use her law firm she is a partner at in Washington D.C. for the APRA request. This is different than a non-attorney choosing to retain expensive counsel outside of the state of Indiana. Not to mention a simple APRA request turned into major litigation given the Department's handling of this case.

41. The Department's argument regarding the Lewis Baach's unnecessarily expensive rates fails.

42. Plews Shadley was hired in 2014 as local counsel and reviewed everything. Plews Shadley did not do the depositions or do oral argument for the initial Summary Judgment. After the Departments Motion to Modify the Summary Judgment Plews Shadley became the lead counsel.

43. Lewis Baach attorney Jeff Robinson assisted Toomey all of her APRA requests. He was experienced with lethal injections. It was not unreasonable for Toomey to retain him. He as was the attorney in Toomey's firm that drafted the Complaint in the Marion Circuit Court and conducted the oral argument for the Department's Motion for Summary Judgment which Toomey prevailed.

44. Attorney Robinson helped to prepare the initial fee request for Toomey's request for attorney fees that the Court set for a hearing in the Order Denying the Department's Motion for Summary Judgment.

**Exhibit R**

**Corrected Reply in Support of Successive Petition for**
**Post-Conviction Relief - Roy Lee Ward**
USDC IN/ND case 3:25-cv-00798-CCB    document 1-11    filed 09/18/25    page 84 of 88

45. Attorney Robinson took a back seat and was not active once the Department filed the appeal and matters thereafter. He was not experienced in appellate law or constitutional arguments.

46. The Court notes that it required Attorney Robinson to attend the evidentiary hearing on Toomey's Fee Petition in Indianapolis. The Court has broad discretion in awarding attorney fees. The Court wanted to make sure the Court could properly judge his credibility in person instead of a telephonic appearance given the amount of Attorney fees being requested along with his hourly rate as a Washington D.C. attorney on this case.

47. Toomey was an attorney and partner in Washington D.C. at the firm of Lewis Baach when she did the initial APRA request to the Department regarding the lethal injections in Indiana.

48. The Department argues that the hourly rates of the Lewis Baach firm are not at the local rate of Indianapolis and suggests their rates are inflated. The Department further argues this Court should follow the "Ken Faulk" of the ACLU rate of the Indiana Southern District, Federal Court.

49. Ken Faulk is an attorney for the ACLU a non-for-profit organization. Toomey is an attorney for a private law firm in Washington D.C. from the start of her initial APRA request. There is no "Ken Faulk" rule in the Indiana state case law.

50. The Department also argues that the travel expenses of Lewis Baach should not be granted by the Court.

**Exhibit R**

Corrected Reply in Support of Successive Petition
for Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3.25-cv-00798-CCB   document 1-11   filed 09/18/25   page 85 of 88

51. The Department only gave oral argument and did not have any witnesses for testimony regarding its argument objecting to the hourly rates and travel expenses. Toomey on the other hand did present testimony for the hourly rates of both firms representing Toomey and the travel expenses.

52. Toomey retaining her firm with the Washington D.C. hourly rates and the travel expenses are reasonable given the history of this case and the relationship Toomey had with her firm at the start of this APRA request.

53. Toomey presented witness testimony of the reasonableness of Plews Shadley's hourly rates as reasonable, and the Court found the testimony credible.

54. The Department objects to Toomey's request of pre-judgment interest. The Court is not persuaded by the Department's sovereign immunity argument. The Court agrees with Toomey that sovereign immunity does not apply to an APRA request.

55. However, the Court has carefully considered Toomey's request for pre-judgment interest and the related case law Toomey presented.

56. This case is regarding an APRA case that went in a very complicated direction the Department created given the procedural history.

57. Toomey filed a Petition for Fees pursuant to I.C.5-14-3-9. Toomey argues that pre-judgment interest is a request for additional damages or expenses. The cases Toomey has cited to the Court are not applicable for an APRA request under I.C. 5-14-3-9.

**Exhibit R**

Corrected Reply in Support of Successive Petition for
Post-Conviction Relief - Roy Lee Ward
USDC IN/ND case 3:25-cv-00798-CCB   document 1-11   filed 09/18/25   page 86 of 88

58. The cases Toomey has presented to the Court are regarding damages and not attorney fees with a pre-judgment interest award on attorney fees. The APRA requests have a specific statute giving the Court how to handle attorney fees, court costs and other reasonable expenses of litigation.

59. I.C. 5-14-3-9 does specifically states an award of attorney fees, but it does not specifically state if attorney fees are awarded then pre-judgment interest can be awarded.

60. The Court does not find that pre-judgment interest under the APRA statute is an "other reasonable expenses of litigation to the prevailing party". The Court considers other reasonable expenses of litigation like travel expenses.

61. Toomey's argument for pre-judgment interest on their attorney fees fails.

62. The Court, after carefully considering the APRA request statute and the related case law, finds Toomey's request for pre-judgment interest in this APRA request is not reasonable for additional damages or other reasonable expenses of litigation. Pre-Judgment interest is not reasonable for the Court to grant in this APRA case.

### JUDGMENT

63. Toomey has met the burden for an award of attorney fees. Toomey's attorney fees and costs are reasonable given the procedural history of this APRA request for the lethal injection information.

64. The Department in its actions going to the General Assembly to successfully obtain a retroactive statute without advising the Court and Toomey after the Court issued its Summary Judgment Order October 24,

14

**Exhibit R**

**Corrected Reply in Support of Successive Petition for**
**Post-Conviction Relief - Roy Lee Ward**
USDC IN/ND case 3:25-cv-00798-CCB   document 1-11   filed 09/18/25   page 87 of 88

2016 in favor of Toomey, and filing an improper appeal to the Indiana Court
of Appeals, Indiana Supreme Court which essentially vacated the October
24, 2016 Summary Judgment Order was egregious.

65. The Court has researched, reviewed all filings and spent much time
deliberating the law and evidence presented in using its broad discretion in
awarding attorney fees.

66. The Court orders the Department is ordered to pay Toomey's attorney fees
and costs in the amount of $538,343.72.

67. Toomey's request for pre-judgment interest on the attorney fees in the
amount of $56,617.32 is denied.

So Ordered on June 12, 2019.

_Sheryl Lynch_

Sheryl Lynch, Judge Marion Circuit Court

**Exhibit R**

4540342

**CERTIFICATE OF DEATH**

| Local No 000569 | EDR No 000011892620 | State No 2025-031635 |
|---|---|---|

| 1. Decedent's Legal Name (First, Middle, Last) | 1a. Maiden Name (If female) | 2. Gender | 3. Time Of Death | 4. Date of Death (Month/Day/Year) |
|---|---|---|---|---|
| Benjamin Ritchie | | Male | 12:46 AM | 05/20/2025 |

| 5. Social Security Number | 6a. Age - Yrs | 6b. Under 1 Year | 6c. Under 1 Month | 6d. Under 1 Day | 6e. Under 1 Hour | 7. Date of Birth (Month/Day/Year) | 8. Birthplace (City and State or Foreign Country) |
|---|---|---|---|---|---|---|---|
| | 45 | Months | Days | Hours | Minutes | | Indianapolis, Indiana |

| 9. Ever in U.S. Armed Forces? | 10. If Death Occurred In A Hospital: | 10a. If Death Occurred Somewhere Other Than A Hospital |
|---|---|---|
| ☐ Yes ☒ No ☐ Unknown | ☐ Inpatient ☐ Emergency Department Outpatient ☐ Dead on Arrival | ☐ Hospice Facility ☐ Decedent's Home ☐ Nursing Home/Long-term Care Facility ☒ Other (Specify) Indiana State Prison |

| 11. Facility Name (If Not Institution, Give Street and Number) 1 Park Row |
|---|

| 12. City Or Town, State, And Zip Code | 13. County Of Death | 14. Marital Status At Time Of Death |
|---|---|---|
| Michigan City, Indiana 46360 | LaPorte | ☐ Married ☐ Married, But Separated ☐ Divorced ☐ Widowed ☒ Never Married ☐ Unknown |

| 15. Surviving Spouse's Name | 15a. Last Name Before First Marriage | 16. Decedent's Usual Occupation | 17. Kind Of Business/Industry |
|---|---|---|---|
| | | Unemployed | Unemployed |

| 18. Residence - State | 18a. County | 18b. City Or Town |
|---|---|---|
| IN | LaPorte | Michigan City |

| 18c. Street And Number | 18d. Apt. No. | 18e. Zip Code | 18f. Inside City Limits? |
|---|---|---|---|
| 1 Park Row | | 46360 | ☒ Yes ☐ No |

| 19. Decedent's Education | 20. Decedent Of Hispanic Origin | 21. Decedent's Race |
|---|---|---|
| 9th-12th grade, No Diploma | Not Spanish/Hispanic/Latino | White |

| 22. Parent's Name (First, Middle, Last) | 23. Parent's Name (First, Middle, Last) | 23a. Parent's Last Name Before First Marriage |
|---|---|---|
| Oscar Ritchie | Verna Ritchie | Unknown |

| 24. Informant's Name | 24a. Relationship To Decedent | 24b. Mailing Address (Street And Number, City, State, Zip Code) |
|---|---|---|
| Ron Neal | Warden | 1 Park Row, Michigan City, IN, 46360 |

| 25a. Method Of Disposition | 25. Place Of Disposition | | |
|---|---|---|---|
| ☐ Burial ☒ Cremation ☐ Donation ☐ Entombment ☐ Removal From State ☐ Other (Specify): | 25b. Place Of Disposition (Name Of Cemetery, Crematory, Other Place) Laporte Cremation Services | 25c. Location - City, Town, And State La Porte, IN | |

| 26. Was Coroner Contacted? | 27. Name And Complete Address Of Funeral Facility | 27a. Funeral Home License Number: |
|---|---|---|
| ☒ Yes ☐ No | Ott Haverstock Funeral Chapel 418 Washington Street, Michigan City, Indiana, 46360 | FH88800023 |

| 27b. Signature Of Indiana Funeral Service Licensee: | 27c. License Number (Of Licensee): |
|---|---|
| *Patrick W Reynolds* Electronically Signed | FD09000041 |

**Cause Of Death (See Instructions And Examples)**

| 28. Part I. Enter The Chain Of Events - Diseases, Injuries, Or Complications - That Directly Caused The Death. Do Not Enter Terminal Events Such As Cardiac Arrest, Respiratory Arrest, Or Ventricular Fibrillation Without Showing The Etiology. Do Not Abbreviate. Enter Only One Cause On A Line. Add Additional Lines If Necessary. | Approximate Interval: Onset To Death |
|---|---|
| Immediate Cause (Final Disease Or Condition Resulting In Death) A. Lethal injection, pentobarbital | seconds |
| Due to (Or As A Consequence Of): | |
| Sequentially List Conditions, If Any, Leading To The Cause Listed On Line A. Enter The Underlying Cause (Disease Or Injury That Initiated The Events Resulting In Death) Last B. | |
| Due to (Or As A Consequence Of): | |
| C. | |
| Due to (Or As A Consequence Of): | |
| D. | |

| Part II. Enter Other Significant Conditions Contributing to Death But Not Resulting In The Underlying Cause Given In Part I | 29. Was An Autopsy Performed? ☒ Yes ☐ No |
|---|---|
| | 30. Were Autopsy Findings Available To Complete The Cause Of Death? ☒ Yes ☐ No |

| 31. Did Tobacco Use Contribute To Death? | 32. If Female: | 33. Manner Of Death: |
|---|---|---|
| ☐ Yes ☐ Probably ☒ No ☐ Unknown | ☐ Not Pregnant Within Past Year ☐ Pregnant At Time Of Death ☐ Not Pregnant, But Pregnant Within 42 Days Of Death ☐ Not Pregnant, But Pregnant 43 Days To 1 year Before Death ☐ Unknown If Pregnant Within The Past Year | ☐ Natural ☒ Homicide ☐ Accident ☐ Pending Investigation ☐ Suicide ☐ Could Not Be Determined |

| 34. Date Of Injury (Month/Day/Year) | 35. Time Of Injury | 36. Place Of Injury (E.G., Decedent's Home, Construction Site, Restaurant, Wooded Area) | 37. Injury At Work? |
|---|---|---|---|
| 05/20/2025 | 12:46 AM | Indiana State Prison | ☐ Yes ☒ No |

| 38. Location Of Injury - State | 38a. City Or Town | 38b. Street & Number | 38c. Apt. No. | 38d. Zip Code |
|---|---|---|---|---|
| Indiana | Michigan City | 1 Park Row | | 46360 |

| 39. Describe How Injury Occurred State order execution by lethal injection | 40. If Transportation Injury, Specify: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) |
|---|---|

| 41. Signature, Of Person Certifying Cause Of Death: | 42. Certifier (Check Only One) |
|---|---|
| *Lynn Sue Swanson* Electronically Signed | ☐ Certifying Physician ☒ Coroner ☐ Health Officer |

| 43. Name And Zip Code Of Person Certifying Cause Of Death: | 44. License Number | 45. Date Certified |
|---|---|---|
| Lynn Sue Swanson 809 State Street 304, Laporte, IN 46350 | | 06/11/2025 |

| 46. Additional Funeral Service Provider: | 47. *Akas: |
|---|---|

| 48. Signature of Local Health Officer: | 49. For Registrar Only - Date Filed (Month/Day/Year) |
|---|---|
| *Sandra Deausy* Electronically Signed | 06/12/2025 |

**AMENDMENT TO CERTIFICATE OF DEATH (ENTRY OR ORIGINAL)**

State Form 53395 ATTENTION ESTATE: The Social Security # is being requested by this state agency in order to pursue responsibility. Disclosure is voluntary and there will be no penalty for refusal.

**WARNING:** ORIGINAL DOCUMENT HAS A MULTICOLORED BACKGROUND ON SPECIAL WHITE SECURITY PAPER AND THE GREAT SEAL OF THE STATE OF INDIANA ON BACK THAT TURNS FROM ORANGE TO YELLOW WHEN RUBBED. ORIGINAL DOCUMENT HAS A HIDDEN VOID ON FRONT THAT APPEARS WHEN PHOTOCOPIED.

VOID IF ALTERED OR ERASED

STATE OF INDIANA

Exhibit S